UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

--------------------------------------------------------- X
FARA D'ANGELO,                                      :
                                                    :        Case No. 3:08-CV-1548(JCH)
                  Plaintiff,                        :
                                                    :
         v.                                         :
                                                    :
                                                    :
WORLD  WRESTLING  ENTERTAINMENT,  :
INC.,                                               :        APRIL 19, 2010
                  Defendant.                        :
                                                    :
--------------------------------------------------------- X

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendant, World Wrestling Entertainment, Inc. ("WWE"), pursuant to Fed. R. Civ.

Proc. 56, hereby respectfully submits this Memorandum of Law in Support of its Motion for

Summary Judgment dismissing the Amended Complaint of Fara D'Angelo ("Plaintiff" or

"D'Angelo") in its entirety.

## I.        PRELIMINARY STATEMENT

Plaintiff, a former Global Licensing Coordinator employed by the WWE, brings this

action alleging that she was subjected to a sexually hostile work environment by her former

supervisor, Alex Romer, and that based on this conduct, she was constructively discharged from

employment in violation of Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C.

§§2000e et seq. ("Title VII").   As set forth in detail herein, even assuming D'Angelo's

harassment allegations against Romer are viewed in a light most favorable to her, the conduct

complained of was not sufficiently severe nor pervasive in nature to give rise to an actionable

hostile environment sexual harassment claim.   Alternatively, even if the subject conduct is

-1-

viewed as actionable, the claim should still be dismissed as a matter of law because there was no tangible employment action, WWE took prompt and corrective action to prevent further harassment, and D'Angelo unreasonably failed to take advantage of these corrective measures.

Likewise, D'Angelo cannot establish that she was constructively discharged as her departure from the WWE was of her own volition.  D'Angelo resigned to accept a position with another employer for a higher salary, and cannot attribute this resignation to any deliberate act on Defendant's part, or to workplace conditions that could be viewed as so "intolerable" that she was left with no other alternative but to resign.

## II.   FACTS

### A.   Background

Plaintiff was employed by the WWE as a Global Licensing Coordinator in its Stamford, Connecticut headquarters from April 1, 2004 until May 15, 2006 when her resignation was effective.  (Exhibit A, WWE Offer of Employment, dated April 1, 2004; D'Angelo Dep. p. 23 (Plaintiff's deposition transcript excerpts referred to herein are annexed hereto as Exhibit B)). On the first day of her employment, D'Angelo was provided a copy of the WWE Equal Employment Opportunity/Sexual Harassment Policy (Exhibit C) which set forth in detail the WWE's anti-discrimination and harassment policy, and outlined the procedures to lodge a complaint.  (Exhibit D, signed acknowledgement dated April 1, 2004; D'Angelo Dep. pp. 70-71, 73-74)  D'Angelo was initially supervised by Alex Romer, Director, International Licensing and Joel Satin, Director of Home Video until supervision was assigned solely to Romer.  (D'Angelo Dep. pp. 92-93)  At all times relevant to this action, Romer was physically located in and conducted the majority of his work for WWE out of London, England, and D'Angelo was located in and conducted the majority of her work for WWE in Stamford, Connecticut. (Exhibit

-2-

A; D'Angelo Dep. p. 65)

**B.    D'Angelo's Allegations of Sexual Harassment**

Plaintiff claims that towards the end of 2004, she began being sexually harassed by Romer. (D'Angelo Dep. p. 41)  As Romer was located in London, the majority of the purported harassment took the form of e-mails, instant messages ("IMs"), and phone calls. (Id. at p. 65-66) D'Angelo claims that Romer would talk to her about personal matters, including asking her about her sex life.  Furthermore, she claims that frequent e-mail and instant message exchanges were improper.  Specifically, D'Angelo claims that: in an e-mail Romer told her she had a nice "tail"; Romer would refer to her as "darling", "precious[1]", "special" and "Tinker Bell"; in an instant message Romer told Plaintiff that he was naked; on one occasion Romer told Plaintiff that he wanted to have sex with her and all she had to do was ask; Romer invited Plaintiff to dinner on Valentine's Day 2006; Romer gave her and Ipod; Romer gave Plaintiff $150 and a note saying that he could not stand the thought of her running out of gas somewhere; Romer told Plaintiff that the idea of her doing karate was "fun and sexy"; Romer invited her on a vacation; and that Romer said he was helping her at work by "putting his dick on the line for her". (D'Angelo Dep. pp. 94-95, 99-101, 149-50; Amended Complaint at ¶¶27-32, 36-42, 58, 60, 61) D'Angelo concedes that the "putting his dick on the line" comment was made by Romer in reference to complaints that Romer received from Donna Goldsmith, his then superior, about D'Angelo, and that D'Angelo perceived the comment to be an indication that Romer was supporting D'Angelo, *i.e.* "going to bat for [her]" and attempting to get her promoted. (Id. at p. 95) Plaintiff focuses in particular on the alleged frequency of Romer's contact with her, stating

---

[1] It should be noted that D'Angelo admitted that her ex-boyfriend used to call her "precious". (D'Angelo Dep. p. 145)  While she denied knowing where Romer got the idea to call her "precious" query whether Romer was psychic, a great "guesser", or whether it was D'Angelo herself who shared with Romer that she had been called "precious" by a friend from her past. (Id.)

it was constant.  Plaintiff further alleged that Romer would contact other WWE employees to locate her when he could not reach her, and that he would call her at all times of day or night, including on several occasions while drunk.  (Id. at p 101).  It is undisputed that Romer had a general reputation for being controlling, constantly contacting his subordinates.  (Yamuder Dep. pp. 62-63 (Yamuder deposition transcript excerpts referred to herein are annexed hereto as Exhibit E); Affidavit of Kurt Schneider, sworn to on December 20, 2006, Exhibit F at ¶8: "Indeed, Romer was known to think nothing of calling his reports and co-workers at all hours for work related issues"; Affidavit of Joel Satin sworn to on December 21, 2006, Exhibit G at ¶6)  Thus, it bears repeating that the majority of the claimed "harassment" was conducted across the Atlantic Ocean, via electronic and phone communications.

However, equally noteworthy is D'Angelo's obviously voluntary, unsolicited and inexplicable participation in (and even her own frequent prompting of) this type of dialogue with Romer.  For example, on April 20, 2005, Romer sent D'Angelo an e-mail indicating that he was watching Batista, a wrestling talent, doing an interview with Sky Italia.  (Id. at p. 151).  In response, D'Angelo wrote "Oh, my goodness.  Does he have his shirt on or off?"  Romer responded by calling her a tart and stated that Batista was wearing "a rather smart suit and shirt on."  D'Angelo then responds "lol was a joke.  Good visual."  (Id. at p. 152).  On June 2, 2005, D'Angelo sent Romer an e-mail indicating that she needed to find herself a rich husband so she could retire early.  (Id. at  p. 143)  Similarly, on July 22, 2005, D'Angelo forwarded Romer an e-mail she received from an outside vendor calling her a star for some work she did in connection with a wrestler's tattoos.  During the e-mail exchange, D'Angelo states that "stars like tattoos" and that she "really should get [her] 3rd [tattoo] soon."  (Id. at 110-11)  At the end of this e-mail Romer states "thought you were being a naughty girl again" to which D'Angelo responded

-4-

"never stopped."  (D'Angelo Dep. pp. 112-13)  Along those same lines, on December 20, 2005, D'Angelo sent Romer an e-mail indicating that she only had $36 in her checking account, and in response to Romer's follow up question as to how she would be able to pay for her upcoming personal trip to California responded "[w]ith my good looks" and ended the e-mail with a smiley face.  (Id. at p. 120)  Similarly, on December 21, 2005, in response to an e-mail from Romer about this same trip and referring to her lack of funds, "I take it it's not exactly a girly trip", D'Angelo responded "[n]ever is", clearly suggesting she would pick up men on the trip to pay her way.  (Id. at 124)

Again, on February 16, 2006, Romer sent D'Angelo an e-mail complaining about a meeting he was in and requesting that D'Angelo send him "gossip".  After some e-mails back and forth Romer writes "Need lots of laughs to keep me going.  It will be a long day", to which D'Angelo responds "[h]ow are those cookies?  Care to make a special delivery to my office with some treats?"  (Id. at p. 134).  D'Angelo also forwarded, unprompted, jokes containing sexual images to Romer, including one joke which included an image of a man placing his penis into a mammogram machine.  These are just a few examples of the types of e-mails exchanged between D'Angelo and Romer in which D'Angelo is welcoming the dialogue, and even initiating it.  (Exhibit H, sample e-mails sent by D'Angelo during her employment; D'Angelo Dep. pp. 109-35, 142-46, 150-53)  What becomes clear from these e-mails is that what D'Angelo describes as a hostile work environment perpetrated by Romer was actually a mutually flirtatious environment wherein D'Angelo encouraged and actively participated in the conduct she now conveniently claims was offensive[2].

---

[2] It should also be noted that D'Angelo exchanged e-mails with a fellow co-worker and attempted to set him up with one of her friends.  In connection with this e-mail conversation D'Angelo noted that her friend "doesn't put out … she's a prude… I don't think u will be pleased."  (Exhibit H; D'Angelo Dep. pp. 147-48)  Thus further evincing the

When asked to explain her participatory conduct, D'Angelo agreed that some of the comments she made in e-mails, including a reference that she never stopped being "naughty," could be perceived as flirtatious, and that she regretted her own complicity. (D'Angelo Dep. pp. 112-13, 128: "There is some things [sic] I wish I, looking back, didn't say … Because I probably shouldn't have sent him a picture of me, knowing the fact that he – how he felt towards me and how he often made comments about my appearance and the things like that ….")  Indeed, D'Angelo testified "do I wish I didn't do or say half the things you are showing me?  Of course, but I was, you know just trying to keep things calm and not stir trouble between him and I so that I can continue working for WWE and not have him kind of make this situation worse by questioning me, what's wrong." (Id. at pp. 135-36).  D'Angelo consistently testified that she sent these types of e-mails so that she would be viewed as a "team player" and not "stiff", so that she could fit in with her boss and have a "fun/witty relationship".  (D'Angelo Dep. pp. 130, 133, 153)  At the same time, D'Angelo failed to offer any rational explanation as to why refraining from such unsolicited dialogue would stir up any "trouble" between her and Romer, or why she later did not provide any of them to Human Resources[3].

Aside from the electronic communications, D'Angelo claims that during certain business trips, Romer inappropriately "touched" her.  With respect to this form of purported "harassment", D'Angelo concedes that Romer and she were together during three or four business trips, and a few times when Romer was in Stamford, Connecticut for WWE business. (D'Angelo Dep. pp. 65-66, 98-99)  Specifically, with respect to the allegations of "touchings",

---

fact that conversations of a sexual nature at work are not offensive to D'Angelo.

[3] It is noteworthy that D'Angelo agreed that Romer never suggested she would be fired if she did not engage in these types of conversations.  (D'Angelo Dep. p. 149-50)

D'Angelo claims that Romer once caressed her face, twice pet her hair, two or three times touched her waist, and put his arm around her and held her close multiple times . (Id. at pp. 101-04)  Plaintiff also claims that during business dinners Romer would sit close to her, put his hand on her hand and that the dinner "felt" more like a date than a business dinner.  (Id. p. at 104) D'Angelo further claims that Romer always wanted to spend time with her, and often pressured her to have drinks with him, so that they "could get to know each other and that kind of thing." (Id. at p. 106).

On one occasion, during a business trip, D'Angelo was in a hotel lounge with WWE talent (wrestlers and other actors).  Plaintiff claims that Romer put his arm around her shoulders, pulled her out of the bar and told her she should not be there, at that hour, with the talent. (D'Angelo Dep. pp. 97, 203-04)  D'Angelo asserts she was offended by this conduct and told Romer not to touch her.  (Id. at 203-04)  D'Angelo further claims this incident was witnessed by Satin.  (Id. at pp. 203-04)  However, at the same time, it is noteworthy that D'Angelo admits she had previously been informed that other WWE employees, including Donna Goldsmith, Romer's direct supervisor, expressed concern that D'Angelo was getting physically "too close" with the talent, giving the impression she was being flirtatious.  (Id. at pp. 96-97, 137-41)  Indeed, Romer admittedly expressed his own concern to D'Angelo that others would not take her seriously if they perceived her in that light.  (Id. at pp. 139-41; Exhibit I, e-mail to Danielle Fisher and John Laurinaitis, dated January 30, 2006)  D'Angelo claims that after this incident, she went out to dinner with Satin and Romer, and she did not say a word during the dinner.  She claims that she went to the bathroom and started crying, and when she returned to the table Satin asked her if she was okay because he allegedly "saw her expression" and "could tell that she had been crying" or was upset.  D'Angelo did not respond to Satin, clearly leaving Satin to decide that his perception

was incorrect, or was unrelated to anything happening at that dinner.  (Id. at pp. 203-04)

The last alleged problematic "touching" purportedly occurred during a European tour in April 2006.  D'Angelo claims that she was again at a bar with Romer, Satin, and Kurt Schneider, Executive Vice President of Marketing (query why she would even attend a non-obligatory social drinking gathering after the first alleged incident in a hotel bar).  (D'Angelo Dep. pp. 104-05, 184-85)  D'Angelo claims that Romer was attempting "to make sure that [she] had enough drinks, so you know, – wanting to make sure that [she] was drinking and being part of the team." (Id. at p. 187)  D'Angelo concedes that Schneider and Satin were also drinking.  (Id.)  Towards the end of the evening, Satin and Schneider proceeded to get up to leave, and she attempted to follow them.  (D'Angelo Dep. pp. 186-87, 189)  D'Angelo claims that Romer "grabbed" her arm and attempted to pull her back in order to prevent her from leaving the table, as he did not want her to leave yet.  (Id.)  D'Angelo allegedly resisted Romer's efforts and proceeded to follow Satin and Schneider into the hotel elevator.  (Id. at pp. 189-90)  D'Angelo claims that Romer started to follow them, but then did not.  (Id. at 189-90)  Thereafter, D'Angelo, Satin and Schneider rode together in the elevator.  (Id. at 190).

Satin and Schneider allegedly asked D'Angelo "what was that about?" to which she replied "[t]hat's Alex.  This is how he acts."  (Id. at p. 191)  The elevator then arrived at Satin's floor and he exited the elevator.  (Id. at p. 192)  D'Angelo and Schneider then took the elevator to Schneider's floor where they continued the conversation.  (Id.)  According to D'Angelo, Schneider asked her why Romer was "touching her like that", and she responded to the effect that this "is what [she has] been going through".  (Id. at p. 192)  Schneider allegedly thereafter inquired as to what D'Angelo "was doing about that", to which D'Angelo replied that she had a new job offer at a paint company. (Id. at pp. 192-93, 200-01)  Schneider inquired as to whether

-8-

this was the best career move for her and informed her that he thought she had a better career path at the WWE. D'Angelo informed Schneider that "it's what I have to do in order to get ahead in my career and succeed because working for [Romer] is not getting better and I am not going anywhere" (emphasis added), and thus, leaving was the best choice for her. Nothing more was said, nor did D'Angelo specify the factual bases for why "working for [Romer was] not getting any better" (Id. at. pp. 192-93, 199-201; Exhibit F at ¶5:"After Mr. Satin got out of the elevator, Ms. D'Angelo informed me that she had a new job offer at a paint company. She said it was a better opportunity and was closer to home. I believed that her mind was made up to leave and only cautioned her that taking a job with a paint company may preclude her from finding work in the entertainment field in the future.") D'Angelo's focus was clearly on the perceived lack of advancement working with Romer.

Upon the conclusion of her conversation with Schneider, D'Angelo got back in the elevator and went to her floor to retire for the evening. (D'Angelo Dep. pp. 105-06) According to D'Angelo, when she got off the elevator, Romer was waiting for her on her floor, and inquired why it had taken so long to get to her floor and what she had discussed with Schneider. (Id.) D'Angelo claims that Romer asked to come to her room to discuss this further. (Id.) D'Angelo refused and went back to her room alone. (Id. at p. 106) D'Angelo claims that at the conclusion of this same trip, Romer hugged her closely and attempted to kiss her. She claimed she resisted these efforts and went back to her room for the evening. D'Angelo insists that that she feared Romer would attempt to enter her room, and thus, went to the airport in the middle of the night to await her return flight home. (D'Angelo Dep. p. 103) Of particular note, D'Angelo had already obtained an alternative job offer outside of WWE by the time this alleged series of incidents had occurred during the April 2006 tour. (Job Offer from Sherwin Williams, Exhibit J;

D'Angelo Dep. pp. 24, 193, 199)

A plain reading of the Plaintiff's allegations show that electronic and verbal communications, in addition to these isolated incidents of "touchings", comprise the sum total of what D'Angelo claims created the actionable, sexually hostile working environment.  (D'Angelo Dep. pp. 94-95, 99-105, 184-201, 210-14; Amended Complaint ¶¶27-32, 36-42, 58, 60, 61)

## C. Plaintiff Did Not Complain about Alleged Harassment

Plaintiff concedes that despite being provided a copy of WWE's sexual harassment policy, which included a complaint procedure, she did ***not*** file a complaint of sexual harassment against Romer during her employment, nor did she ask anyone at WWE to file a complaint on her behalf.  (D'Angelo Dep. pp. 70-71, 78-79, 107; Exhibit D, signed acknowledgement of receipt of policy and complaint procedure)  At the same time, however, Plaintiff asserts that that other employees of WWE were aware of the harassment; specifically Bernadette Hawks, Joel Satin, Kurt Schneider, Michael Archer, Lisa Richards, and Peter Clifford, (Id. at pp. 159-61), in an attempt to excuse her admitted failure to utilize a clearly articulated and known internal complaint procedure.

More specifically, Plaintiff claims the following incidents should have placed WWE on notice she was being sexually harassed by Romer:

In June of 2005, Bernadette Hawks, ***a non-managerial employee***, saw Romer touch D'Angelo on her lower waist.  (D'Angelo Dep. pp. 210-11)  Hawks told Archer, Senior Director of Quality Assurance and Hawks' then supervisor, that she had seen Romer touch D'Angelo's lower waist, which, according to Archer, Hawks deemed "troublesome".  (Id.; see also Affidavit of Michael Archer, sworn to on December 21, 2006, Exhibit K at ¶4)  Archer approached D'Angelo regarding Hawks' observations.  (Id. at p. 211; Exhibit K at

¶4)   D'Angelo confirmed to Archer that Romer had touched her lower waist.   Archer "offered to punch [Romer's] lights out . . . He was kind of joking acting like a tough guy, like, you know, do you want me to punch his lights out for you kind of thing", giving the clear impression that Archer thought this was a one time occurrence and not an ongoing problem.  (Id. at p. 211)  Archer also offered to talk to Romer, but D'Angelo replied that "[she] did not want him to talk to Alex about what happened", thus confirming for Archer that the alleged incident was not particularly troublesome.  (D'Angelo Dep. pp. 212-13; see also Exhibit K at ¶5: "I followed up directly with Ms. D'Angelo as to Ms. Hawks' observations and concerns.  I initiated the conversation because I wanted to help.  Ms. D'Angelo assured me that there was no problem to report.  I emphasized to Ms. D'Angelo that the matter would be reported to Human Resources, or to Romer's supervisor Donna Goldsmith, if she had any concern whatsoever.  Ms. D'Angelo unequivocally assured me everything was fine, ***and there was no situation to report.***")(emphasis added)[4]

D'Angelo claims that, during this same conversation, she informed Archer that Romer was "constantly calling [her], harassing [her], stalking [her]", and was controlling, obsessive and a "stalker."  (D'Angelo Dep. pp. 213-14.)  Yet, D'Angelo concedes that she never told Archer that Romer was pressuring her sexually, or otherwise that the meaning of "harassing" or "stalking" had any meaning other than the one consistent with Romer's general reputation as controlling and "stalking" with subordinates.  Nor did D'Angelo relay any other incidents of touching.  (Id.)  D'Angelo never approached Archer again about Romer.  (Id. at pp. 215-16)

D'Angelo claims she told Schneider on a few occasions that Romer was

---

[4] Even complaints regarding troublesome managerial styles, wholly unrelated to sexual harassment, could be reported to and addressed by the Human Resources department at WWE.  (Exhibit C)

"controlling" and that she was "unhappy" working with Romer.  (D'Angelo Dep. pp. 181-82)  D'Angelo concedes that she did not tell Schneider that Romer was sexually harassing her, that Romer was pressuring her sexually, that Romer was calling her "sexy" or "precious," or commenting about her body.  (D'Angelo Dep. pp. 183-85).  D'Angelo claims that Schneider "would often make comments to [her], why or how can you work for [Romer]? And you know trying to get [her] to talk more about it", and that she would not talk more because "[she] didn't really want everybody to know."  (Id. at p. 188)   In such a way, from her own mouth, D'Angelo admits that she deliberately withheld information from anyone at WWE, including Schneider, which would lead them to surmise that anything other than the perceived micromanaging style of Romer was at work.  Finally, D'Angelo claims that in November 2005, Schneider saw on one occasion that Romer was "always so close to [her] and [Schneider] probably thought that was kind of weird  So that's why he is saying your boss, you know is crazy, he is out of his mind."  (Id. at p. 196)  Again, D'Angelo does not, because she cannot, explain why such vague and generic conversations and observations were sufficient to put WWE on notice that Romer had been sexually harassing her.  (D'Angelo Dep. pp. 192-93; 196, 217)   Indeed, when pressed to explain how the incident in the bar in April 2006 provided Schneider with this knowledge of sexual harassment, as opposed to Romer generally acting with a controlling management style, D'Angelo simply stated "[i]t's common knowledge that a boss should not be touching a female employee."  (Id. at p. 193)  In short, D'Angelo had nothing else to offer.

D'Angelo claims that one evening she approached Satin and informed him that she was "frustrated" with Romer as Romer was constantly asking her personal questions while she was trying to get work done.  (D'Angelo Dep. at pp. 206, 228)  Satin suggested she

threaten Romer that she would report this matter to Human Resources.  (Id. at pp. 206-07, 228-29).  D'Angelo concedes that Satin also offered to speak to Romer directly, but she declined this offer, indicating instead that she would speak with Romer herself.  (Id. at p. 228)  D'Angelo could not recall that she ever told Satin the "personal" questions meant questions about her sex life or any other matter of a sexual nature.  She further could not recall ever telling Satin that Romer was complimenting her body, or about any other potentially sexually harassing remarks.  (Id. at pp. 207-09)

D'Angelo next alleges that she approached another WWE employee, Lisa Richards, Director of Marketing, "as a friend" for career advice.  D'Angelo told Richards she did not like the way Romer talked to her, nor his constant calls (which, again was consistent with Romer's general reputation as being a micromanager, or even a "stalker" with respect to his demands on subordinates) (Exhibit F at ¶8; Exhibit G at ¶6).  D'Angelo also claims to have mentioned that Romer had called her when he was drunk.  (D'Angelo Dep. pp. 163-65:"I told her details of how my boss was talking to me because I was looking for career advice from her on how I could handle the situation.  And I looked to her because she was older than me and she had more work experience.")  When asked at her deposition whether she had raised any claims of sexual harassment to Richards, D'Angelo responded ambiguously that she might have to told her that Romer said she "looked sexy in a karate suit", and that she had "nice legs", but had no specific recollection she made these statements at all, or any similar ones.  (D'Angelo Dep. pp. 165-66).  D'Angelo claims that Richards "understood the situation to be not healthy so that's when she started saying, well, maybe you should talk to [Clifford] about a possible position in my department."  (Id. at p. 165)  Tellingly, the minimal details of the conversation that D'Angelo could remember are consistent with the

affidavit submitted by Richards to the Connecticut Commission on Human Rights and Opportunities wherein Richards averred: "D'Angelo never mentioned any conduct by Romer to me that resembled sexual harassment during any discussion I had with her.  Rather, the only statements made to me by Ms. D'Angelo about Romer were that she did not like working for him.  Ms. D'Angelo also expressed to me that she was interested in any opening in the Affiliate Sales and Marketing Department, because she was looking for a better opportunity" (Affidavit of Lisa Richards, sworn to on December 20, 2006, Exhibit L, at ¶4.) Given D'Angelo's total lack of any other recollection, this statement by Richards cannot be disputed.

D'Angelo thereafter interviewed with Peter Clifford for a position in his department. During this interview, D'Angelo expressed to Clifford that she was unhappy working with Romer; that Romer would be unhappy if he learned that she was interviewing for a different position; that Romer was possessive and controlling; and that it was stressful working for him.  (D'Angelo Dep. pp. 162-63)  Plaintiff did not allege that she told Clifford that Romer was sexually harassing her, nor did she relay any facts on which such a perception could be based.  (Id. at p. 164).  In short, the sum and substance of what D'Angelo claims she conveyed to Clifford in no way suggested sexually harassing behavior.  D'Angelo asserts she did not pursue a position further in Clifford's department because Human Resources suggested Romer had plans for her advancement in the WWE, and thus, the better career move would be to stay in her position (further begging the question of whether D'Angelo could be viewed by any reasonable person as the victim of harassment, choosing to stay subordinate to the "alleged harasser" to advance in her WWE career).  (D'Angelo Dep. p.

65).[5]

Finally, Plaintiff claims that she was friendly with Sheryl Ann Yamuder, an attorney who worked in WWE's legal department.  (D'Angelo Dep. at pp. 37, 217, 219)  D'Angelo claims that she told Yamuder Romer was "obsessed" with her, was constantly calling and sending her e-mails and IMs.  According to D'Angelo, in 2005, Yamuder remarked to her that she thought Romer was "in love" with D'Angelo.  (Id. at pp. 172, 217)  She further claims that Yamuder was with her on one occasion when she received a call from Romer when he was drunk, and she told Yamuder this was not the first time Romer had called her drunk.  (Id. at p. 219)  D'Angelo also claims that on one occasion when she was arriving late to work, Romer contacted Yamuder, who allegedly told D'Angelo that Romer was "going nuts."  (Id. at p. 219-20).  D'Angelo conceded that the sum and substance of what Yamuder knew in terms of affirmative conduct by Romer was "[Romer's] IMs, constant calling and e-mailing [and that] he would call [Yamuder] looking to have [her] paged."  (Id. at p. 220).

Yamuder, when deposed, testified as to her perception, consistent with that of others at WWE, that Romer had a reputation for constantly contacting his subordinates, was a micromanager, and vehemently denied ever being provided with any information by D'Angelo that suggested she was being sexually harassed.  (Yamuder Dep. pp. 61-62: stating that D'Angelo's concerns about Romer were that "[h]e overcomunicated, micromanaged.  He put a lot of responsibility on her.  He expected her to be responsive to him more than she felt necessary"; see also Yamuder Dep at pp. 58-64, 105.)  Consequently, she presumed the conduct described by D'Angelo was consistent with that reputation, and

---

[5] Notably, D'Angelo conceded that she had actively sought at least one other promotion directly from Romer, which would compel her to continue reporting to the alleged harasser.  (D'Angelo Dep. at pp. 39-41, 62-63)

-15-

nothing more.  (Id. at pp. 58-64, 105)   Even if true, an observation about Romer "being in love" did not automatically mean Romer was engaging in sexually harassing conduct.

Yamuder denied being informed by D'Angelo, or otherwise witnessing or hearing that Romer was interested in D'Angelo "sexually speaking".   Yamuder further denied any knowledge of any accusation that Romer touched D'Angelo in any improper way, or that Romer called D'Angelo names such as "precious" or "Tinker bell."  (Id. at pp. 62-64).

D'Angelo concedes that she never asked Yamuder to file a complaint with Human Resources on her behalf.  (D'Angelo Dep. at pp. 79, 220)   Despite being an in-house attorney, it is undisputed that Yamuder did not have the power to fire Romer or otherwise make any changes to Romer's employment (nor did she have any supervisory authority over D'Angelo for that matter).   Nor was Yamuder employed or expected by WWE to be a designated recipient for complaints of sexual harassment.  (Yamuder Dep. p. 103)

When pressed for the reason she never followed the clearly articulated complaint procedure at WWE, D'Angelo testified that she was afraid of retaliation.  (D'Angelo Dep. at p. 78)  However, the sole, factual bases for this fear were: (1) an unnamed WWE employee was allegedly sexually harassed and thereafter terminated.  (Id. at pp. 79-81); (2) the absurd claim of "common knowledge" that the CEO had sexually harassed a female wrestler, gleaned from gossip on the Internet; (Id. at p. 81-83)(tellingly, D'Angelo does not even contend that this unidentified wrestler complained about this alleged harassment and/or endured retaliation because of that complaint); and (3) an allegation that Yamuder "went to Human Resources with something that was going on with her [and that Yamuder] confided in Human Resources and … they ended up using that against her with her boss" and that Yamuder somehow discouraged her based upon this experience from complaining to Human

Resources   (D'Angelo Dep. p. 80).

This so-called support for D'Angelo's alleged fear of retaliation are patently insufficient to excuse her failure to utilize the internal complaint procedure.  The first two are obviously insufficient, as they are borne of gossip, and D'Angelo could not even specify the nature of any claimed retaliation.  Indeed, with regard to the unnamed WWE employee, D'Angelo testified that "it was just chatter that was going around the office.  It was more than one.  I have heard…." (Id. at p. 80)    With respect to the allegation regarding Yamuder's experience, likewise, D'Angelo did not even know the exact nature of Yamuder's complaint.  (Id.)   Moreover, and critically important, it is undisputed that Yamuder complained to Human Resources (and not regarding a sexual harassment allegation, nor about Romer) months ***after*** D'Angelo resigned.  Therefore, even if Yamuder shared some perception of ill effects after her internal complaint, this shared perception could never have been relied on by D'Angelo in deliberately failing to utilize Human Resources, or in failing to complain to any manager at WWE specifically about sexual harassment during her employment. (Affidavit of Danielle Fisher, sworn to on April 14, 2010, Exhibit M at ¶6)

**D.     D'Angelo's Resignation and Romer's Termination**

On May 5, 2006, D'Angelo gave ten days notice of her resignation.  (D'Angelo Dep. p. 224)  Shortly after giving notice, D'Angelo was approached by Goldsmith, then Executive Vice President, Consumer Products.  D'Angelo believed, without support therefore, that Goldsmith had been informed by Yamuder "about the sexual harassment that I was telling her about."  (D'Angelo Dep. pp. 221-23).  However, a person with direct, first-hand knowledge of the conversation between Goldsmith and Yamuder, Yamuder herself, testified as follows.

Approximately one week before D'Angelo's notice of resignation, D'Angelo told Yamuder about what was described by D'Angelo as two "negative interactions" between D'Angelo and Romer during the April 2006 tour.  (Yamuder Dep. pp. 69-80)  Yamuder could not remember the details of these "negative interactions" except to state that she "remembered that it made [D'Angelo] uncomfortable.  I remember she was annoyed." (Yamuder Dep. pp. 70-72, 75, 79)  Yamuder encouraged D'Angelo to report the incident to Goldsmith or Human Resources.  (Id. at pp. 67-68)  Yamuder herself relayed this conversation with D'Angelo to Goldsmith, who contacted Danielle Fisher, Senior Vice President for Human Resources.  Fisher then reached out to D'Angelo, who interestingly, still had not contacted Human Resources or Goldsmith.

It was during this meeting that, for the first time ever, D'Angelo provided copies of Romer's e-mails and details of the so-called "touching incidents" to anyone, a fact conceded by Plaintiff herself.  (D'Angelo Dep. pp. 220-23).  Plaintiff further concedes that during this discussion with Human Resources, while providing Ms. Fisher with copies of Romer's allegedly problematic e-mails to her, she failed to provide the WWE with e-mails from her to Romer, thinking they were "irrelevant".  (Exhibit H; D'Angelo Dep. pp. 109-36, 141-46, 150-55).  D'Angelo fails to explain how these e-mails are irrelevant, but the answer to this mystery is all too clear; D'Angelo knew if Human Resources noted her participation, it would appear as it was—mutual flirtation.  (D'Angelo Dep. pp. 39-40, 63-64, 130, 132-33)

WWE conducted a complete investigation of D'Angelo's allegations by interviewing D'Angelo, Romer, Yamuder, Satin and Schneider (D'Angelo failed to mention other purported witnesses to HR).  (D'Angelo Dep. pp. 222-24; Exhibit G at ¶7; Exhibit F at ¶9. ***Prior to D'Angelo's last day of employment,*** WWE concluded its investigation, and

terminated Romer's employment.  D'Angelo was informed of Romer's termination, also before her last planned day of employment, and was asked to retract her resignation.  As D'Angelo further admitted, she was offered a promotion and a commensurate raise. (D'Angelo Dep. pp. 83-84).  D'Angelo declined the offer, and began employment with Sherwin Williams with an annual salary of $70,000, which was approximately $20,000 more than she had been earning with WWE.  (D'Angelo Dep. pp. 25, 84, 87).  D'Angelo told Fisher that she would never accept the promotion or raise offered by the WWE as Sherwin Williams offered her a much higher salary.  (Exhibit M at ¶5).

Underscoring the fact that this higher salary was the actual reason she was leaving, on May 16, 2006, D'Angelo's last day of employment (and thus after she had already conveyed her allegations about Romer to Human Resources), D'Angelo filled out an exit interview form and inserted the reason for her leaving as "a better opportunity arose for me to advance in my career" and the attraction for the new opportunity was "money, location." (Exit Interview, dated May 16, 2006, Exhibit N)  D'Angelo is currently employed by Sherwin Williams and concedes that she has not suffered any lost wages-she is in fact currently earning $90,000 annually, or $45,000 more per year than she had been earning when she left WWE. (D'Angelo Dep. pp. 25, 32)

A plain reading of the undisputed material facts, as well as the applicable judicial precedent, reveals the absence of any genuine issues of material fact as to the Plaintiff's claims.  Accordingly, Defendant respectfully requests that summary judgment be granted in its favor as to the sole cause of action alleged in the Complaint.

# III. ARGUMENT

## The Standard On A Motion For Summary Judgment

A moving party is entitled to summary judgment if the "pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any" demonstrate the absence of a genuine issue of material fact. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Holcomb v. Iona College, 521 F.3d 130, 137 (2d Cir. 2008). The movant's burden is satisfied if it can point to an absence of evidence to support an essential element of the non-moving party's claim. Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995); Vaden v. Connecticut, 557 F. Supp. 2d 279, 287 (D. Conn. 2008). Defendants are entitled to judgment if a fair-minded jury could not return a verdict for the Plaintiff on the evidence presented. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). "Even in the discrimination context, ... a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment, and show more than some metaphysical doubt as to the material facts." Chertkova v. Conn. Gen. Life Ins. Co., 92 F.3d 81, 92 (2d Cir. 1996).

## A.      Plaintiff Cannot Prove Actionable Hostile Environment Sexual Harassment

In Count One (the only Count) of the Amended Complaint, D'Angelo alleges hostile environment sexual harassment by her supervisor Romer, in violation of Title VII. In support of this cause of action, however, D'Angelo proffers only the factual allegations set forth above. Even if all the above allegations are deemed true, D'Angelo's claim of sexual harassment must fail as a matter of law.

### i      D'Angelo Cannot Satisfy Her *Prima Facie* Burden

To establish a *prima facie* case of hostile work environment sexual harassment under Title VII, Plaintiff must prove with competent evidence that she was subjected to unwelcome

conduct because of her gender that was so extreme as to create an objective change in the terms and conditions of her employment. Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 78-81 (1998); Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (citations omitted); Mormol v. Costco Wholesale Corp., 364 F.3d 54, 58 (2d Cir. 2004). For the workplace to be deemed a sexually hostile work environment:

> it must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.... [Courts must] look [] at all the circumstances, 'including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998) (citations omitted); Byrne v. Telesector Res. Group, Inc., 2009 U.S. App. LEXIS 15493, at *12-13 (2d. Cir. July 14, 2009).

Thus, in analyzing hostile work environment claims, courts must "filter out complaints attacking the ordinary tribulations of the workplace...." Faragher, 524 U.S. at 788 (citation omitted). "Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at 'discriminat[ion]...because of...sex.'" Oncale, 523 U.S. at 102. Significantly, "workplace harassment, even harassment between men and women, is [not] automatically discrimination because of sex merely because the words used have sexual content or connotations. The critical issue...is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." Id. (citing Harris, 510 U.S. at 25). Plaintiff's claims here must therefore be examined against these standards.

In determining whether the atmosphere was sufficiently hostile, the Court must consider the totality of circumstances. See Brennan v. Metropolitan Opera Ass'n, 192 F.3d 310, 319 (2d

Cir. 1999); Hudson v. Fischer, No. 06 Civ.1534 (TJM), 2008 U.S. Dist. LEXIS 97711, at *13-15(N.D.N.Y. December 2, 2008).    Generally, "isolated remarks or occasional episodes of harassment will not merit relief under Title VII; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive." Tomka v. Seiler Corp., 66 F.3d 1295, 1305 n.5 (2d Cir. 1995) (overruled on other grounds by Faragher).    See also, Romano v. Stora Enso Corp., No. 07 Civ. 4293 (NGG), 2010 U.S. Dist. LEXIS 24937, *54, *58-59 (E.D.N.Y. February 10, 2010)("to be actionable, defendants' conduct must have been so severe and pervasive as to create a 'poisoned' atmosphere in which the employee must run a gauntlet of sexual abuse in order to perform her job.").    Critically important, the alleged conduct must be both objectively and subjectively offensive, such that a reasonable person would find the behavior hostile or abusive, and such that the Plaintiff herself did, in fact, perceive it to be so.    See Harris, 510 U.S. at 21-22.

Based on these standards, Plaintiff cannot establish the existence of a "hostile work environment" actionable under Title VII. The majority of the allegedly problematic behavior occurred via electronic communications, with the allegations of "touching" relating to episodic, infrequent behavior during the isolated business trips where Plaintiff and Romer were together.    The e-mails and telephone calls, which D'Angelo portrayed as constant, traversed over three thousand miles, and the content, at best was flirtatious, and certainly not even remotely similar to the type of conduct dismissed as insufficient by other courts.    Moreover, D'Angelo cannot sustain her burden of establishing that the frequency of the contact was on account of sex or gender, as opposed to Romer's known managerial style.

For example, in Quinn v. Green Tree Credit Corp., 159 F.3d 759, 763, 768 (2d Cir. 1998), plaintiff alleged she had been subjected to more than 30 separate incidents of sexual harassment.

-22-

The incidents consisted primarily of sexual comments to her by her supervisor concerning his sexual prowess and her body parts, including that that she had been voted the "sleekest ass" in the office.  Plaintiff also alleged that her supervisor had deliberately touched her breasts with paper. The Second Circuit affirmed the lower court's grant of summary judgment, holding that plaintiff had not been subjected to sufficiently pervasive or severe abuse to alter the conditions of her employment.   A legion of more recent district court decisions have underscored the Quinn rationale, granting summary judgment where the subject conduct, much more egregious than that conduct alleged here by D'Angelo, was deemed insufficient to be actionable. Illustrative are the decisions in Martires v. State of Conn. Dep't of Transportation, 596 F.Supp. 2d 425, 442-43 (D. Conn. 2009)(summary judgment granted on allegations that (1) supervisor propositioned plaintiff for sex; (2) supervisor intentionally bumped into plaintiff; (3) on occasion supervisor rubbed up against plaintiff while walking); Richards v. New York City Dep't of Homeless Servs., No. 05 Civ. 5986 (DLI), 2009 U.S. Dist. LEXIS 20410, *18-19 (E.D.N.Y. March 15, 2009)(allegations that harasser "told [plaintiff] that he needed a 'real woman,'" (ii) touched his buttocks twice, (iii) came in close physical proximity to him on several occasions, and (iv) assigned him unfavorable tasks, such as bathroom cleaning did not constitute a hostile work environment); Morris v. Ales Group USA, No. 04 Civ. 8239 (PAC), 2007 U.S. Dist. LEXIS 47674, *33-34 (S.D.N.Y. June 29, 2007) (granting summary judgment in favor of defendant where harasser told plaintiff he enjoyed watching topless dancing, invited her to join him in watching topless dancing, and "constantly touch[ed] [plaintiff], e.g. grabbing [her] by the hand to lead [plaintiff] into his office for a meeting, hugging [her], and wanting to cheek-kiss when [they] met or parted"); Durant v. A.C.S. State & Local Sols. Inc., 460 F. Supp. 2d 492, 497-98 (S.D.N.Y. 2006) (granting summary judgment in defendant's favor and holding that offensive jokes, a comment by a supervisor regarding her sex

life, and two requests for sex did not rise to the level of a hostile work environment); <u>Feliciano v. Alpha Sector, Inc.</u>, No. 00 Civ. 9309 (AGS), 2002 U.S. Dist. LEXIS 12631, at *23 (S.D.N.Y. July 12, 2002) (supervisor's alleged actions of unwelcome romantic overtures toward plaintiff that included compliments, requests for dates, an attempt to hug her, kissing her, stating he wanted to "lay with" her, and "constantly yelled" at her did not constitute actionable offenses under Title VII); <u>O'Dell v. Trans World Entertainment Corp.</u>, 153 F.Supp.2d 378, 386-88 (S.D.N.Y. 2001), <u>aff'd</u>, 40 Fed. Appx. 628 (2d. Cir. July 16, 2002) (summary judgment granted where supervisor repeatedly asked plaintiff out on dates, made comments about her appearance, sent her emails professing his love for her, called her at work and home, gave her gifts, invited her to tour New York City with him, and played her a song that alluded to an extramarital affair that she found offensive).

Most compelling in determining the severe, pervasive and unwelcome nature of the subject communications, Plaintiff actively participated in and initiated numerous communications with Romer of a personal and sexual nature, demonstrating the fact that she was neither offended, nor that the conduct was unwelcome. As set forth in detail above, D'Angelo's own statements unequivocally reveal that these conversations did not become "unwelcome" until she knew she was not being promoted. (D'Angelo Dep. pp. 39-40, 62-64, 130, 133) Indeed, an employee who sends a joke image of a man putting his penis into a mammogram machine, along with making her own jokes about her picking up men, such as paying for her trip to California with her good looks and needing to find a rich husband, can hardly be said to be offended by sexual banter by Romer, even if Romer was smitten with her. (Exhibit H; D'Angelo Dep. pp. 109-35, 141-46, 150-53). Given these undisputed facts,

such feigned offense to Romer's e-mails after resigning from the WWE rings hollow[6].  <u>See</u>
<u>Sacco v. Legg Mason Inv. Counsel & Trust Co., N.A.</u>, 660 F. Supp. 2d 302, 315 (D. Conn.
2009)("[t]hat [plaintiff] participated in conduct of the same general variety [including
sending e-mails with sexually suggestive content] cuts against her claim that [defendant]
engaged in behavior that she perceived to be abusive.")  In sum, based on the wealth of
judicial precedent presented, it is clear that Plaintiff's showing falls far short of sustaining her
burden of proof.

   **ii**   **Even If Romer's Actions Were Tantamount to Sexual Harassment,**
       <u>**Plaintiff's Claims are Barred**</u>

    Even if this Court deems the conduct of which D'Angelo complains to constitute
actionable sexual harassment, it must nevertheless be dismissed as no tangible employment
action was taken and it is undisputed that: (a) the employer exercised reasonable care to prevent
and correct promptly any sexually harassing behavior; and (b) Plaintiff was unreasonable in not
taking advantage of the corrective opportunities provided by WWE. <u>Faragher,</u> 524 U.S. at 807;
<u>Burlington Indus., Inc. v. Ellerth,</u> 524 U.S. 742, 765 (1998); <u>Canales-Jacobs v. New York State</u>
<u>Office of Court Admin.</u>, 640 F. Supp. 2d 482, 502 (S.D.N.Y. 2009).

    A "tangible employment action" is a <u>significant</u> change in employment status, such as
hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a
decision causing a significant change in benefits. <u>See, e.g.</u>, <u>Vazquez v. Southside United Hous.</u>
<u>Dev. Fund Corp.</u>, No. 06 Civ. 5997 (NGG), 2009 U.S. Dist. LEXIS 74480, *50-51 (E.D.N.Y.
August 18, 2009).  To the extent that D'Angelo relies on her claim that she was constructively

---

[6] It bears repeating that D'Angelo concedes that even after the alleged harassment began she sought a promotion
within her department wherein she would still be reporting to Romer.  (D'Angelo Dep. at pp. 39-41, 62-63) Query
why, if the work environment was so hostile, that D'Angelo would want to continue working for her alleged
harasser.

discharged, her claim fails as a constructive discharge solely based upon a hostile work environment does not qualify as a tangible employment action sufficient to negate the result of a Faragher/Ellerth defense.  See Finnerty v. Sadlier, 2006 U.S. App. LEXIS 8620, at *6-7 (2d Cir. April 7, 2006) ("we have decided that even a constructive discharge resulting from a hostile work environment does not constitute a tangible employment action because generally a constructive discharge, like harassment itself, is not ratified by the employer")(internal quotations omitted); Caridad v. Metro-North Commuter Railroad, 191 F.3d 283, 294 (2d. Cir. 1999), overruled on other grounds.  Accord, Pennsylvania State Police v. Suders, 542 U.S. 129, 148-49 (2004).  See also Stofsky v. Pawling Central School District, 635 F. Supp. 2d 272, 295 (S.D.N.Y. 2009)(noting that "the alleged constructive discharge does not rank as a tangible employment action for purposes of negating a Faragher/Ellerth defense.")(internal citations and quotation marks omitted).

Moreover, it is undisputed that D'Angelo concedes that submission to sexual conduct was not a condition of employment.  (D'Angelo Dep. p. 150)(stating that she did not believe she would be fired if she did not engage in sexual banter with Romer).  See Finnerty, 2006 U.S. App. LEXIS 8620, at *7 (noting employee's claim of constructive discharge is not a tangible employment action as employee "does not contend that [her harasser] explicitly threatened her with termination or otherwise formally altered or threatened to alter her job responsibilities if she did not submit to his advances.")  In any event, even if a factual allegation of constructive discharge can form the basis of finding a tangible employment action occurred, it clearly cannot do so here for those reasons set forth in Section B, below.

Second, it is undisputed that the WWE promulgated, and D'Angelo received, a sexual harassment policy which provided an avenue for employees to file complaints of

harassment.  (Exhibit D; D'Angelo Dep. p.78)  <u>See</u> <u>Caridad</u>, 151 F.3d at 295.  It is equally undisputed that after hearing D'Angelo's allegations for the first time (a conversation which WWE's Human Resources department initiated, not D'Angelo-D'Angelo Dep. pp. 221-23), WWE immediately investigated, and took prompt corrective action, which included the expedited termination of Romer's employment before D'Angelo left.  (D'Angelo Dep. pp. 83-84, 221-24)   Thereafter, WWE informed D'Angelo of its actions, asked D'Angelo to rescind her resignation, and offered D'Angelo a promotion and a raise.  (<u>Id</u>.)  D'Angelo refused (i.e., refused to avail herself of WWE's remedial actions), opting instead to take another position at the higher salary.  (<u>Id</u>. at p.87).  These undisputed facts should be fatal to D'Angelo's claim, even if this Court deems Romer's alleged conduct to be sufficiently actionable[7].  <u>Sutton v. New York City Transit Auth.</u>, No. 02 Civ. 1441 (RRM), 2009 U.S. Dist. LEXIS 118309, *16 (E.D.N.Y. September 30, 2009)(concluding defendant proved its <u>Faragher/Ellerth</u> defense as it "is undisputed that the [defendant] had a system in place to investigate and address discrimination claims (including sexual harassment claims), that plaintiff properly filed a complaint, and that the problem was immediately and permanently corrected.")

        iii      **D'Angelo's Failure to Utilize the Complaint Procedure is Not Excused by Her Allegations of Constructive Knowledge, Even if True**

Recognizing WWE's compliance with each of its obligations, D'Angelo attempts to

---

[7] D'Angelo attempts to persuade the Court that she did not accept the promotion and raise because "her reputation was ruined", an assumption "that because of what [she] went through that my future career at the company would be very challenging", and because people at the WWE were "treating her differently".  (D'Angelo Dep. pp. 85-87). First, such vague and conclusory statements are insufficient, as a matter of law, to excuse her failure to accept the remedial measures.  <u>Breeding v. Cendant Corp.</u>, No. 01 Civ. 11563 (GEL), 2003 U.S. Dist. LEXIS 6558, at *21 (S.D.N.Y. April 10, 2003).  Second, the alleged different treatment consisted of people expressing sympathy towards D'Angelo and her perception that people "pitied" her—clearly not a rational basis for refusing to stay. (D'Angelo Dep. pp. 85-87)  Finally, and most critical, D'Angelo's real reason for leaving despite the offer is revealed by her own statements to Yamuder and on the exit interview form completed following her meetings with Human Resources; i.e., to take a higher salary.  (Yamuder Dep. pp 67-68; Exhibit N)

resurrect her action by asserting WWE had constructive notice prior to her resignation by virtue of what other employees saw or heard.  To this end, Plaintiff relies solely on the conversations she allegedly had with Satin, Schneider, Archer, Richards, Clifford and Yamuder as detailed above, and the November 2005 and April 2006 tour incidents.  However, even taking her testimony as true, none of these allegations are sufficient to impute WWE with prior knowledge of sexual harassment.   Again, in this regard, D'Angelo only recaps generic statements to certain management level employees and describes isolated incidents they allegedly observed which do not sufficiently suggest sexual behavior.

As far as the incident Archer discussed with Hawks, and then D'Angelo, no reasonable juror could conclude that this conversation should have put Archer on notice of sexual harassment.  The most one could assert is that Archer thought, on one occasion, Romer put his hands on D'Angelo's waist, and offered to talk to Romer about it as sort of an act of chivalry.  D'Angelo declined that offer outright, and never suggested to Archer anything to counteract Archer's clear impression this incident was a "one-time" thing.  (D'Angelo Dep. pp. 210-15; Exhibit K at ¶5)

Likewise, neither the April 2006 nor the other two incidents allegedly witnessed by Satin and Schneider could be deemed to have provided WWE with actual or constructive notice[8].  First, these incidents were not overtly sexual.  (D'Angelo Dep. pp. 97, 137-41, 185-89; Exhibits F and G: "[n]othing [they] witnessed in the bar led [them] to believe that there was any improper behavior on the part of Alex Romer towards Ms. D'Angelo, nor did [they] witness behavior that was 'sexually possessive'"-Satin Aff. at ¶4; Schneider Aff. at ¶4)  Again, D'Angelo offers nothing to contradict these affidavits and the perception shared by Satin and

---

[8] One incident of this type is clearly insufficient in itself to put WWE on notice of sexual harassment. Weger v. City of Ladue, 500 F.3d 710, 714-15, 722-23 (8th Cir. 2007).

Schneider. Such observations, even viewed in a light most favorable to Plaintiff, are patently insufficient, especially given the reputation Romer had with respect to his obsessive managerial style, to establish actual or constructive notice that D'Angelo was being sexually harassed. (See, e.g., Exhibits F and G)[9]

It is well settled that "generalities are not enough to put an employer on notice" of sexual harassment. Schmidt v. State University of New York at Stonybrook, No. 02 Civ. 6083 (SLT), 2006 U.S. Dist. LEXIS 27663, at *39 (E.D.N.Y. May 5, 2006). In Schmidt, the employer asserted a Faragher/Ellerth defense as the employee waited to complain about the alleged sexual harassment until well after the harassment occurred. After the employee complained, the employer took prompt corrective action, which included initiating steps to terminate the harasser's employment. Schmidt, 2006 U.S. Dist. LEXIS 27663 at *38-41. The employee attempted to overcome her failure to complain in a timely manner by insisting that she had earlier complained to a supervisor that she was "uncomfortable" with the alleged harasser who was "overbearing." The District Court concluded that such vague statements fell "short of establishing constructive notice of the harassment." Id. See also Duviella v. Counseling Serv., No. 00 Civ. 2424 (ILG), 2001 U.S. Dist. LEXIS 22538 at *9-11, *40 (E.D.N.Y. November 20, 2001) (complaints that: (1) plaintiff was "uncomfortable" with working with the alleged harasser; (2) plaintiff was experiencing unspecified "problems" with him; (3) the alleged harasser would not let plaintiff change her work schedule; and (4) general comments that the alleged harasser "has no scruples", was not an honest person and acted "inappropriately", did not provide constructive notice to the employer sufficient to defeat a Faragher/Ellerth defense), affirmed 52 Fed. Appx. 152, 153 (2d. Cir. 2002). It bears

---

[9] Furthermore, it bears repeating that Hawks was not a management level employee.

highlighting that the <u>Duviella</u> case involved an actual complaint to a supervisor—something D'Angelo admits she did not ever do before her resignation.  (D'Angelo Dep. p 79).

In any event, courts have consistently held that supervisors witnessing isolated incidents of even more explicit sexual conduct do not result in constructive knowledge by the employer of actionable sexual harassment.  See <u>Weger v. City of Ladue</u>, 500 F.3d 710, 714-15, 722-23 (8th Cir. 2007)(fact that some supervisors witnessed the alleged harasser: (1) putting his arm around the plaintiff and leaning close into her face; (2) putting his arms around the plaintiff's waist and attempting to tickle her; (3) following plaintiff around; and (4) rubbing plaintiff's shoulders while plaintiff grimaced, did not put the employer on notice of the harassment prior to plaintiff's formal complaint of harassment, nor otherwise defeat the <u>Faragher/Ellerth</u> defense.)[10].

Finally, D'Angelo's claim she confided in Yamuder cannot impute knowledge to WWE.  First, it is undisputed that D'Angelo failed to ever "complain" to Yamuder about Romer, but rather, spoke in generalities with her in a social context--as a friend.  (D'Angelo Dep. pp. 170, 217).  It is equally undisputed that D'Angelo never asked Yamuder to take any action.  (D'Angelo Dep. p. 79)  See <u>Madray v. Publix Supermarkets, Inc.</u>, 208 F.3d 1290, 1301 (11th Cir. 2000)(approaching mid-level managers about harassment not in their "professional capacity" does not provide notice to employer).  Cf. <u>Duch v. Jakubek</u>, 588 F.3d 757, 763-64 (2d Cir. 2009)(in the context of co-worker harassment, complaint of sexual harassment to co-worker who was also the EEO liaison, did not create constructive knowledge where employee asked co-worker not to report the alleged harassment to harasser's supervisor.)

---

[10] It should be noted that D'Angelo claims that two individuals who provided security for the WWE on oversees trips also witnessed unidentified incidents of alleged harassment.  (D'Angelo Dep. 209-10.)  Security is provided for the WWE by outside vendors who are neither employees nor management of the WWE (D'Angelo Dep. p. 230) and, thus , such alleged knowledge cannot be imputed to the WWE.  Moreover, Plaintiff failed to provide any details of what these individuals allegedly witnessed.

In particular with respect to the question of Yamuder's knowledge, rulings issued in the context of determining when an employer has constructive knowledge of co-worker sexual harassment so as to impute liability to that employer are analogous and instructive.  As explained by the Second Circuit "[a]n official's actual or constructive knowledge of harassment will be imputed to the employer when principles of agency law so dictate.  That will be the case where a) the official is at a sufficiently high level in the company's management hierarchy to qualify as a proxy for the company, or b) the official is charged with a duty to act on the knowledge and stop the harassment, or c) the official is charged with a duty to inform the company of the harassment."  Duch, 588 F.3d at 763; See also Hudson v. Proctor & Gamble Paper Products, Corp., 568 F.3d 100, 107 (3d Cir. 2009).   An employee is significantly high enough in management when the employee has the authority to counsel, investigate or fire the accused harasser.  Hudson, 568 F.3d at 107(holding that to be senior enough in the governing hierarchy "the employee usually has the authority to act on behalf of the employer to stop the harassment, for example, by disciplining the employees or by changing their employment status or work assignment.")  As aptly noted by the Third Circuit "'management' in this context means the collective body of those who manage or direct an enterprise or interest: the board of managers; employer representation in an employer-employee relationship opposed to labor.  Thus in requiring that a 'management level' employee have knowledge as a pre-requisite to imputing that knowledge to the employer, we require this knowledge to have reached an employee in the governing body of the entity, as opposed to merely a supervisory employee in the labor force."  Hudson, 568 F. 3d at 108.

Applying these cases, Yamuder, despite holding an in-house counted position, simply does not qualify as management.  Yamuder was neither Plaintiff's nor Romer's supervisor, nor

was she otherwise in a position to discipline Romer or make any changes to D'Angelo's working environment.  (D'Angelo Dep. p. 220; Yamuder Dep. p. 103)   Thus, Yamuder's knowledge cannot be imputed to the WWE even if there is a question regarding her observations and alleged remark about Romer being "in love" with D'Angelo. [11]  See Duch, 588 F.3d at 763; Hudson, 568 F.3d at 107-09.  This holds true especially because even this perception is not equivalent to an admission of or recognition that D'Angelo was enduring hostile environment, sexual harassment.  See Duviella, 2001 U.S. Dist. LEXIS 22538 at *9-11, *40.

### iv    D'Angelo's Failure to Utilize the Complaint Procedure is Further Not Excused by Her Vague Alleged Fear of Retaliation

Finally, D'Angelo excuses her failure to follow the prescribed internal complaint procedure on an unsupported and generic fear of retaliation.  Initially, such testimony suggests that D'Angelo was waiting to resign to complain.  Yet, noteworthy again, D'Angelo ***did not initiate any complaint, even after her notice of resignation***.  Rather, she was approached by Human Resources after Human Resources spoke to Yamuder about two allegedly negative interactions she heard D'Angelo had with Romer. (Yamuder Dep. pp. 67-68)  Second, her articulated reasons for this fear were comprised solely of gossip about individuals she could not even identify.  (D'Angelo Dep. 79-80).  Third, her reference to Yamuder should be outright rejected, as Yamuder did not complain about her supervisor until after D'Angelo resigned from WWE.

While fear of retaliation may, under very specific circumstances, excuse an employee from complaining, and thus, defeat a Faragher/Ellerth defense, the Second Circuit has held that

---

[11] Further, as already outlined above, the majority of the information provided to Yamuder by D'Angelo consisted of generic statements that Romer would constantly try to contact D'Angelo, and that he would seek out other individuals including Yamuder to locate D'Angelo when he could not reach her.

an employee's reluctance to avail herself of preventive or corrective opportunities ***must be based***
on a "credible fear" of retaliation. See Leopold v. Baccarat, Inc., 239 F.3d 243, 246 (2d Cir.
2001); Brewster v. City of Poughkeepsie, 447 F. Supp. 2d 342, 354-56 (S.D.N.Y. 2006). "A
credible fear must be based on more than the employee's subjective belief.  Evidence must be
produced to the effect that the employer has ignored or resisted similar complaints or has taken
adverse actions against employees in response to such complaints." Leopold, 239 F.3d at 246.
A claim that "a co-worker's vague and ambiguous complaint was not taken seriously" is not
enough to excuse the employee's obligation to complaint.  Id.  Likewise, a general fear that the
employer would not take corrective action or that complaining would impact the employee's job
is not enough to create a credible fear.  See Caen v. Medina, 537 F. Supp. 2d 471, 476-77
(S.D.N.Y. 2008); Brewster, 477 F. Supp. 2d at 35-56; Breeding v. Cendant Corp., No. 01 Civ.
11563 (GEL), 2003 U.S. Dist. LEXIS 6558, at *21 (S.D.N.Y. April 10, 2003) (claim that
"creating any kind of waves could cause retaliation or hurt her opportunities" not enough to
excuse failure to complain.)

As a matter of law, D'Angelo's patently vague statements about unidentifiable claimants
(from hearsay and gossip), as well as a statement about a complainant whose situation did not
arise under after D'Angelo left WWE, are insufficient to support a fear of retaliation that would
excuse her lack of complaint.  Leopold, 239 F.3d at 246.

**B.  D'Angelo Was Not Constructively Discharged**

Plaintiff alleges that she was constructively discharged from her employment in violation
of Title VII.  (Amended Complaint ¶77)  Yet again, Plaintiff has failed to state an actionable
claim.  First, Plaintiff's departure from WWE was of her own volition by resigning to accept a
position with another employer for a higher salary, certainly not a "deliberate" act on

-33-

Defendant's part.  Second, WWE's treatment of Plaintiff cannot even remotely be described as intolerable. Third, Plaintiff had other options available to her, rather than resigning.

In order to state an actionable claim of constructive discharge, a plaintiff must allege two elements. First, Plaintiff must show that the defendant acted "deliberately" to create an intolerable work environment. Pena v. Brattelboro Retreat, 702 F.2d 322, 325 (2d Cir. 1983); Martin-Glave v. Aventis Pharms., No. 03 Civ. 1482 (EBB), 2007 U.S. Dist. LEXIS 939, at *25 (D. Conn. January 8, 2007).  "Deliberateness exists only if the actions complained of 'were intended by the employer as an effort to force the employee to quit.'"  Lombardo v. Oppenheimer, 701 F.Supp. 29, 30-31 (D. Conn. 1987) (citations omitted).  See also, Lucas v. Potter, No. 08 Civ. 480 (HBF), 2010 U.S. Dist. LEXIS 2255, at *38-9 (D. Conn. January 11, 2010).  The second element requires a showing that the working conditions were "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." Pena, 702 F.2d at 325; see also Lee v. Sony Bmg Music Entm't, Inc., No. 07 Civ. 6733 (CM), 2010 U.S. Dist. LEXIS 19481, at *25 (S.D.N.Y. March 3, 2010).  An employee's subjective opinion that the working conditions were "intolerable" is not sufficient to establish this element.  Leson v. Ari of Conn., 51 F. Supp. 2d 135, 142-43 (D. Conn. 1999).  See also, Cooper v. Wyeth Ayerst Lederle, 106 F. Supp. 2d 479, 496 (S.D.N.Y. 2000).

The standard for constructive discharge is not an easy one to satisfy.  See, e.g., Martin v. Citibank, 762 F.2d 212, 221 (2d Cir. 1985).  See also, Borski v. Staten Island Rapid Transit, No. 04 Civ 3614 (SLT), 2009 U.S. Dist. LEXIS 103347, at *23-26 (E.D.N.Y. October 28, 2009); Sedotto v. Borg-Warner Protective Services  Corp., 94 F. Supp. 2d 251, 262 (D. Conn. 2000).  In this regard, the Second Circuit has held that a constructive discharge cannot be established through evidence that the employee's supervisor had created working conditions

-34-

that were merely "difficult" or "unpleasant."  Lucas v. South Nassau Communities Hospital, 54 F.Supp.2d 141, 149 (E.D.N.Y. 1998); Martin, 762 F.2d at 221.  Indeed, a working environment can be far from perfect and yet will not be held to be "intolerable."  See Cooper, 106 F. Supp. 2d at 496; Martin, 762 F.2d at 221.  Plaintiff here does not even come close to meeting this stringent standard.  In fact, Plaintiff's constructive discharge claim is based upon the same facts as her hostile work environment claim.  (Amended Complaint at ¶77: "Plaintiff was constructively discharged from her employment due to the hostile environment created by Defendant's acts and omissions)  However, "both the Supreme Court and the Second Circuit have emphasized that a constructive discharge claim must entail something more than what is required for an ordinary sexual harassment hostile-environment claim."  Lupacchino v. ADP, Inc., No. 02 Civ. 2281 (MRK), 2005 U.S. Dist. LEXIS 1687, at *17-18 (D. Conn. January 21, 2005).  See also Fiore v. Fairfield Bd. of Educ., No. 07 Civ. 00926 (CFD), 2009 U.S. Dist. LEXIS 79676, at *17-18 (D. Conn. September 1, 2009).  For this reason alone, Plaintiff's claim fails.

Moreover, Plaintiff has not alleged one fact that would indicate that WWE deliberately set out to create arduous working conditions that would have caused a reasonable person in her position to resign.[12]  To the contrary, it is undisputed that once WWE was apprised of the alleged sexual harassment, it proceeded expeditiously to investigate and remedy the situation, which included the termination of Romer's employment before Plaintiff's last day of work, and the offer to Plaintiff of a promotion and raise in salary which Plaintiff refused.  These undisputed facts are likewise fatal to a constructive discharge claim.  See Mack v. Otis Elevator Co., 326

---

[12] Generally, constructive discharge is found where the employer has made clear and unequivocal remarks to the employee threatening termination, demotion, or a change in job status.  See, e.g., Equal Employment Opportunity Commission v. Die Fleidermaus, 77 F.Supp.2d 460, 471 (S.D.N.Y. 1999). Here, there is no evidence that WWE expressed, either explicitly or implicitly, that it intended to force Plaintiff to resign.

F.3d 116, 128 (2d. Cir. 2003) (upholding grant of summary judgment concluding that employee could not establish she was constructively discharged as employer took prompt remedial action to address employee's claims of harassment); Pasternak v. Baines, No. 00 Civ 0369C, 2006 U.S. Dist. LEXIS 62898, at *18 (W.D.N.Y. September 1, 2006)("An employee who fails to explore alternative avenues offered by her employer before concluding that resignation is the only option cannot make out a claim of constructive discharge")(citations omitted); Cooper, 106 F.Supp.2d at 496-97 ("[b]cause Plaintiff herself refused to explore the employer's proposed remedy for the situation she found intolerable, I must grant [defendant's] motion for summary judgment); Lee-Crespo v. Schering- Plough Del Caribe, Inc., 354 F.3d 34, 45-46 (1st Cir. 2003) (prompt remedial action that eliminated the intolerable working conditions, such as moving the employee away from the alleged harasser, negated a claim that the employee was forced to resign due to intolerable working conditions).

Plaintiff resigned to accept a position at Sherwin Williams at a higher salary, evincing her true motivation for resigning. See Zephyr v. Ortho McNeil Pharm., 62 F. Supp. 2d 599, 609 (D. Conn. 1999)("when [plaintiff] resigned from OMP he had already accepted a salesperson position with a rival pharmaceutical company that paid a significantly higher base salary …While not relevant to his working conditions at OMP, this undisputed fact is pertinent to why [plaintiff] left OMP and further undermines his claim of constructive discharge.")  As previously noted as well, on her exit interview form and in statements to several WWE employees, D'Angelo never indicated that was resigning due to the alleged hostile work environment.  To the contrary, D'Angelo stated in her own handwriting and in these conversations that she resigned to accept a better opportunity with a better salary and a better location. (Exhibit N)  In sum, Plaintiff cannot establish that her working conditions were so

-36-

intolerable that she had no option other than resignation.

## IV.   <u>CONCLUSION</u>

The undisputed record reveals that D'Angelo availed herself of one thing—not WWE's clearly articulated complaint procedure, but rather, her perception of Romer's attraction to her because it might work to her advantage and secure a promotion (potentially still reporting to Romer).   When the promotion seemed to not be happening, she looked outside of WWE for jobs paying more.   She obtained one, even before the final, series of "troublesome" incidents in April of 2006.   D'Angelo had no intention of utilizing the complaint procedure well known to her, and even at the end, Human Resources had to seek her out for the details.   This deliberate failure to report the so-called offensive behavior was not due to any fear of retaliation, but rather, because D'Angelo was neither offended nor troubled by any of it, and even welcomed it.   WWE undertook a prompt investigation, terminated Romer's employment, and offered D'Angelo a promotion and raise, all within the ten days notice period she gave to WWE of her intended resignation.   She refused, and even when she had nothing to fear and all allegations were out in the open, D'Angelo put on her exit interview form that she was leaving WWE for a higher paying job, as well as making the same statement to her friend, Yamuder, and to Fisher from Human Resources.

Now, D'Angelo asks this Court to agree with her that a reasonable jury, on this record, could find in her favor that she was sexually harassed, constructively discharged, and that she deserves damages despite her own negligence in failing to complain, the numerous opportunities to complain even outside the Human Resources department's procedure, and despite WWE's aggressive efforts to keep her employed.

Consequently, based on the foregoing, even if the allegations contained in Plaintiff's

Amended Complaint and her deposition testimony are true, Defendant has unequivocally established the absence of any genuine issue of material fact as to Plaintiff's sole cause of action.   Accordingly, Defendant respectfully requests that its Motion for Summary Judgment be granted in its entirety.

DEFENDANT,
WORLD WRESTLING ENTERTAINMENT, INC.

By:   _____/s/_____
        Mary Gambardella, Esq.
        Federal Bar No. ct05386
        Jonathan Bardavid, Esq.
        Federal Bar No. ct27763
        Wiggin and Dana LLP
        400 Atlantic Street
        Stamford, CT  06911-0325
        (203) 363-7662
        (203) 363-7676 (fax)
        mgambardella@wiggin.com
        jbardavid@wiggin.com

        *Attorneys for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

This will certify that, on April 19, 2010, a copy of the foregoing was filed electronically.

Notice of this filing will be sent by email to all parties listed below by operation of the Court's

electronic filing system.  Parties may access this filing through the Court's CM/ECF System.

Patrick J. Boyd, Esq.
The Boyd Law Group, PLLC-NY
230 Park Avenue, Suite 1000
New York, NY 10169
212-808-3020
pboyd@theboydlawgroup.com
Lead Attorney
Pro Hac Vice
Counsel for Plaintiff

Peter L. Truebner, Esq.
1150 Summer St.
Stamford, CT 06905
203-323-4540
ptruebner@aol.com
Lead Attorney
Counsel for Plaintiff

                                          _____/s/_____
                                          Jonathan Bardavid (ct27763)

20324\4\2349824.4