# TAB A



**World Wrestling Entertainment, Inc.**

1241 East Main St.
Stamford, CT 06902
Tel: 203 352 8600

March 9, 2004

Fara D'Angelo
150 West 47th St., Apt 3H
New York, NY 10036

Dear Fara:

On behalf of World Wrestling Entertainment, Inc., I am pleased to extend the following offer of employment to you.

| | |
|---|---|
| Title: | Global Licensing Coordinator |
| Location: | 1241 E Main St.<br>Stamford, CT |
| Department: | Consumer Products Group |
| Reporting Relationship: | Joel Satin, Director, Home Video<br>and Alex Romer, Director, International Licensing |
| Start Date: | TBD |
| Base Compensation: | $45,000 base salary, which will be paid bi-weekly, in the amount of $1730.77. You will be eligible for a salary increase, based upon your performance evaluation, in calendar year 2005. Our current review date is June 1st. |
| Benefits: | You will be eligible for full company benefits on the first day of the month following your date of hire. Company benefits include: Medical, Dental, Life, LTD and 401(k) plan. Detailed information regarding the benefits is included in the enclosed offer packet. |
| Sign-on Bonus: | $5,000 less applicable deductions payable on the first pay date following 30 days of employment. If you voluntarily terminate employment with WWE within one year of your date of hire, you must reimburse WWE 100% of your sign-on bonus. Reimbursement is due within 10 days following last day of employment. |
| Vacation: | Two (2) weeks vacation and three (3) personal days. See vacation policy included in the offer packet for more details. |
| Confidentiality/Non-Solicitation Agreement: | Enclosed please find a Confidentiality/Non-Solicitation Agreement to be signed and returned to the Human Resources Department. |

P 0001



**World Wrestling Entertainment, Inc.**

1241 East Main St.
Stamford, CT 06902
Tel: 203 352 8600

This offer is contingent upon clear reference and background checks and satisfaction of the Immigration Control and Reform Act requirements. Your employment relationship with WWE, Inc. will be "at will." This means that either you or WWE can end your employment at any time, for any reason.

On behalf of World Wrestling Entertainment, Inc., we are very pleased that you have accepted this offer and look forward to you joining our team. If you have any questions, please do not hesitate to give me a call at (203) 352-8681.

Please fax a signed copy of this letter to my attention by March 12, 2004. The fax number is (203) 359-5151.

Sincerely,

Danielle Fisher
Human Resources Generalist

_____                    _____
Fara D'Angelo                                                    Date

Enclosure

D'Angelo, Fara2.doc

P 0002

# TAB B

```
 1          UNITED STATES DISTRICT COURT
               DISTRICT OF CONNECTICUT
 2     ------------------------------x
       FARA D'ANGELO,
 3
                    Plaintiff,
 4
       VS.              CASE NO. 3:08-CV-1548(JCH)
 5                      Date:  January 22, 2010
       WORLD WRESTLING ENTERTAINMENT, INC.,
 6
                    Defendant.
 7     ------------------------------x

 8

 9             DEPOSITION OF FARA D'ANGELO

10        The deposition of Fara D'Angelo was taken on

11     January 22, 2010, beginning at 9:45 a.m., at Wiggin

12     and Dana, 400 Atlantic Street, Stamford, Connecticut,

13     before Susan Wandzilak, Registered Professional

14     Reporter and Notary Public in the State of

15     Connecticut.

16

17

18

19

20             Susan Wandzilak  License No. 377
           DEL VECCHIO REPORTING SERVICES, LLC
21          PROFESSIONAL SHORTHAND REPORTERS
                     117 RANDI DRIVE
22            MADISON, CONNECTICUT 06443
                    800-839-6867
23
       NEW HAVEN            STAMFORD        HARTFORD
24

25
```

```
 1    attorneys.

 2         A.   No.

 3         Q.   Great.  All right, where are you currently

 4    employed?

 5         A.   Sherwin Williams.

 6         Q.   Is that the same job that you had immediately

 7    after your left WWE?

 8         A.   Yes.

 9         Q.   How much are you making there?

10         A.   95.

11         Q.   What is your position?

12         A.   Product manager.

13         Q.   When was your first day there?

14         A.   I think May, May 30, 2006.

15         Q.   Your last day at WWE was what, if you can

16    recall?  Not when you resigned, the last day you

17    worked.

18         A.   It was two weeks after May 5th, so probably

19    May 15.

20         Q.   All right, you took two weeks off?

21         A.   No, I took like a week off.  There was like a

22    week between --

23              MS. GAMBARDELLA:  She is going to give you

24         the original.

25              (Whereupon, D'Angelo Exhibit No. 1 was marked
```

```
 1          for identification.)

 2    BY MS. GAMBARDELLA:

 3          Q.   Ms. D'Angelo, we have marked as an exhibit

 4    D'Angelo 1.  Can you identify this document for us?

 5    Take your time.

 6          A.   It's the offer letter I received from Sherwin

 7    Williams.

 8          Q.   Very good, all right.  So you did receive

 9    this and that is your signature on the bottom?

10          A.   Yes.

11          Q.   And the date accepted looks like April 21,

12    2006.  Can you confirm that for me because you might

13    have written it.

14          A.   Yes.

15          Q.   All right.  So you received this -- when did

16    you receive this offer?  How close to April 20, 2006,

17    did you receive it to the best of your recollection?

18          A.   Probably a couple of days before April 21st.

19          Q.   Did you know it was coming?  In other words,

20    did you have a conversation with anybody from Sherwin

21    Williams where they said they were going to send you

22    an offer?

23          A.   Yes.

24          Q.   Now, bi-weekly salary, it says $2,692.31

25    cents.  How much was that a year?
```

1      A.   It was I think probably 70,000.

2      Q.   I will take your word for it.  How much were

3  you making at WWE when you resigned?

4      A.   I think close to $50,000.

5      Q.   So you were going to get a raise of over

6  $20,000 a year to start.  Would that be correct?

7      A.   To start with Sherwin Williams?

8      Q.   Yes.

9      A.   Yes.

10      Q.   And now you are making 95 a year?

11      A.   Yes.

12      Q.   So you are now making about $45,000 or more a

13  year than when you left WWE; would that be correct?

14      A.   Yes.  I was just promoted.

15      Q.   When were you promoted?

16      A.   Last week.

17      Q.   So you are doing very well.

18      A.   Yes.

19      Q.   How is your performance?

20      A.   Very well.

21      Q.   Has it been very good since you started?

22      A.   Yes.

23      Q.   So you go to work every day.  You do a very

24  good job, correct?

25      A.   This is the second time I was promoted, so --

1       Q.   Do you know whether or not your contribution

2   is about the same, more, or less than it is at Sherwin

3   Williams?

4       A.   I don't know.

5       Q.   And that's obviously why I need it.  Okay, so

6   we can leave that for now, okay?

7       A.   Um-uh.

8       Q.   Is it accurate to say, again, before we get

9   to Exhibit 2 that you have lost no wages since you

10   left WWE?

11           MR. BOYD:  Objection.

12   BY MS. GAMBARDELLA:

13       Q.   Would that be accurate?

14       A.   That I have lost no wages?

15       Q.   No wages.  You have had no wage loss since

16   the last day you worked at WWE?

17       A.   That is correct.  I was not out of work.

18       Q.   You have lost no income in terms of salary

19   since you left WWE, correct?

20       A.   Correct.

21       Q.   In fact, you are making more?

22       A.   Yes, I am.

23       Q.   Okay.  Do you have any other losses out of

24   pocket that you claim you have experienced since you

25   left WWE?

1    the question was, Had you consulted with an attorney

2    about the prospect of suing?

3           And this is a little bit different of a

4    question.  Did you consult with any legal advisors

5    about what you claim you were enduring while you were

6    employed at WWE?

7       A.   I was friends with Cheryl Yamuder, who was

8    legal, who worked in the legal department for WWE.  So

9    we never really talked about filing a lawsuit, but she

10   was someone that was a lawyer and I talked to her

11   about what was going on.  So I guess yes to your

12   question.

13      Q.   Do you know why you don't reference those

14   conversations in your CHRO affidavit?

15      A.   I don't really see the relevance.

16           MS. GAMBARDELLA:  Can you read back the

17      question, please.

18           (Whereupon, the question was read back.)

19   BY MS. GAMBARDELLA:

20      Q.   Is it because you think those conversations

21   are irrelevant?

22           MR. BOYD:  Objection.

23           THE WITNESS:  Yeah, I mean, I wasn't --

24      originally when I left the company -- I am not

25      really sure what your question is or what you're

```
1          A.    I think I read it on April 1st, '04.
2          Q.    What was your understanding of the content of
3     this document?
4          A.    I mean, it seems like a pretty standard legal
5     document.  You are signing a lot of papers when you
6     walk in the door, so --
7          Q.    But you read it, right?
8          A.    Yeah, I read it.
9               (Whereupon, D'Angelo Exhibit No. 6 was marked
10         for identification.)
11    BY MS. GAMBARDELLA:
12         Q.    Just keep that handy, the policy too.
13         A.    Um-uh.
14              MS. GAMBARDELLA:  Okay.  And don't walk
15         off -- you can keep this on the record.  People
16         sometimes scoop up everything and walk out the
17         door and exhibits go out the door.  So just make
18         sure you don't do that, okay?
19              MR. BOYD:  I missed what you said.
20              MS. GAMBARDELLA:  No, all I said is she has
21         got all the exhibits in front of her and what
22         sometimes people do when they leave is they scoop
23         everything up that is in front of them and walk
24         out the door.  I've had that happen.
25              MR. BOYD:  You can mark any of these or mess
```

1  nobody that ever went to a sexual training course.

2      Q.   Were you a member of management?

3      A.   No, but I knew people that were.  And it was

4  pretty much common knowledge that sexual harassment

5  was kind of thrown out the window being that senior

6  management were involved with sexual harassment

7  charges.

8      Q.   So you have never seen me there giving

9  training after training after training?

10     A.   Never.

11     Q.   Okay, so let's put that aside.

12          And did not tender an employee handbook to

13  our client at any time; do you see that?

14     A.   Yeah, I don't remember getting the handbook.

15     Q.   Well, this doesn't say you don't remember.

16  It says we didn't give you one.

17          MR. BOYD:  Objection.

18  BY MS. GAMBARDELLA:

19     Q.   Am I right?  And did not tender an employee

20  handbook at any time.  Do you see that?

21          The only question on the table is, do you see

22  where I am reading from?

23     A.   Yeah.

24     Q.   Now --

25          (Whereupon, D'Angelo Exhibit No. 7 was marked

74

```
 1            for identification.)
 2   BY MS. GAMBARDELLA:
 3       Q.   Exhibit 7 is Bates stamped P 0110 to 0121.  P
 4   means, Ms. D'Angelo, your counsel produced it to us,
 5   okay?  And this is an employee handbook; is it not?
 6       A.   Yes.
 7       Q.   Is it something you received at WWE?
 8       A.   Probably was in my welcome packet.
 9       Q.   So you got a handbook?
10       A.   Yeah, I probably did.
11            MR. BOYD:  Objection.
12   BY MS. GAMBARDELLA:
13       Q.   Your answer is you did or you probably did?
14   I didn't hear that.
15       A.   I mean, I don't remember it, but it was
16   probably included in the welcome kit, so --
17       Q.   When is the first time you gave your
18   counsel -- and this is just state and it doesn't have
19   to be exact -- any documents in connection with this
20   case?  Documents you had in your possession that you
21   gave to your lawyers, when was the first time that
22   happened?  Because I am assuming you gave him this,
23   Exhibit 7.
24       A.   I know I probably -- I gave him the stack of
25   e-mails and everything initially when we first signed
```

1          Q.    And the handbook that we just marked is P

2     1102121, so it's within this number range, correct?

3          A.    Yes.

4          Q.    All right.   Now, this response is dated June

5     23rd of '09, okay?   Does this help you estimate in

6     time when for the first time you gave your attorneys

7     any documents in this case?   No conversations, no

8     communications.   When?   Chronology.

9          A.    I really don't remember when I gave him the

10    documents.

11         Q.    Good enough.   Fair enough.

12              Did you ever report your complaints about

13    Alex Romer to anybody in human resources before the

14    end of your employment when you were resigning?   In

15    human resources.

16         A.    I did not being that I had --

17         Q.    I didn't ask you why yet.   We are going to

18    get there, okay?

19         A.    Okay.

20         Q.    You did not, correct?

21         A.    Correct.

22         Q.    Did you ever ask anybody at WWE to report to

23    human resources for you your complaints about Alex

24    Romer?

25         A.    I was afraid of losing my job.

```
 1              MS. GAMBARDELLA:  Let's read back the
 2         question.
 3              THE WITNESS:  So I did not ask anybody.
 4              MS. GAMBARDELLA:  Okay, that's the answer.
 5         Very important.  Not the question you wanted me
 6         to ask, but the question I asked.  All right, and
 7         we will get there.
 8    BY MS. GAMBARDELLA:
 9         Q.   You did not ask anybody at WWE to report your
10    allegations for you to human resources, correct?
11         A.   Correct.
12         Q.   Tell me if you are aware of anybody while you
13    were employed at WWE who reported any complaint to
14    human resources and subsequently got fired?
15         A.   Yes.
16         Q.   Who?
17         A.   I don't remember their names, but I have
18    heard of someone that was complaining of sexual
19    harassment and they ended up getting fired.  That was
20    one person.  I --
21         Q.   You don't know anything about the name?
22         A.   I don't remember their name.
23         Q.   Who told you?
24         A.   They were not in my department.
25         Q.   Who told you?
```

1          A.    It was, it was just chatter that was going
2     around the office.  It was more than one.  I have
3     heard --

4               And then also Cheryl told me that she went to
5     HR with something that was going on with her.  She
6     confided in HR and told them what was going on with
7     her boss.  And then in the end they ended up using
8     that against her.

9               HR ended up telling her boss what she
10    confided in them and basically used it against her.
11    So there was no trust between the employee and HR.  So
12    I basically learned from her experience and then also
13    from the other people that had charges against WWE for
14    sexual harassment that there was --

15              Obviously, I didn't feel comfortable going
16    with my case because I felt that I would be
17    jeopardized as a result of what information I would
18    tell them.

19         Q.    So let's set aside Ms. Yamuder for a moment.
20    You can't think of the name of one person who got
21    fired nor the name of one person who told you somebody
22    got fired after a complaint.  Do I have that right?

23         A.    I don't remember the name of the person that
24    got fired, but it was also -- it was common
25    knowledge.  I mean, Vince McMahon was being charged

1    with sexual harassment.

2         Q.   By who?

3         A.   One of the talent, one of the wrestlers.

4              MS. GAMBARDELLA:  Can you read back the

5         question, please?

6              THE WITNESS:  So, there was -- it was

7         multiple cases that were going on.

8              MS. GAMBARDELLA:  I need her to read back the

9         question.

10             (Whereupon, the question was read back.)

11             THE WITNESS:  Yeah, I don't remember the

12        name.

13   BY MS. GAMBARDELLA:

14        Q.   Not one?

15        A.   If I think long and hard, maybe it will

16   come.

17        Q.   Well, this is the time to do it.

18        A.   Believe me, I have been trying to think of

19   that person's name.  I know that female was -- she

20   obviously wasn't in my department, but --

21        Q.   What did she look like?

22        A.   She had long blond hair.  I don't remember

23   her name.

24        Q.   Did you take any notes of these conversations

25   that you had with people who allegedly it was common

82

1     knowledge among that people got fired after they

2     complained of sexual harassment?

3         A.   Did I take notes?

4         Q.   Did you take notes?

5         A.   No.

6         Q.   But you have notes of other events during

7     your employment, correct?

8         A.   Yeah, because that was -- it was happening to

9     me, so I was trying to remember everything.  There is

10    only so much that I could remember, so --

11        Q.   But you never took a note at any time about

12    any of these other conversations that you had?

13        A.   Well, some of it is public knowledge.  I

14    mean, Vince McMahon's charges are all over the

15    Internet so that's public knowledge.

16        Q.   Tell me where on the Internet you saw Vince

17    McMahon was charged with sexual harassment.

18        A.   Where on the Internet?

19        Q.   Yes, where on the Internet.

20        A.   If you do a Google search, you will see that

21    he has been -- people have made claims against him for

22    sexual harassment.

23        Q.   When?  When did they make claims against him

24    for sexual harassment?

25        A.   A couple of years ago.

```
1            Q.   Who?

2            A.   I know it was one of the wrestlers from the

3       talent.

4            Q.   You don't remember the name?

5            A.   No.

6            Q.   Who else?

7            A.   It's like Tory -- it's not Tory.  I forget

8       her name.

9            Q.   Are you talking about the wrestling rag

10      sheets online?  What's commonly referred to as a rag

11      sheet?

12           A.   I don't know what websites it is, but there

13      is a few.

14           Q.   Okay, so is that your way of telling me, no,

15      I didn't take any notes of any of these conversations

16      I had about other people getting fired?

17           A.   I mean, I didn't write it down, but --

18           Q.   That's a great answer.  No, I didn't write it

19      down.  Okay.

20           A.   No, I didn't.

21           Q.   Okay, fine.  When you finally -- strike

22      that.

23                And we are going to get to this in more

24      detail.  But when HR did get your allegations at the

25      end of your employment, Alex Romer got fired, right?
```

1          A.    Yes.

2          Q.    And you were told before you left WWE

3     physically that he had been fired, correct?

4          A.    Yes.

5          Q.    And were you offered an opportunity to stay

6     employed by WWE?

7          A.    Yes.

8          Q.    Making more money than you were then,

9     correct?

10         A.    Yes.

11         Q.    And you turned it down, correct?

12         A.    I turned it down because at the time, my -- I

13    was humiliated, embarrassed of what had happened.  And

14    my reputation was pretty much tarnished, so I felt

15    that it would be better to cut my losses and start

16    over at an organization as opposed to having to stay

17    there when already it was out that everybody knew that

18    Alex got fired and Fara is resigning.

19              People put two and two together.  So because

20    of the situation, I felt it would be a better move for

21    my career if I left the company.

22         Q.    Ms. D'Angelo, did you tell any of that to

23    anybody when you turned it down?

24         A.    I don't remember.  There was a lot going on

25    when I resigned.

1        Q.    Isn't it a fact that when you were offered a
2    job at a higher salary to stay, you said, The commute
3    will be better for me and I will have better
4    opportunities for advancement at Sherwin Williams?
5    Isn't that what you said?
6        A.    I don't remember saying that.  I mean,
7    obviously the commute was better.
8        Q.    Right.
9        A.    But I was willing to move my life and live in
10   Connecticut to work for that company because I was
11   very focused and I wanted to succeed at that company.
12       Q.    So you assumed that it would be better for
13   you because you assumed your reputation would be
14   ruined?
15       A.    Well, my reputation was ruined when I
16   resigned and it came out with the fact that my direct
17   report was sexually harassing me.
18       Q.    How was your reputation ruined?
19       A.    I don't think too many people would want to
20   work with somebody that is saying that their direct
21   boss was sexually harassing them.
22       Q.    How do you know that?
23       A.    As a female, I just felt very uncomfortable
24   with the whole situation.
25       Q.    After it got reported to HR, did anybody

1    treat you differently at WWE?

2        A.   Well, I was only there for like a week, week

3    and a half.

4        Q.   So did anybody during the week treat you

5    differently?

6        A.   Yes.

7        Q.   Who?

8        A.   Well, everybody.  I was --

9        Q.   Name one.  Give me names.  I need names.

10   Everybody.  Name one person who you contend knew that

11   you complained -- let's change the question -- and

12   treated you differently because of it?  One.

13       A.   Treated me differently, I will define that as

14   there was a lot of sympathy.  And it just -- it felt

15   like people pitied me that -- because I was, I was

16   very emotional that week after what was going on.

17       Q.   Is that a bad thing that people felt badly

18   for you?

19       A.   I would -- I mean, that's not how I want to

20   be viewed as a professional.  I am trying to grow in

21   my career.  I don't want people pitying me.

22       Q.   Ms. D'Angelo, how do you know that that would

23   have lasted throughout your career?  I mean, you told

24   me it was a one-week interim period.  You were very

25   emotional and people pitied you.  How do you know that

```
 1    the pity, quote-unquote, would have continued had you
 2    stayed?
 3             MR. BOYD:  Objection.  I'm sorry.
 4             MS. GAMBARDELLA:  That's okay.
 5             THE WITNESS:  I don't know.  I just assumed
 6         that because of what I went through that my
 7         future career at that company would be very
 8         challenging.
 9    BY MS. GAMBARDELLA:
10         Q.  Right.  So that was my original question.
11    You assumed.
12         A.  Yes, I had no other -- nothing else to base
13    it upon.
14         Q.  Right, okay.  Did you also tell HR that you
15    were making so much more money at Sherwin Williams
16    that you would not consider staying, that that was one
17    of the reasons that you would not consider staying?
18         A.  The offer I got at Sherwin Williams was more
19    than what WWE was offering me.
20         Q.  All right, that wasn't my question.  My
21    question was, did you indicate to anybody in human
22    resources that another reason you would not stay --
23    that a reason you would not stay at WWE is because you
24    were being offered more money at Sherwin Williams?
25         A.  Like I said, it was -- for me I felt it was a
```

1        Q.   Okay.  Can you go to paragraph 18 and just

2   review it to yourself.  Is that an accurate

3   description, more or less, of your primary job

4   responsibilities at WWE?

5        A.   Yes.

6        Q.   Did you always report to Mr. Romer?

7        A.   Yes, there was a period where I was reporting

8   to Alex and Joel Satin.

9        Q.   Do you remember what period that was?

10       A.   I think it was when I originally started.

11       Q.   Okay.  And then that changed?

12       A.   Yes.

13       Q.   All right.  Do you remember about when that

14   changed?

15       A.   No.

16       Q.   All right.  Did you have any reporting

17   relationship with Joel Satin -- or you said Mike

18   Archer was the other person?

19       A.   No, I reported -- when I started, I believe I

20   reported to Alex Romer and Joel Satin.

21       Q.   I've got it, okay.  Did that ever change that

22   you had a reporting connection with Joel Satin?  In

23   other words, did there come a time after you started

24   that you no longer had a reporting relationship with

25   Joel versus Alex and Joel?

```
 1          A.    Yes, when I first started, I was working for

 2    Alex and Joel reporting to both of them.  And then I

 3    don't remember when, but I no longer reported to Joel

 4    so I was just reporting to Alex.

 5          Q.    All right.  And when about did that happen;

 6    do you know?

 7          A.    I don't remember.

 8          Q.    Okay, fair enough.  Did you have a reporting

 9    relationship with Donna Goldsmith?

10          A.    She was not my direct report, so she was

11    above -- she was Alex's boss.

12          Q.    Did your job duties generally require you to

13    interact with Ms. Goldsmith?

14          A.    Not on a daily basis.

15          Q.    Did you interact with her occasionally?

16          A.    Occasionally, on meetings, yeah.

17          Q.    Okay.  So if you had to give an average, on

18    average, how often would you interact directly with

19    Donna Goldsmith?

20          A.    Percentage you are looking for?

21          Q.    On average, once a month, twice a month?

22          A.    Maybe once or twice a month.

23          Q.    Okay.  Were you aware at any time while you

24    were working at WWE that Ms. Goldsmith was not

25    completely satisfied with your performance?  And by
```

```
 1    the way, I am not restricting it to something she told
 2    you directly.  The question is did you ever learn?
 3          A.    That she was not happy with my performance?
 4          Q.    That she was not completely happy with your
 5    performance or she had issues with aspects of your
 6    performance?
 7          A.    No.
 8          Q.    Isn't it true that Mr. Romer on a few
 9    occasions intervened for you with Ms. Goldsmith?
10          A.    In what respect?
11          Q.    To help Ms. Goldsmith understand that you
12    were a better employee than she thought you were?
13          A.    Yes, he actually -- he told me that he had --
14    well --
15          Q.    Go ahead.
16          A.    He had told me that he had put his dick on
17    the line for me on multiple occasions.
18          Q.    Did you believe him?
19          A.    I guess.  I mean, not really.
20          Q.    You don't have to guess.  You didn't believe
21    him?
22          A.    Did I believe him?
23          Q.    You thought he was lying about that?
24          A.    I took it for what it was worth.  I just
25    listened to what he said.
```

1        Q.    What did you think he meant?

2        A.    I guess putting your dick on the line would

3    mean that he went to bat for me?

4        Q.    Right.  Did you have an understanding of why

5    he would have had to do that?

6        A.    Well, he told me that it was because he was

7    trying to get me promoted.

8        Q.    Did you believe him?

9            MR. BOYD:  Objection.

10           MS. GAMBARDELLA:  What's the objection?

11           MR. BOYD:  You asked it and she answered it

12       already.  Twice I think.

13           MS. GAMBARDELLA:  I am not sure it was the

14       same question, but I will take it at face value.

15   BY MS. GAMBARDELLA:

16       Q.    Did you believe that he was trying to help

17   you get promoted?

18       A.    Did I -- I mean --

19       Q.    Not today.  Then.  Did you believe it?

20       A.    I guess I might have.

21       Q.    Okay.

22       A.    But it never really happened.  And he was

23   telling me that for so long, so I started to really

24   lose faith in what -- I never really -- I didn't

25   believe what he was saying because he was saying it

```
 1    for so long, so how long does it take --
 2         Q.   So you believed him, but at some point you
 3    stopped believing him because it wasn't happening?
 4         A.   Right.  I might have believed him in the
 5    beginning, but then towards the end I wasn't getting
 6    anywhere.
 7         Q.   Right.
 8         A.   So I felt that maybe he was just -- you know,
 9    they use the term blowing air up your skirt.  Maybe
10    that was what he was doing.
11         Q.   Right.  I understand that.  Isn't it a fact
12    that what he told you was that he thought you should
13    get promoted but Ms. Goldsmith didn't?
14         A.   I don't recall that.
15         Q.   Do you know what Ms. Goldsmith's opinion was
16    of your promote ability while you were at WWE?
17         A.   No.
18         Q.   Mr. Romer never discussed that with you?
19         A.   No.
20         Q.   Did you ever get reprimanded at WWE for
21    flirting with talent?  And I am not asking if you
22    agree with it.  It's very simple.  Did you ever get
23    reprimanded, whether you believe it was the right
24    thing to do or not, by anybody at WWE for flirting
25    with talent?
```

1        A.   Could you define reprimanded.

2        Q.   Told to stop it, knock it off kind of thing.

3        A.   Well, I was pulled out of a bar by my neck

4    and told that I shouldn't be in the bar at that hour

5    with some of the wrestlers.

6        Q.   Isn't it a fact, Ms. D'Angelo, that you were

7    also told that people got the impression you would get

8    too close to or cosy up to talent and that was not

9    something they wanted you to do?

10       A.   Yes, that's what Alex told me.  He was afraid

11   of the image that people would perceive me as.

12       Q.   Did he elaborate on what image he was worried

13   about?

14       A.   He didn't -- well, not really.  He just

15   didn't want people to think that I was always with the

16   talent.

17       Q.   Flirting.

18       A.   Yeah.

19       Q.   Right.

20       A.   However, I was not the only corporate person

21   in the bar.

22       Q.   I didn't ask you that, okay?  Now, in your

23   complaint you say, paragraph 19:  The formal reviews

24   of plaintiff's work performance were always

25   satisfactory or better throughout her employment at

```
1    WWE.
2              Do you see that?
3         A.   Um-uh.
4         Q.   So is that true?  I mean, you told me you
5    approved this before it was filed and it was accurate,
6    remember?
7         A.   Yes.  I never received a performance review
8    that said I was a horrible employee.
9         Q.   I didn't ask that.  Your allegation in the
10   complaint is that your reviews were always
11   satisfactory or better throughout your employment.  Is
12   that an accurate statement?
13        A.   Yes.
14        Q.   So earlier today I asked you about whether or
15   not your performance basically -- your reviews were
16   basically pretty good.  And you thought so.  So now we
17   can confirm that it's accurate.  Your work performance
18   reviews were always satisfactory or better, correct?
19        A.   Yes.
20        Q.   Now, paragraph 23 says you met with Romer on
21   numerous business trips.
22        A.   Right.
23        Q.   How many business trips did you meet up with
24   Alex Romer?  This doesn't talk about meetings, its
25   business trips, okay?  How many times?
```

1          A.   Well, approximately three or four trips to
2     Europe --
3          Q.   Is that numerous?
4          A.   -- is what I can recall.
5          Q.   Okay.
6          A.   Well, numerous -- at a time you're spending
7     7 to 10 days with a person, so if you put it together,
8     that's 30 plus days.
9          Q.   Well, that's not what this says.  It says
10    numerous business trips, not numerous days.  So I just
11    want to make sure we are getting the same --
12              MS. GAMBARDELLA:  Would you like to take a
13         break while you go out and decide that you are
14         done laughing?
15              MR. BOYD:  Do you want me to take a break to
16         laugh for a second?  I'll walk out and laugh --
17              MS. GAMBARDELLA:  Yeah, go right ahead
18         because that is probably not a professional thing
19         to do during the deposition -- to have a lawyer
20         laughing.
21              MR. BOYD:  Well, Mary, you have been rolling
22         your eyes.  Everybody is an advocate here.  If
23         you want to take a big deal and make this into a
24         big deal, I'll step outside and laugh.  If you
25         want me to stay here, I'll stay here.

```
 1              But let's not try and turn this into
 2         something that requires, you know, this much
 3         discussion.  I don't think it's essential.
 4              MS. GAMBARDELLA:  Well, I understand why
 5         you're uncomfortable with it.  I just want to get
 6         it clear --
 7              MR. BOYD:  Yeah, because you're splitting
 8         hairs over whether it's numerous or not.  Three
 9         to four is defined as numerous if you want to
10         pull out the dictionary.  But I don't really see
11         that it's a useful expenditure of time.
12              MS. GAMBARDELLA:  Well, then I will have to
13         think about that later and --
14              MR. BOYD:  I'll welcome your consideration of
15         it later if you wish.
16    BY MS. GAMBARDELLA:
17         Q.  When you allege numerous business trips, are
18    we talking about the three to four business trips or
19    are we talking about numerous occasions you were
20    together with him?  I am just trying to get your
21    complaint straight.
22         A.  I am assuming that I was referring to the
23    trips to Europe.
24         Q.  The three to four business trips?
25         A.  Right, but then there was also trips where he
```

1    came to the U.S., so --

2         Q.   Well, those -- okay, got it.  Okay, tell me

3    how Mr. Romer started to sexually harass you.

4         A.   Well, there was constant communication of

5    e-mails to my personal account which I submitted,

6    instant messengers, phone calls during the off hours

7    of the business day, phone calls when he was drunk

8    calling my cell phone, invitations to dinner, him

9    inviting me to vacations with him.  Just the two of

10   us.  Should I go on?

11        Q.   Yes.

12        A.   Other instances where physical contact of him

13   touching me in my lower, my lower waist, my hair,

14   caressing my face, him putting his arm around me.  I

15   mean, there was multiple instances where he touched me

16   inappropriately and unprofessionally and the constant

17   communication and more of a obsession that he had with

18   me where he was -- always needed to know where I was

19   and felt the need to express how he personally felt

20   about me.

21        Q.   Tell me all the places he touched you?

22        A.   Like I said, he touched my lower back.

23        Q.   Put his hand around your waist, lower waist?

24        A.   Lower waist close to -- above my rear end.

25        Q.   How many times did he do that?

1      A.   About two or three times.

2      Q.   And where else did he touch you?

3      A.   He caressed my face.  He, you know, petted my

4   hair.  He, you know, would speak very closely when he

5   would try and talk to me.  It was very different from

6   when he would talk to his boss or any other females.

7   It was always with me he was right about two inches

8   away from my lips.

9      Q.   Well, let's stick with touching, okay?  So he

10  caressed your face how many times?

11     A.   That happened once in a cab.

12     Q.   How many times did he pet your hair?

13     A.   I think twice.

14     Q.   Was one of the occasions he pet your hair the

15  same time that he caressed your face?

16     A.   Yes, yes.

17     Q.   The same incident?

18     A.   Yes.

19     Q.   Where else did he ever touch you?

20     A.   He put his arm around me multiple times.

21     Q.   Your shoulder?

22     A.   Yeah, but it was more like a close bring-her-

23  in, hold-me-very-close-to-him.  And I felt like I

24  couldn't get away from him because he had a tight

25  grasp on me.

```
 1        Q.   Where else?
 2        A.   He practically, I felt, almost kissed me
 3   like, kissed me like right here in April of '06.  And
 4   that was really like -- that was, that was really like
 5   the last straw.
 6             I was very scared for myself at that point
 7   because I was afraid that he would tell the hotel
 8   concierge or something and try and do something that
 9   -- he was very good at kind of making up stories.
10             So I -- when he said good night to me that
11   night, he gave me a hug and a kiss like right here and
12   I got scared and I went to my room and I was nervous
13   that he was going to talk to the concierge or someone
14   saying that he needed to get into my room for some
15   reason and like come -- I don't know, and get me.  I
16   was having a very anxious moment.
17             I ended up leaving the hotel two hours later,
18   which was like 3:00 or 4:00 in the morning because I
19   wanted to just get away from him.  And I was actually
20   scheduled to leave at like 9:00 in the morning.  So I
21   sat at the airport for like five hours.  But I was
22   very scared at that moment.  That was a really bad --
23        Q.   What trip was that?  Where was that?
24        A.   That was -- I was actually in Dublin.
25        Q.   That was in April of '06ish?
```

```
1          A.   Yes.

2          Q.   Okay.  Just sticking to touching.  I know

3     there is a lot of e-mails.

4          A.   Okay.  And then there was dinners.  He would

5     invite me out to dinners.

6          Q.   Touching.  Stick to touching right now.

7          A.   Well, I would be at dinner with him.  And he

8     would, you know, sit very closely and put his hands on

9     my hands.  And it was very awkward and uncomfortable

10    for me, being that I was -- I felt more that I was on

11    a date with a guy that was in love with me as opposed

12    to being at a business dinner with my boss.  And that

13    was in 2005.

14          So the hand.  There was a -- the point where

15    he put his arm around me once again was when I was in

16    Europe and interviewing one of the talent.  And Alex

17    ended up pulling me away from one of the wrestlers and

18    put his arm around me and was just, I just want to

19    talk to you, and pulled me very closely.

20          And I actually -- I said to him, you don't

21    have to touch me in order to talk to me.  Just don't

22    touch me.  And Joel Satin was right there so he

23    obviously witnessed that.

24          And then there was another incident where it

25    happened in April '06 when I was at a bar with a whole
```

1   bunch of other corporate executives.  We were all

2   sitting at the bar and Joel and Curt Schneider were

3   trying to go upstairs to go to bed.  And I got up

4   because I wanted to go in the elevator with them and

5   go to my room.  And Alex grabbed my wrist and

6   pulled -- was trying to pull me back down so that I

7   would sit and stay next to him because he didn't want

8   me to leave.

9        So he had my wrist and was like pulling it.

10  And it was obviously very uncomfortable.  And

11  everybody was just looking like, What is he doing, you

12  know.  She is just trying to go back to her room.

13       So then I pulled away and I got in the

14  elevator with Joel and Curt and they both said to me,

15  What the hell was that about?  And I was just -- I

16  said, Well, that's Alex for you.

17       And, you know, obviously they knew that that

18  situation was not appropriate.  And we ended up -- I

19  ended up going -- riding up the elevator.  We dropped

20  Joel off and then I stopped on the floor with Curt at

21  his floor and we had a conversation.  Then I ended up

22  getting back into the elevator.  And when I got to my

23  floor, Alex was standing right at the elevator bank --

24       Q.   Okay.

25       A.   -- and was screaming at me, Where did you

```
 1   go?  What happened?  What took you so long to get to
 2   your floor?
 3              And I was just like, Why are you stalking
 4   me?  Number one.  And at that point he said, Let's go
 5   to your room.
 6              I said, We are not going to my room.  I am
 7   going to my room.  You are not.  And he was just like
 8   I just need to talk to you.  He was very flustered and
 9   upset at that point.  He was upset at the fact that I
10   wanted to go to my room and not stay down there and
11   hang out and drink with him.
12              That was another thing.  He often pressured
13   me to like have drinks with him and spend time with
14   him.  And he always wanted to spend time and get to
15   know each other and that kind of thing.  And I really
16   -- I was very focused.  I wanted to just do my job and
17   be a professional employee and be recognized for my
18   achievements.
19        Q.   And throughout all these incidents, you never
20   went to HR?  I know you had a reason.  I am just
21   asking, you never went to HR?
22              MR. BOYD:  Objection.
23   BY MS. GAMBARDELLA:
24        Q.   Right?  You can answer.
25              MR. BOYD:  I objected.  You can still
```

1      answer.  I am sorry.

2           THE WITNESS:  Yes, I did not go to HR.  I did

3      not feel comfortable.

4  BY MS. GAMBARDELLA:

5      Q.   Okay.  Do you believe that you did anything

6  to suggest to Mr. Romer that you were fine with some

7  of the ways he was talking to you?  Let's set aside

8  the touching for now, okay?  And then we will revisit

9  that.

10          Do you ever think you did or said anything to

11  him to suggest that you were not offended and in fact

12  were okay with the way he was conducting himself or

13  communicating with you via e-mail?

14     A.   I addressed the way that he would talk to me

15  with him and I never felt that I got anywhere.  It was

16  more about -- when I would address it, he would, you

17  know, go into a big tirade of how important I am to

18  him and how special I am and how, you know, he is

19  doing all that he can to help me grow and I was the

20  most important thing for him.

21          And I would get a long, detailed tirade of

22  how great I am and how special I am to him and he

23  would not want to lose me.  So it was a lot of

24  information I didn't really want to hear.  So when I

25  addressed it, I was -- you know, the things that were

```
 1    really wanted to go down.
 2        Q.   All right, I got lost.  My question was, Do
 3    you think you did anything in your communications with
 4    Mr. Romer that would convey to him, that could convey
 5    to him you were okay with the banter?  Is that a
 6    better way to put it?  Do you think you did anything?
 7        A.   Not intentionally.
 8             MS. GAMBARDELLA:  Let's mark this.
 9             (Whereupon, D'Angelo Exhibit No. 11 was
10        marked for identification.)
11    BY MS. GAMBARDELLA:
12        Q.   Take your time.  If you need to read the
13    whole thing, read the whole thing, okay?
14             Exhibit 11 for the record is an e-mail
15    stream.  July 15, 2005, it starts and going forward
16    through July 22, 2005.
17             And just let me know when you are ready.
18             Yes, that's a good idea.  It's Bates
19        D 00000850851852.
20    BY MS. GAMBARDELLA:
21        Q.   Have you had an opportunity to read the
22    e-mail stream or are you still working at it?  It's
23    fine if you are.
24        A.   Just two more seconds?
25        Q.   Sure, not a problem.
```

1         Are you set?

2     A.   Yes.

3     Q.   Do you remember this e-mail stream?  You

4  might not.  I mean, we are going to 2005.

5     A.   I am just reading it.

6     Q.   Obviously, it goes in reverse order.  So if

7  you have to start at the back at 852, the third page,

8  because that's the first one, July 15.  And it looks

9  like you are sending him images of Orton's tattoos?

10    A.   I was actually -- I was sending that to

11 someone else.

12    Q.   To Sam Topley.  And then Sam Topley says, You

13 are a star.  And then you keep going forward and then

14 there's e-mails with you and Alex.

15    A.   Right.

16    Q.   And it looks like, tell me if I am wrong, you

17 are forwarding to him Mr. Topley's comment, You are a

18 star?

19    A.   Yes.

20    Q.   And you say, See below, awe.  And that's a

21 little smiley face, right?  I am too old.  I don't

22 know how to make those smiley faces.  But that's

23 supposed to be a smiley face, right?

24    A.   Yes.

25    Q.   And then Mr. Romer says, Stop drooling over

```
 1    the tattoos.  And then you say, Stars like tattoos.
 2    Right?
 3         A.   Yes.
 4         Q.   And then first-hand knowledge, he says as a
 5    question.  And then you go on, Yes, I really should
 6    get my third soon.  So, now, what are you suggesting
 7    there?
 8         A.   This is what I was talking about.  This is
 9    the type of conversation that -- where I feel that I
10    was appeasing him to just instead of really -- you
11    know, not engaging in this type of conversation with
12    him.
13             I am more appeasing him just to as opposed to
14    kind of stirring up more of him being obsessive with
15    me.  Or it's just kind of like I am going down his
16    road of communication.  Not that I wanted to, but I
17    did.
18         Q.   Sure.  But that wasn't my question.  My
19    question is what were you talking about here?  I
20    should get my third soon.  Are you talking about
21    tattoos?
22         A.   Yes.
23         Q.   Do you have tattoos?
24         A.   Yes.
25         Q.   Did you get a third?
```

1      A.   No.

2      Q.   You thought it was appeasing him to tell him

3   that you might get a third tattoo?

4      A.   Yeah, it's where the conversation was going.

5      Q.   But that was to appease him?

6      A.   Yes.

7      Q.   Okay.   Then he says:   First-hand knowledge

8   that our stars like tattoos?   I hope not.   And then

9   you say no, that's not what I am saying.   So you're

10   continuing the conversation, correct?

11      A.   Well, he misinterpreted what I was actually

12   trying to say.

13      Q.   I understand.   My question is you were

14   continuing the vein of the conversation, right?

15      A.   Yes.

16      Q.   Okay. Then you say, No, that's not what I

17   meant.   Meant to write star.   That's you, in quotes,

18   right?

19      A.   Right.

20      Q.   Likes tattoos.   You thought it was appeasing

21   to tell him that you like tattoos.   Would that be

22   correct?

23      A.   Yeah, I was just --

24      Q.   And then he says, Aw, thought you were being

25   a naughty girl again.   And there is that smiley face.

1    And you respond:  Never stopped.

2            What does that mean?

3        A.    That's just -- it's just the way that I ended

4    up talking with him.  Because if I spoke with him,

5    letting him know every time that he talked to me was

6    offending me, I wouldn't get anywhere.

7        Q.    So you flirted with him?

8        A.    Someone might read that to think that I was

9    flirting with him, but it was more of me just trying

10   to keep things quiet so I didn't have to hear a long

11   tirade of how special I am and how great I am to him

12   and important and how much he loves having me work for

13   him.

14       Q.    So if I understand you correctly, in order to

15   prevent him from going on and on about how much he

16   loves having you and how great you are, you flirted

17   with him?

18           MR. BOYD:  Objection.

19   BY MS. GAMBARDELLA:

20       Q.    Do I have that right?

21       A.    It's not flirting with him.

22       Q.    You don't think if somebody says, I thought

23   you were being a naughty girl, and you say, I never

24   stopped, that's not flirtatious?

25       A.    It's me just appeasing his humor.

```
 1              (Whereupon, D'Angelo Exhibit No. 12 was
 2         marked for identification.)
 3    BY MS. GAMBARDELLA:
 4         Q.    Exhibit 12 is an e-mail stream Bates stamped
 5    D 50706 and 707.  And it's an e-mail stream which
 6    looks to be dated December 20, 2005, and December 21,
 7    2005, between you and Mr. Romer.  Do you remember this
 8    communication?
 9         A.    Yes.
10         Q.    It starts with -- in the back, it's from him
11    to you on December 20th.  Why did you tell me it was
12    girls only then?
13              Do you know what communications preceded him
14    asking you that?  Do you know what that was about?
15         A.    I don't really remember.
16         Q.    Were you having a conversation or
17    communication with Mr. Romer where you were discussing
18    your social activities at any point in time?
19         A.    Yes, oftentimes he would try and get -- he
20    would ask me information about my personal life, so
21    these e-mails are perfect examples of him trying to
22    find out what I am doing on the weekends, who I am
23    going on trips with, how am I paying for these trips,
24    what -- you know, he would get very involved in my
25    personal life.  So yes, he is asking about --
```

1        Q.   So you answered him?

2        A.   Well, if I told him I thought he was not a

3    great person, it was -- I don't know how I say this.

4    It was easier for me or better for me to answer him

5    than tell him how I really felt because, number one,

6    he was my boss and if I told him how I really felt, I

7    probably would have gotten fired.  So I was trying to

8    keep my job, so --

9              And, two, I didn't want to hear his long

10   tirade of how special I was every time he acted

11   offensively or inappropriate to me.

12       Q.   So why don't you just lie to him and say, I

13   don't have plans?  Why did you get involved with a

14   communication --

15       A.   Because he was very persistent.  And

16   oftentimes he would ask me about my personal life.

17   And I would tell him -- I would try and deflect it and

18   turn it into, let's talk about work.  I have so much

19   work to do, let's focus on that.

20             Oh, no, no, no.  Let's like -- he would try

21   and change the subject and talk about my personal

22   life.  He was more interested in what was going on in

23   my personal life and who I was dating as opposed to

24   what was going on in the business.

25       Q.   So why didn't you lie, make something up?

```
 1        A.    Meaning what?  Tell him I had no plans.
 2        Q.    Yeah, why didn't you do that?
 3        A.    I have lied to him on multiple occasions.
 4        Q.    Why didn't you say, I was sick, I didn't go
 5   out?
 6        A.    Because he would then continue and try and
 7   get me to continue having a conversation about what
 8   was going on.  So sometimes I did lie.  I didn't tell
 9   him the truth every time.
10        Q.    You didn't lie here, right?
11        A.    Here he kept pursuing me about what this trip
12   was and --
13        Q.    Well, but -- okay, so you say to him, It is
14   girls, but that doesn't mean I won't meet anyone.
15              Why did you say that?  Why did you add, It is
16   girls, but it doesn't mean I don't meet anybody.
17        A.    I don't know why I wrote that.
18        Q.    And then he says, Right.  How do the great
19   looks pay for the trip then?
20              Do you know what he is talking about?  Did
21   you and he have a conversation about how you were
22   going to pay for your trip?
23        A.    No.
24        Q.    Are you sure?
25        A.    Yeah.
```

1          Q.    And then you say, Don't worry about it.

2          A.    Yes, that's me.

3          Q.    What does that mean?

4          A.    I am trying to stop talking about this

5     because I don't want to continue this conversation and

6     he is trying to press.

7          Q.    Isn't it true that leading up to these

8     communications you tell him you only have $36.  You

9     are going on a trip and you only have $36.  And right

10    on the heels of telling him you might meet somebody,

11    he says, Well, how are you going to pay for your trip

12    basically with $36?  And you say, Don't worry about

13    it.

14         A.    I don't remember if I told him I had $36.

15              (Whereupon, D'Angelo Exhibit No. 13 was

16         marked for identification.)

17    BY MS. GAMBARDELLA:

18         Q.    This is documents Bates stamped Defendant's

19    50660 to 663 for the record.  It's an e-mail stream

20    somewhat that overlaps with Exhibit 12.  Same dates,

21    December 20, 2005.  Starting -- let's start from the

22    back, okay?

23              MR. BOYD:  Hey, Mary, I hate to do this.

24         Once you are finished with this document, if you

25         could let me step out.  My wife happens to be

```
 1        pregnant and I have logged four messages here, so
 2        I just want to check and make sure everything's
 3        okay.
 4             MS. GAMBARDELLA:  I will finish with this and
 5        we will break for lunch.
 6             MR. BOYD:  That's fine if you like.  Or if
 7        you just want to give me a break after you're
 8        done --
 9             MS. GAMBARDELLA:  That makes more sense.
10        That makes more sense.
11             MR. BOYD:  I just want to --
12             MS. GAMBARDELLA:  Do you want to do it now?
13             MR. BOYD:  No, that's fine.
14             MS. GAMBARDELLA:  Are you sure?
15             MR. BOYD:  I just want you to follow through
16        with what you've got here.  I don't want to be --
17             MS. GAMBARDELLA:  Okay, all right, we will do
18        this and then we will break for lunch.
19             MR. BOYD:  Thank you.  I am sorry to
20        interrupt.
21             MS. GAMBARDELLA:  No, please, don't say
22        that.
23   BY MS. GAMBARDELLA:
24        Q.   The e-mail at the bottom which starts at 662
25   and the top of 663 is just your sort of sign-off.  It
```

1   is from you to Alex.  Do you know when the PSP games

2   are going to be coming to me?  Santa?

3           What were you talking about?  Why were you

4   call him Santa?

5       A.   I think --

6       Q.   Don't guess.  I am sure Patrick, Attorney

7   Boyd, does not want you to guess.  Do your best.  If

8   you don't remember.  You don't remember.  Guessing

9   doesn't do either one of us any good.

10      A.   I am sorry.  What was the question?  What are

11  the PSP games?

12      Q.   Yes.

13      A.   I believe PSP was one of our licensees and

14  they might have been sending me some games.

15      Q.   Why are you calling him Santa?

16      A.   I am being sarcastic because he is sending me

17  a gift, PSP games.

18      Q.   This is a gift from Alex, right?

19      A.   Well, I think it was a licensee that he

20  worked with.  He had them send --

21      Q.   And he was going to give them to you.

22      A.   -- games to me, right.

23      Q.   Right.  And that's why you are calling him

24  Santa.  He is giving you gifts, right?

25      A.   Yes, it was a joke.

```
 1          Q.   Don't tell me you have run out of food
 2     favors.
 3               And then I don't really care much about
 4     this.  We are just continuing with this stream.
 5               And then you tell him only $36 in my
 6     checking.  Do you see that?
 7          A.   Yes.
 8          Q.   Why are you telling him that?
 9          A.   It looks like he is insinuating that I am
10     looking for food favors and I don't have money.
11          Q.   But you tell him I only have $36 in my
12     checking, so my question to you is, Why are you
13     telling him that?
14          A.   I am not sure.
15          Q.   And then he says, And how are you paying to
16     go to Cali?
17               Were you going to go to California for a
18     vacation or something around this time?
19          A.   Yes, probably.
20          Q.   And you say, With my good looks.  Smiley
21     face.  Right?
22          A.   That's me once again appeasing him.
23          Q.   Why didn't you just say, My parents are going
24     to pay for it?
25          A.   Because then he would come back with a
```

1     comment about -- you know, he had a comment for

2     everything.

3         Q.   But don't you think this is a little

4     flirtatious?   With my good looks?

5         A.   Like I said, he would lead me down a path of

6     communication that I was not happy about.   And it's

7     not something that I wanted to do.   But to ease and

8     make my situation less stressful and less anxiety for

9     me --

10        Q.   You flirted with him?

11        A.   -- I appeased him and played back.

12        Q.   You flirted with him.

13           MR. BOYD:  Objection.

14           MS. GAMBARDELLA:  If she doesn't agree, she

15        can say she doesn't agree.

16           MR. BOYD:  But you've asked the question at

17        least three times.

18           MS. GAMBARDELLA:  Well, I am not getting an

19        answer.

20           MR. BOYD:  That doesn't mean that you can

21        continue to ask forever.

22           MS. GAMBARDELLA:  Yes, it does.

23           MR. BOYD:  No, it doesn't.

24           MS. GAMBARDELLA:  It means I can get an

25        answer, Mr. Boyd.

1           MR. BOYD:  And she has answered each time you

2       have asked it.

3   BY MS. GAMBARDELLA:

4       Q.   Do you agree that's flirtatious?

5           MR. BOYD:  Objection.

6           THE WITNESS:  No.

7   BY MS. GAMBARDELLA:

8       Q.   Do you think he as somebody reading it could

9   see it as flirtatious?

10      A.   I think reading it he is flirting with me.

11      Q.   You are not flirting back?  With my good

12  looks?  And that's when he says, I thought it was

13  girls only, smiley face.

14          MR. BOYD:  Objection.

15          MS. GAMBARDELLA:  I am just reading.

16          MR. BOYD:  I know there is not a question on

17      the horizon.

18          MS. GAMBARDELLA:  I didn't say there was.

19          MR. BOYD:  Well, just reading it is not what

20      you are supposed to being doing at a deposition.

21          MS. GAMBARDELLA:  Thank you.  Another great

22      tip.

23          MR. BOYD:  She can read it to herself.

24  BY MS. GAMBARDELLA:

25      Q.   I take that as not exactly then --

```
1            MR. BOYD:  I will object again.  If she wants
2        to ask questions, that's what we're here for and
3        my client is to answer.
4            MS. GAMBARDELLA:  Mr. Boyd.
5            MR. BOYD:  And this is on the record.
6            MS. GAMBARDELLA:  Mr. Boyd.
7            MR. BOYD:  Yes, ma'am.
8            MS. GAMBARDELLA:  Your objection is noted.
9        You are being obstructionist now.
10           MR. BOYD:  I am not being obstructive.  I am
11       telling you that you need to ask a question.
12           MS. GAMBARDELLA:  I heard you.
13           MR. BOYD:  And so --
14           MS. GAMBARDELLA:  We all heard you.  We heard
15       you the first five times.
16           MR. BOYD:  And I heard you the first six
17       times you asked the same question.
18           MS. GAMBARDELLA:  I didn't ask a question.
19       Did I ask a question you're objecting to --
20           MR. BOYD:  Are you flirting?  Are you
21       flirting?  Are you flirting?  You've asked it at
22       least six times.
23           MS. GAMBARDELLA:  I got your objection.
24           MR. BOYD:  I understand.  And now I am
25       objecting for a different reason, which is
```

```
 1          because you are not asking a question; you're
 2          merely reading a document that is already there.
 3               MS. GAMBARDELLA:  I am not done with the
 4          question; that's why.
 5               MR. BOYD:  Is there a question coming?
 6               MS. GAMBARDELLA:  Yeah.
 7               MR. BOYD:  Okay.
 8               MS. GAMBARDELLA:  You're done?
 9               MR. BOYD:  I am happy to hear when the
10          question comes, sure.
11               MS. GAMBARDELLA:  Great, okay.
12      BY MS. GAMBARDELLA:
13          Q.  Following through, I take that as not exactly
14      then.  Then you say to him, Come on, you know better.
15      Then he says, I take it it's not exactly a girly trip
16      then?  And you say, Never is.
17               Do you take that as flirtatious or no?
18          A.  No, because --
19          Q.  I didn't ask because.
20          A.  Well, no.
21          Q.  Is that flirtatious or not?
22          A.  No.
23          Q.  What do you mean by, Never is, in response
24      to, I take it it is not exactly a girly trip, then?
25          A.  Because he would ask when I went -- because I
```

```
1    travelled a lot personally, he would ask, Oh, did you
2    meet anybody?  He would ask, you know, how many guys
3    did I meet.
4         He would ask me questions about my personal
5    life and who I met and who I was dating and how many
6    guys were there.  And every detail about my life he
7    wanted to know.
8         And this is me being sarcastic that the fact
9    he said before that there is always guys around me.
10   So I am throwing it back in his face that it's never
11   just me and girls.  It's just me -- it was never me
12   and just girls.  So I am throwing it back, basically
13   reiterating the fact that he has said to me, It's
14   never me and just girls.  There's always guys around
15   me.
16        Q.   Well, he is not asking you in this e-mail
17   stream how many guys you're hooking up with or
18   anything that specific, right?
19        A.   Well, I am not saying that he is.  I am just
20   saying that --
21        Q.   And he says, Whatever, just don't get hurt.
22   And you say:  bc, because, I am precious.  Smiley
23   face.
24        A.   Right, that's me.
25        Q.   Now, one aspect of your complaint is that he
```

126

```
 1    called you Precious, right?
 2         A.   Yes.
 3         Q.   But you are calling yourself precious to him
 4    because I am precious, smiley face?
 5         A.   I am being sarcastic because I am making fun
 6    of him, the fact that he calls me Precious.  I mean,
 7    when you read an e-mail, it's up to interpretation.
 8              But between the me and him, he obviously
 9    knows that I am kind of laughing at him because he has
10    the smiley face back.  I am making fun of the fact
11    that he is calling me Precious.
12         Q.   Do you think making fun of him by saying
13    because I am precious would suggest to him that you
14    are offended by the use of that word?
15         A.   Would it suggest to him?
16         Q.   To him that you are offended.
17         A.   I think, yeah.
18         Q.   You think so?
19         A.   Yeah.
20              MS. GAMBARDELLA:  Okay, we break for lunch.
21    So what do you think you can do, 40 minutes?
22              MR. BOYD:  You just have to tell me how far
23    -- I mean, if it's quick, that's fine.
24              (Luncheon recess, during which D'Angelo
25         Exhibit No. 14 was marked for identification.)
```

```
 1    BY MS. GAMBARDELLA:
 2         Q.   Okay, looking at Exhibit 14, D 0317 and 318,
 3    Ms. D'Angelo.  And this is an e-mail from you to
 4    Mr. Romer attaching pictures in September of 2005.
 5    Look at the lovely girls of WWE.  Do you see that?
 6         A.   Yes.
 7         Q.   I can't see who is in the picture.  Do you
 8    remember who is in the picture?
 9         A.   Yes.
10         Q.   Who?
11         A.   Myself, Bernadette Hawks, Jen Vogestat, and
12    Kat Kramer.
13         Q.   And how about the photos on the second page?
14         A.   It's probably the same people, plus like
15    other people that were at the party.
16         Q.   What party was that?
17         A.   That was Jen's engagement party.
18         Q.   Not a work function?
19         A.   No.
20         Q.   Any particular reason you decided to forward
21    these to Mr. Romer?
22         A.   I was, you know, just sending him a picture
23    of us and trying to get along with my boss and keep
24    the peace.
25         Q.   Any particular reason why you just didn't
```

1    forward the pictures, that you felt you should say,

2    Look at the lovely girls of WWE?

3        A.    I mean, I was just making a comment.   There

4    is some things I wish I, looking back, didn't say.

5        Q.    Is this one of them?

6        A.    Yeah, probably I regret saying that.

7        Q.    Why?   Why looking back is this something you

8    shouldn't have said?

9        A.    Because I probably shouldn't have sent him a

10   picture of me, knowing the fact that he -- how he felt

11   towards me and how he often made comments about my

12   appearance and things like that, so --

13       Q.    Do you think it was also not a good idea to

14   preface these pictures with, Look at the lovely girls

15   of WWE?

16       A.    I don't really see any harm in writing that.

17       Q.    You don't think that could be received as

18   encouraging him to look at the lovely girls, one of

19   whom is you?

20       A.    It's just a picture.

21       Q.    But you don't know why you just didn't send

22   the picture and say, Here is some photos from the

23   party?   Why didn't you just do that?

24       A.    I probably could have.   I just didn't.

25             MS. GAMBARDELLA:   15.

```
 1              (Whereupon, D'Angelo Exhibit No. 15 was
 2          marked for identification.)
 3     BY MS. GAMBARDELLA:
 4         Q.   Have you had a chance to look at Exhibit 15,
 5     which is an e-mail stream Bates stamped D 0303 through
 6     309.  Have you had an opportunity to look at that?
 7         A.   Yes.
 8         Q.   Okay.  Now, these appear to be jokes and
 9     images connected with the jokes that a Mr. -- I don't
10     know if it's Mr. or Ms. to be honest; Lee can be
11     either -- Lee Silverman sent you among other people in
12     February of '06, correct?
13         A.   Yes.
14         Q.   Okay.  And then you forwarded them to Alex,
15     correct?
16         A.   Yes.
17         Q.   Why did you forward to Alex jokes?
18         A.   It's just -- these are just trivial e-mails
19     that, you know, going back and forth, a lot of people
20     forward them around the office.  It's just joking.
21     It's me joking with him.
22              Like I said, I tried to get along with him as
23     much as I possibly could for the sake of me keeping my
24     job and, you know, having the opportunity to still
25     work at WWE.
```

```
 1              I was trying to just -- I didn't want to seem

 2    like a person that is, you know, not part of the team

 3    or not fun to work with because otherwise I mean that

 4    would make my job very difficult, if I was not, you

 5    know, someone that he could get along with.

 6              So here I am, you know, joking, sending an

 7    e-mail just trying to get along with my boss so that I

 8    could, you know, grow and succeed in my position.

 9         Q.   Well, am I correct that he would never know

10    you even got these jokes from Lee Silverman unless you

11    forwarded them to him, correct?

12         A.   Yes, that is correct.

13         Q.   So what is it about not forwarding these that

14    you contend would have created the perception you

15    weren't easy to get along with or fun?

16         A.   Because if I was -- if all that I ever wanted

17    to do was just talk about work only, he would probably

18    perceive me as a stiff and not someone that he would

19    want to work with.

20         Q.   Or promote, right?

21         A.   Or promote, yeah.

22         Q.   Or promote?

23         A.   Yeah.

24         Q.   Can you look at the last page, which is D

25    0309.  What is that an image of?
```

1       A.   I am not really sure.

2       Q.   Let me help you out.  A man putting his penis

3  in a mammogram machine.  Would I be right?

4       A.   It looks like that, yes.

5       Q.   This is a sexual joke, isn't it?  It has a

6  sexual image, doesn't it?

7       A.   It's a stupid e-mail joke that gets passed

8  around from many people's e-mails from one person to

9  another.  I am not the only person that forwards

10  e-mail jokes like this to their boss.

11      Q.   Ms. D'Angelo, I wasn't suggesting you were.

12  You weren't fired for sending this e-mail.

13        My question is:  Do you agree with me that

14  the picture of a man with his penis in a mammogram

15  machine is a sexual image of somebody's body part,

16  private part?  Yes or no?

17      A.   It's a joke, yeah.

18      Q.   With a sexual image in it, right?

19      A.   Yes.

20      Q.   Okay.  Were you aware that you were including

21  this last page in the jokes that you forwarded to

22  Mr. Romer?

23      A.   I don't really remember if I read the whole

24  joke or I just forwarded it.

25      Q.   Were you aware that WWE had an e-mail policy

1    which prohibited the forwarding of jokes, in

2    particular the ones with graphic or images like that,

3    at the time?

4         A.   No.

5         Q.   Okay, do you think forwarding jokes to your

6    boss in any way could suggest to him that you were not

7    upset with him or offended by him or upset by some of

8    the things that he said?

9         A.   Like I said, I just forwarded this as a joke

10   to be -- to, you know, be viewed as funny and to have

11   a laugh with my boss.

12        Q.   Is the bottom line, Ms. D'Angelo, that you

13   participated in the flirtation with him because you

14   figured as long as you did, you would have a good

15   career and he might promote you?

16        A.   No.   You often flirt with people that you

17   like and are interested in.   And I had no physical or

18   sexual or any type of interest in Alex Romer, so I was

19   not flirting with him.

20        Q.   I wasn't suggesting that.

21        A.   You said I flirted with him.

22        Q.   Okay, I will change the question.   Is the

23   bottom line that you participated in the bantering

24   that you now claim offended you because you thought

25   that's how you would proceed in your career at WWE,

1    that was the best way to get ahead?

2         A.    I participated in the bantering so that I

3    would keep the peace and not have to deal with

4    additional stress from him about his feelings for me

5    and so that I could just continue doing my job on a

6    daily basis and not have to hear the additional banter

7    from him of how great I am and how much he loves

8    having me work for him, the additional drama.

9         Q.    And appeasing him or trying to get along with

10   him includes forwarding jokes to him that otherwise he

11   wouldn't even know you got, is that correct, because

12   you wanted to be fun?

13        A.    I wanted to be viewed as a team player and

14   not some stiff person that is going to make a comment

15   of, oh, you offended me, you offended me on this.

16   This like -- that's not.

17        Q.    I am not suggesting that.

18        A.    Well, I am just saying it's the opposite of

19   what I was trying not to be.

20             MS. GAMBARDELLA:   16.

21             (Whereupon, D'Angelo Exhibit No. 16 was

22        marked for identification.)

23   BY MS. GAMBARDELLA:

24        Q.    Okay, 16 is an e-mail stream Bates stamped

25   906, the last three digits.  Defendant's 906.

1     February 16, 2006.  Down below it starts with Alex

2     asking you to give him gossip.  And then you respond.

3          A.   Or anything to make me smile.

4          Q.   Um-uh.  And then you respond, Wow, it is

5     getting hot in there.  I feel bad for you.

6               And the rest is irrelevant.  And then he

7     responds.  And then the last line, that is he needs to

8     laugh.  Need lots of laughs to keep me going.  It will

9     be a long day.

10              And then you say to him, Aw, that's good.

11    How are those cookies?  Care to share some and make a

12    special delivery to my office with some treats?

13              What were you talking about?

14         A.   I have no idea.  I think he probably told me

15    that they got -- I think he was working on some big

16    presentation and they were in the boardroom for a long

17    period of time.  And they got cookies because they

18    ordered food.  So that's what I'm talking about those

19    cookies.

20         Q.   Why would you invite Mr. Romer to your office

21    to make you a special delivery of treats?

22         A.   It's just me once again --

23         Q.   Trying to be fun.

24         A.   -- making a joke, yeah.  I mean, the fact of

25    the matter is, he was fired for sexual harassment.

```
1           Q.    That is correct.

2           A.    It's not that -- this is not something, you

3      know --

4                 MR. BOYD:   17?

5                 MS. GAMBARDELLA:   Um-uh.

6                 (Whereupon, Plaintiff's Exhibit No. 17 was

7            marked for identification.)

8      BY MS. GAMBARDELLA:

9           Q.    Bates stamped D 0322 through 324.

10     Ms. D'Angelo, these are jokes, more jokes that you

11     forwarded to Mr. Romer, correct?

12          A.    Yes.

13          Q.    Okay.  Do you remember where you got the

14     jokes from?

15          A.    No, a lot of times people just forward jokes

16     throughout the office.

17          Q.    Okay.  On the second page there is a joke

18     about cigarettes and tampons, correct?

19          A.    Yes.

20          Q.    And did anybody compel you to forward these

21     to Mr. Romer?

22          A.    No.  Like I said, this is just a joke.  Do I

23     wish I didn't do or say half the things that you are

24     showing me?  Of course, but I was, you know, just

25     trying to keep things calm and not stir trouble
```

1   between him and I so that I can continue working for
2   WWE and not have him kind of make this situation worse
3   by questioning me, What's wrong?
4           If I wasn't acting like a team player and
5   joking with him, I would get questioned, What's
6   wrong?  Why do you have a attitude?  And it would be a
7   constant interrogation.  So by me like sending jokes
8   and just being silly, it made things smoother and less
9   stress for me.
10      Q.   Ms. D'Angelo, at the end when you met with
11  HR, you brought them e-mails you had saved, correct?
12      A.   Yes.
13      Q.   You didn't bring them any of these, did you?
14      A.   No, I didn't feel they were relevant.
15      Q.   Right, okay.
16          (Whereupon, D'Angelo Exhibit No. 18 was
17      marked for identification.)
18  BY MS. GAMBARDELLA:
19      Q.   We have marked Exhibit 18.  It's Bates
20  stamped 00003019 of defendant's production.  It is an
21  e-mail from Alex Romer January 30, 2006, to Danielle
22  Fisher.  And it -- I am going to ask you first if you
23  have ever seen this before.  This was produced to your
24  attorneys.
25      A.   No.

1        Q.   All right, take a minute to take a look at

2   it, okay?  And I am going to ask you some questions.

3        A.   (Witness complying.)

4        Q.   Have you ever seen this before?

5        A.   No.

6        Q.   This is not one of the documents that you

7   reviewed to prepare for today?

8        A.   No.

9        Q.   Okay.  This document refers to a concern --

10  well, something about a tour -- let me go through it

11  again.  Alex is telling Danielle that you may attract

12  the unwanted attention of one or two male talent.  And

13  there is an e-mail to Donna:

14        Simply a reminder.  We should emphasize to

15  our staff that professional boundaries should not be

16  crossed.  His main concern was the perceptions of

17  others about Fara's professional ability.

18        Okay, is this e-mail authored around the time

19  where you were pulled away from talent?  Do you

20  remember you described an incident to me.  You said, I

21  was pulled by the neck.

22             MR. BOYD:  Objection.

23  BY MS. GAMBARDELLA:

24        Q.   Do you know what incident I am talking

25  about?

```
 1          A.   I do, but I don't remember what -- when that
 2     was.
 3          Q.   Okay, that's fair enough.  You don't know --
 4          A.   And I don't have the dates, so --
 5          Q.   Was that the only time, the incident you
 6     described to me earlier today, was that the only time
 7     you had been told to get away from talent?
 8               MR. BOYD:  Objection.
 9               THE WITNESS:  I think yes, that's the only
10          time I can recall.
11     BY MS. GAMBARDELLA:
12          Q.   Do you have any knowledge sitting here today
13     of the circumstances surrounding the generation of
14     this particular discussion between Alex and other
15     people at WWE around a perception they were concerned
16     about of you and talent?  Do you have any idea of the
17     circumstances surrounding the reason this e-mail was
18     generated?
19          A.   Well, it seems that Alex is trying to protect
20     me and -- protect me from the talent.  And I just
21     think oftentimes what he might have perceived as him
22     being protective of me from the talent was more of his
23     own jealous issues because the talent was paying me
24     attention and he obviously had feelings for me, so he
25     was jealous that the talent, you know, were spending
```

 1    time with me and it was kind of taking it away from
 2    him.  I am not sure.
 3         Q.   That's what you get from this?
 4         A.   Well, he was very jealous if the talent were
 5    talking to me.
 6         Q.   Is that what you get from this document?  Or
 7    isn't he trying to protect your image in the company?
 8    Isn't that what he is trying to do?  If you disagree
 9    with me, tell me.
10         A.   Yeah, that's what it says here.
11         Q.   That's what it says.  Isn't it a fact that
12    Mr. Romer told you on more than one occasion that
13    management, not him, had gotten word that people were
14    trying to perceive you were cosying up too much to
15    talent at events?  I am not suggesting it is true or
16    not true?
17         A.   Okay.
18         Q.   All I am asking you is this.  Did he not, in
19    fact, tell you that Donna, John Laurinitis, maybe
20    others --
21         A.   He told me that.
22         Q.   -- were concerned about that?
23         A.   He told me that Donna was concerned about it,
24    yes.
25         Q.   Was he lying?

```
 1          A.    I didn't say that he was.

 2          Q.    I didn't say you did say.  I am asking you

 3    now, do you have any facts on which to base a belief

 4    that Mr. Romer was lying that others in the

 5    organization were becoming concerned about the

 6    appearance that you were too close to talent at

 7    events?

 8          A.    No.

 9          Q.    You have no basis to think that he was lying,

10    right?

11          A.    No.

12          Q.    Okay.  So isn't it a fact that when he pulled

13    you away from talent at the incident you were talking

14    about, what he said to you was, You already have been

15    talked to about this?

16                And trust me, I am not suggesting that he had

17    any right to pull you by the neck, so let's leave that

18    aside.  Isn't it a fact that when he pulled you out of

19    there, he said, Fara, you have already been talked to

20    about this; what are you doing, or words to that

21    effect?

22          A.    Yeah, it's possible.

23          Q.    Because he was worried you might get fired

24    for it, right?

25          A.    He never told me that, that I was at risk of
```

```
 1    getting fired for it.  He just said, you know --
 2         Q.   You have been talked to about this?
 3         A.   Yeah, I thought I told you not to, you know,
 4    hang out with the talent.  But like I said before, I
 5    was not the only corporate person with the talent,
 6    so --
 7         Q.   I wasn't suggesting that at all.
 8         A.   I am just saying.
 9         Q.   I am focusing on you now.  Not everybody sued
10    us.  We are concerned here now with you, all right?
11    So what I am asking you is -- and I think you have
12    answered it already.  I just want to make the record
13    clear.  Aside from whatever other people were there,
14    when he pulled you out of that room, he said to you,
15    you have been spoken to about this, get away from the
16    talent or words to that effect, correct?
17         A.   I don't remember those exact words but he did
18    tell me that I needed to leave the situation.
19         Q.   Because people other than him had commented
20    you shouldn't be doing that, correct?
21         A.   Yes, Donna specifically was who I was told.
22         Q.   His boss?
23         A.   Yes.
24         Q.   Who could fire you if she wanted to?
25         A.   Yes.
```

1        Q.   Right?

2        A.   Yes.

3             MS. GAMBARDELLA:   For the record, Bates stamp

4        D 0299 and 300 is Exhibit 19.

5             (Whereupon, D'Angelo Exhibit No. 19 was

6        marked for identification.)

7    BY MS. GAMBARDELLA:

8        Q.   Let me know when you are ready.  Okay?  This

9    is an e-mail stream between you and Alex.  And it

10   starts with a business-related conversation about gray

11   samples, okay?

12            And then going to the front page at the

13   bottom, there is one.  It's June 2, 2005, 10:28 a.m.,

14   from you to Alex:  I will probably have to retire

15   early, maybe at 32.  Find me a rich one.

16            What did that mean?

17            MR. BOYD:   Objection.

18            MS. GAMBARDELLA:   Is there something you want

19       to point out to her?

20            MR. BOYD:   No.

21            MS. GAMBARDELLA:   Oh, I thought you were

22       reaching over.  I'm sorry.

23            MR. BOYD:   I was modestly concerned that she

24       was going to speak before I got in my objection.

25            MS. GAMBARDELLA:   No, no, no, no, no, no.

```
 1              MR. BOYD:  We don't have any double secret
 2        hand signs.
 3              MS. GAMBARDELLA:  No, I though you wanted to
 4        show her something.
 5              MR. BOYD:  I'm not that creative.
 6    BY MS. GAMBARDELLA:
 7        Q.   June 2, 2005, 10:28 a.m.  Fara D'Angelo to
 8    Alex Romer:  I will probably have to retire early,
 9    maybe at 32.  Find me a rich one.
10              What did you mean by that?
11        A.   Find me a rich husband.  That's a joke.  And
12    then his response is, You can have anyone you want.
13    And he wrote that because he wrote, Told you you can
14    have anyone you want.  That was right after he told me
15    that he would be willing to have a shag with me
16    anytime.  I just needed to say the word.  Shag meaning
17    have sex with him.  It was at my discretion.
18        Q.   The previous communications are about work.
19    And you say find me a rich one, right?  You started
20    this conversation here, did you not?
21        A.   No, he did.
22        Q.   Where?
23        A.   Well, it was about work.  And then I guess I,
24    you know, didn't -- kind of forgot something so I made
25    a joke about Alzheimer's and my old age.  And then he
```

1    said, Wait until you get to my dizzy height, meaning

2    his age.

3         Q.   Right.  And you say --

4         A.   And then I am joking back.  And then he

5    brings it to the sexual level because that was right

6    after he had pretty much said that he would have sex

7    with me whenever I wanted to.

8         Q.   He brought it to the sexual level?

9         A.   Yes, where he was saying, Told you you can

10   have anyone you want, dot dot dot.  He is referring to

11   himself.

12        Q.   Ms. D'Angelo, why did you start the

13   conversation about find me a rich one?

14        A.   It was a joke.

15        Q.   To which he responded to your joke?

16        A.   Right.  And like I said, I felt the need to

17   have a joking type relationship with him because that

18   was better and easier for me to have as opposed to

19   being someone that was very stiff and telling him

20   anytime that he said something he offended me because

21   that was not going to help make my job easier at WWE.

22   And I wanted to keep my job and I wanted to work

23   there.

24        Q.   I got it.

25        A.   So I sacrificed the way that I feel is the

```
 1    right way to communicate to my boss.
 2         Q.   Part of what you said offended you was him
 3    calling you Precious, correct?
 4         A.   Yes.
 5         Q.   Did anybody else in your life call you
 6    Precious?
 7         A.   No.
 8         Q.   Sure?  Who is Gary Karantonis?
 9         A.   He is an ex-boyfriend.
10         Q.   Did he call you Precious?
11         A.   Yes, actually he did.  You just reminded me.
12         Q.   So would you like to change your answer?  Did
13    anybody else ever call you Precious in your life?
14         A.   Yes, he did.
15         Q.   He did.  So where did Alex get the idea to
16    call you Precious?
17         A.   I have no idea.
18         Q.   Is it because you told him?
19         A.   No.
20              (Whereupon, D'Angelo Exhibit No. 20 was
21         marked for identification.)
22    BY MS. GAMBARDELLA:
23         Q.   D 401517 through 1520.  Part of what you
24    complained about is he called you 'Tinks as well,
25    correct?
```

```
 1          A.   Yes.
 2          Q.   The e-mail at the top, which is the last one
 3     in this stream, April 21, 2005, in response to Alex
 4     telling you basically he had a bad day, you say, That
 5     sounds rough, E-S-P -- I assume that means
 6     especially -- the part about your Zippo.  What is a
 7     Zippo?
 8          A.   It's a lighter.  Something happened to it.
 9          Q.   Well, be sure to get some rest because 'Tinks
10     is coming to town.  Smiley face.
11               Who are you referring to by 'Tinks?
12          A.   Myself, because I am joking back with him.
13          Q.   Again, right?
14          A.   Yeah.
15          Q.   You say you are joking back.  What is the
16     joke in that e-mail stream that you are joking back
17     about?
18          A.   I am being sarcastic because he calls me
19     that, so I was -- it's making fun of the fact that he
20     was calling me that.
21          Q.   Were you offended by the use of the term dick
22     when he said his dick was on the line?
23          A.   Yes.
24          Q.   You're offended by that kind of thing?
25          A.   Yes, I don't think that's the way that your
```

1   boss should talk to you.

2      Q.   Do you ever use -- did you ever use WWE

3   e-mail to have equally graphic conversations with

4   anybody else?

5      A.   I don't think I did.

6      Q.   Who is Chris Terranova?

7      A.   He worked at WWE.

8      Q.   Did you ever e-mail him about somebody

9   putting out?  I will show it to you.

10        MS. GAMBARDELLA:  D 00000950 and 951.

11        (Whereupon, D'Angelo Exhibit No. 21 was

12      marked for identification.)

13  BY MS. GAMBARDELLA:

14      Q.   Take a minute to look at this.  And my first

15   question is going to be who you were talking about.

16   So with that in mind, go ahead and take a look.

17      A.   (Witness complying.)

18      Q.   Do you remember what you were talking about

19   when you said, Barely puts out.  She is a prude.  I

20   don't think you will be pleased.

21      A.   It's a girl that I was trying to set Chris up

22   with.

23      Q.   Chris, a co-worker?

24      A.   Right.

25      Q.   And what do you mean she doesn't put out?

```
 1          A.   That she is very conservative and --
 2          Q.   Won't have sex with him?
 3          A.   Well, not -- I wasn't really referring to
 4     sex.
 5          Q.   You weren't?
 6          A.   No.
 7               MS. GAMBARDELLA:
 8               (Whereupon, D'Angelo Exhibit No. 22 was
 9          marked for identification.)
10     BY MS. GAMBARDELLA:
11          Q.   All right, D 000003000, an e-mail stream of
12     December 28 and 29, 2004, between Ms. D'Angelo.  Who
13     is Alyssa?
14          A.   Oh, one of my girlfriends.
15          Q.   On the top, you say to her, Who is the
16     doctor?  Will it be a sausage fest?  What does that
17     mean?
18          A.   Will it just be all guys.
19          Q.   Sausage fest?
20          A.   Yes, it's a slang word.
21          Q.   Doesn't offend you, I guess?
22          A.   No.   There is a difference between that
23     and --
24          Q.   I'm sorry.  Did you ever talk like that to
25     Mr. Romer?
```

1        A.    Not that I recall.

2        Q.    You could have, right?  Did you ever talk to

3    him about going to sausage fests?

4        A.    No, I don't think so.

5        Q.    Picking up guys?

6        A.    No, I don't think so.

7        Q.    You don't think so, okay.  Did you ever

8    accept gifts from Mr. Romer?

9        A.    Yes, I did.

10        Q.    What kind of gifts did you accept from

11    Mr. Romer?

12        A.    He sent me gifts for Christmas.  He sent me

13    financial -- he sent me money one time.

14        Q.    You took it?

15        A.    Yes.  Well, I actually tried not to take it

16    and I told him I didn't want it, but he persisted and

17    kept telling me just take it, just take it.  So I

18    didn't know what to do, so I took it.

19              I told him originally I didn't want it, but

20    he kept -- he was very aggressive and persistent in

21    the way he was, so --

22        Q.    Did you ever have sex with Mr. Romer?

23        A.    No.

24        Q.    Did you ever have any form of sexual contact

25    with him?

```
1          A.    No.
2          Q.    Did he ever suggest to you that if you
3     didn't, he would fire you?
4          A.    No.
5          Q.    Okay, I am sorry.  Any other gifts?  There
6     were books, correct?
7          A.    Books, an Ipod, money.  I think that's it.
8          Q.    Did you ever not only thank him for the
9     gifts, but tell him how much you loved them?
10         A.    I expressed gratitude for the gifts.
11         Q.    I love it.  I got my gift.  Absolutely love
12    it.
13         A.    Yes, I don't see any harm in saying that.
14         Q.    I didn't ask you --
15         A.    This is just thanking someone for a gift.
16         Q.    Did you generally engage in conversation back
17    and forth with Alex that you -- would say was not
18    work-related even if not sexually harassing?  There
19    was a lot of back-and-forth banter, right?
20         A.    Yes.
21         Q.    Where he is asking you to send him gossip.
22    You are asking him for gossip?
23         A.    Yes, the majority of the time he wanted to
24    talk about my personal life instead of talking about
25    work.  And I on numerous occasions tried to change the
```

```
 1    subject and talk about work, but he always wanted to
 2    talk about personal things.
 3         Q.   Ms. D'Angelo, my question was gossip in the
 4    office, not about you.  Did you talk to him about
 5    gossip in the office that didn't have anything to do
 6    with you?
 7         A.   Not that I remember.
 8         Q.   Have you reviewed all the e-mails that we
 9    produced to your attorney in this case?
10         A.   No.
11         Q.   Have you reviewed any of them?
12         A.   Just a handful.
13              MS. GAMBARDELLA:  Just give me five minutes.
14              MR. BOYD:  23, is it?
15              (Whereupon, D'Angelo Exhibit No. 23 was
16         marked for identification.)
17    BY MS. GAMBARDELLA:
18         Q.   Exhibit 23 is Bates D 300000836 and 837.
19    Ready?
20         A.   Um-uh.
21         Q.   Okay, the first one is April 20, '05.  Alex
22    writes you:  Standing here watching Batista doing an
23    interview with Sky Italia.
24              Do you remember where he was and where you
25    were when you got that e-mail?
```

```
 1         A.   Let's see the date.
 2         Q.   April 20, '05.
 3         A.   I don't specifically remember.  I could have
 4    been at the office or I could have been on tour in a
 5    different city.
 6         Q.   And you respond:  Oh, my goodness.  Does he
 7    have his shirt on or off.
 8              Why did you ask Alex that?
 9         A.   Just --
10         Q.   The same thing?
11         A.   -- typical banter.  Just a joke.  Trying --
12         Q.   Typical?
13         A.   -- trying not to be -- I felt that if I
14    didn't kind of banter back with him like this, I would
15    be viewed as a stiff.
16         Q.   What gave you the impression that writing to
17    you, Standing here and watching Batista doing an
18    interview with Sky Italia was to trigger a response
19    about a guy's shirt being on or off?
20         A.   Because there was a reason why he was telling
21    me that.
22         Q.   And what was the reason?
23         A.   He would joke with me saying that I liked
24    Batista, so I was joking back.
25         Q.   Okay, so you'd joke  --
```

```
1          A.   Outside of the e-mail.

2          Q.   And then he calls you a tart.  And he says he

3     has a rather smart suit and shirt on.  And you say:

4     LOL was a joke.  Good visual, though.

5               Why did you say that?  Why didn't you just

6     say it was a joke?

7          A.   I did say it was a joke.

8          Q.   Why didn't you stop there? is my question.

9     Why did you have to add, Good visual?

10         A.   I mean, looking back on it now I wish I did,

11    but I didn't, so --

12         Q.   Okay, no problem.

13         A.   I was just trying to be a team player and fit

14    in with the relationship with my boss having a fun,

15    witty relationship.

16              MS. GAMBARDELLA:

17              (Whereupon, D'Angelo Exhibit No. 24 was

18         marked for identification.)

19              MS. GAMBARDELLA:  You my as well do this too.

20              (Whereupon, D'Angelo Exhibit No. 25 was

21         marked for identification.)

22              MS. GAMBARDELLA:  24 is D 00000896 and 897.

23         25 is D 00000423 through 425.

24    BY MS. GAMBARDELLA:

25         Q.   Okay, looking at Exhibit 24 -- and if you
```

154

1    have to go through it again to answer the question,

2    feel free.  When you say to Alex on February 9, 2006,

3    hah, I am playing the dramatic game that tends to work

4    here, what were you talking about?  If you remember.

5        A.    I think it had to do with just providing

6    detail to Donna about the document that she asked

7    for.

8        Q.    What did you mean by playing the dramatic

9    game?

10       A.    Just giving details, doing more work than was

11   required.

12       Q.    That's what that means?

13       A.    Yeah.

14       Q.    And looking at 25, it looks like you're

15   forwarding more jokes to Alex, correct, on April 25,

16   2006; is that right?

17       A.    Yes, this was --

18       Q.    More of the same?

19       A.    Yeah, just a joke, but the end is about

20   bugging you about he would make jokes to me about

21   getting married, so I was throwing it back at him.

22       Q.    But for the fact that you forwarded them, he

23   would never know that you got them to begin with,

24   right?

25       A.    Well, he wasn't reading my e-mails, no.

1       Q.   So that's your way of telling me that I am

2   correct.   Correct?

3       A.   Yes.

4       Q.   And the last series of e-mails that we have

5   marked, you never showed those to HR either, did you,

6   when you said Alex was sexually harassing you?

7       A.   Which e-mails are you talking about?

8       Q.   Well, I am talking about the jokes that were

9   forwarded.   I am talking about calling yourself

10  precious to him.

11      A.   I don't really see jokes as sexual

12  harassment.

13      Q.   I didn't ask you that.   You didn't show HR

14  any of those e-mails, did you?

15      A.   No, I didn't show HR that I forwarded him

16  jokes.

17      Q.   Nor did you show HR that you called yourself

18  precious back to him or 'Tinks, correct?

19      A.   Correct.

20      Q.   Or any e-mails that said find me a rich one

21  or things about where you were going and whether it

22  was all girls or not all girls.   You didn't show

23  really any of these e-mails, correct?

24      A.   Correct.

25      Q.   Now, I am going to leave e-mails now because

1  this point in time?

2      A.   I don't remember any details like that.

3      Q.   Did you have any understanding of why he

4  couldn't get you promoted at the time?

5      A.   No.

6      Q.   Okay.  And you didn't get promoted, I take

7  it.  You never got promoted after March.

8      A.   No.

9      Q.   And did you get a pay raise in March?

10     A.   No.

11     Q.   Or early April?

12     A.   No.

13     Q.   And it was right after that, after this

14  e-mail stream, basically in April that you interviewed

15  at Sherwin Williams, correct?

16     A.   Yes, right around the same time.

17     Q.   All right.  Ms. D'Angelo, we have already

18  established that you never complained to HR.  And we

19  are going to ask you again about your fear of

20  retaliation.  But the question I have for you now is,

21  do you contend that you complained to any member of

22  management at WWE about being sexually harassed by

23  Mr. Romer?

24     A.   I am sorry, can you repeat the question?

25          MS. GAMBARDELLA:  Can you read it back?

```
 1              (Whereupon, the question was read back.)
 2              THE WITNESS:  I told a bunch of people that
 3          were in management about what was going on.
 4     BY MS. GAMBARDELLA:
 5          Q.   All right, tell me everybody in management
 6     that you told what was going on.
 7          A.   I just need to make a list.
 8          Q.   Absolutely.
 9          A.   Cheryl Yamuder was a VP of legal.  She knew
10     what was going on.
11          Q.   Let's just start with the names and then we
12     will go back to each one.
13          A.   Okay.
14          Q.   Okay.
15          A.   Mike Archer was management.
16          Q.   Okay.
17          A.   Joel Satin.
18          Q.   Okay.
19          A.   Curt Schneider.
20          Q.   Okay.
21          A.   Danielle.
22          Q.   Well, you know what?  Let me make that
23     clear.  Before the end -- before the last -- before
24     the conversations with Danielle Fisher, she is HR.
25          A.   Right.
```

 1          Q.   So I am excluding obviously the last 10 days
 2     that you were there.
 3          A.   Lisa Richards.  Peter Clifford and I had a
 4     conversation.  I did not spell it out.  I did not come
 5     out and say Alex Romer is sexually harassing me, but
 6     he understood.
 7          Q.   Let's just go through the names.
 8          A.   Sorry.
 9          Q.   Okay.
10          A.   There was also some talent that had -- that
11     also I had conversations with.
12          Q.   Talent?
13          A.   Talent.
14          Q.   They are not managers of WWE, are they?
15          A.   No.
16          Q.   Members of management of WWE.
17          A.   Okay.  I think right now this is the list
18     that I am going to work with.
19          Q.   Let me go backwards.  Peter Clifford, when
20     did you have a conversation with him about Alex
21     harassing you?  And you didn't have to use that word
22     exactly, but where you are complaining about Alex.
23     That might make it better.
24          A.   It was at the time that I was interviewing
25     for the position with him.

1        Q.    Okay.

2        A.    So it was -- I believe it was around November

3     or December of 2005.

4        Q.    Tell me in as much detail as you can recall

5     what you said to him.

6        A.    Well, after I interviewed with him, he had

7     told me that he had a conversation with Danielle

8     Fisher and she told him that it would not be a smart

9     move to take Fara from Alex.  And she led him to

10    believe that.

11       Q.    Let's stick with what you said to

12    Mr. Clifford and what he said to you exactly in as

13    much detail as you can recall.

14       A.    I told Peter that Alex is very controlling

15    and does not -- would not be happy if he knew that I

16    was interviewing to leave from working with him.

17       Q.    Go ahead.  I am sorry.

18       A.    And he --

19       Q.    Okay, so now I see.  Is that the sum and

20    substance of your complaint about Alex to Mr.

21    Clifford?

22       A.    Well, that's some of the detail that I told

23    him.  And he agreed that he got the same feeling when

24    he spoke to HR about possibly pulling me into his

25    department.

163

```
 1          Q.   Okay, so is that the substance of what you
 2     told Mr. Clifford about Alex Romer?
 3          A.   Well, let me just back up.
 4          Q.   Sure.
 5          A.   I told him that he was very possessive and
 6     controlling and did not want me to leave.  He wanted
 7     me to work for him only and he would be very upset if
 8     I left.  And I don't remember the exact details, but I
 9     did lead Peter to believe that I was not happy working
10     for Alex and I wanted to leave because of my
11     unhappiness and stress level that I was having working
12     for Alex.
13          Q.   Okay.  Anything else that you told Peter?
14          A.   Right now, I think that's it.
15          Q.   Okay, let's go to Lisa Richards.  What was
16     her position at the time?
17          A.   She worked for Peter.  She was --
18          Q.   She was a member of management?
19          A.   Yes.
20          Q.   And tell me when you had a conversation with
21     Lisa?
22          A.   We had become friends.
23          Q.   Tell me when you had the conversation with
24     Lisa?
25          A.   Well, we had multiple conversations about
```

1    Alex.   She knew that he was very controlling.   I

2    called him -- I referred to him as a stalker.

3         Q.   I don't mean to interrupt you.   I really

4    don't want to know what she, quote-unquote, knew.   I

5    am really concentrating on conversations that you had

6    with her, all right?

7         A.   Okay.

8         Q.   So tell me if it makes it easier because it

9    might be hard for you to say, well, on such and such a

10   month or such and such a day.   When was the first time

11   you think you ever had a conversation with Lisa

12   Richards about Alex Romer?

13        A.   Sometime in 2005.

14        Q.   Okay.   And how many conversations do you

15   think you had with Lisa Richards about Alex Romer.

16   And I don't mean the fact that, you know, we had a

17   business meeting.   I mean about facts that are

18   relevant to this suit.   How many times?

19        A.   How many conversations?

20        Q.   Yes, just an estimate?

21        A.   A lot.

22        Q.   In as much detail as you can recall, tell me

23   all the things you told Lisa Richards about Alex Romer

24   that you categorize as complaints?

25        A.   I mean, I would tell her how he would

1    constantly call me and how he called me when he was

2    drunk and what some of the things he would say in IMs

3    to me.

4        Q.   Tell me what you told her he said to you in

5    IMs.

6        A.   I mean, I might have told her like some of

7    the comments that he made.  He has made comments that

8    I look sexy in a karate suit.  He has made comments

9    that I had nice legs in a picture that he saw.

10            I told her details of how my boss was talking

11   to me because I was looking for career advice from her

12   on how I could handle the situation.  And I looked to

13   her because she was older than me and she had more

14   work experience.  So I was kind of going to her for

15   some guidance.

16            And she -- that's when she started saying,

17   you know, maybe -- you know, she knew -- she

18   understood the situation to be not very healthy so

19   that's when she started saying, well, maybe you should

20   talk to Peter about a possible position in my

21   department.

22       Q.   Okay.  So you told her that he was calling

23   you sexy and talking about your legs?

24       A.   Right.  And like the names that he called me.

25       Q.   'Tinks and Precious.

1          A.    Um-uh.

2          Q.    Did you tell her that he was pressuring you

3    to sleep with him?

4          A.    I might have.

5          Q.    You don't have a specific recollection

6    today?  If you don't, you don't?

7          A.    I don't remember.  I mean, I conveyed to him

8    that he was pretty much in love with me and that, you

9    know, we don't have this working professional

10   relationship that a typical manager and employee

11   have.  We had something that was a little bit

12   different.

13         Q.    Did she give you any advice other than

14   talking to Mr. Clifford?

15         A.    No.  She just said that, you know, just try

16   and -- because I was very upset about the whole thing,

17   so she was just trying to say -- you know, help me to

18   remain calm and just, you know, try and deflect him

19   when he tries to talk about personal stuff, just, you

20   know, try and deflect him to talk more about

21   business.  And I was trying to do that, but it wasn't

22   getting me anywhere.

23         Q.    Did you take notes of these conversations?

24         A.    No.

25         Q.    You took notes of other conversations, right?

1     things down.  It's not a trick question.  Were there

2     occasions where you wrote things down after the fact

3     and then wrote a series of incidents all at once?

4     Would that be right?

5         A.   I don't remember the time that I wrote the

6     notes.

7         Q.   Okay, when is the first time you ever talked

8     to Cheryl Yamuder about Alex Romer's behavior?

9         A.   Probably when she first started with WWE, I

10    became friends with her and started talking to her

11    about it from the beginning.

12        Q.   When did she start; do you remember?

13        A.   April, I think like, 2005.

14        Q.   Did you ever ask Cheryl Yamuder to give you

15    advice on how to get evidence against Alex Romer?

16        A.   No, not evidence.  I asked her for advice on

17    how I could handle the situation for the fact that my

18    boss was sexually harassing me.  Like what can I do?

19             And she told me, she told me that based upon

20    her experiences, going to HR is not really going to

21    help you because they are not going to help the

22    situation.  And they could possibly use that against

23    you and then you will be out.  You will be --

24        Q.   You are testifying that Cheryl Yamuder

25    discouraged you from going to HR?

1   these incidents.  A lot of them she was there, so she

2   witnessed.  So the notes are me jotting down the fact

3   that somebody else witnessed him and the way he was

4   towards me.

5        Q.   So these don't reflect conversations you had

6   with her; they just reflect what you thought they

7   witnessed?

8        A.   Well, some of it is a conversation because I

9   am quoting her exactly.  She said, Oh, my God, it's

10  clear he is totally in love with you.

11       Q.   When did she say that?  Because I notice

12  these aren't dated at all.

13       A.   Right.  This was when she first joined in

14  April.  The three of us went out to lunch.  And she

15  made that comment after we went out to lunch.  And she

16  said it's clear Alex is totally in love with you.  You

17  can just see it from the way he looks at you.  So this

18  comment she made was sometime in April of '05.

19       Q.   But the notes also talk about Christmas party

20  '05, March '05.

21       A.   Right, it's a running log of what was going

22  on.

23       Q.   So when did you create these notes?

24       A.   I don't remember when I did.

25       Q.   So it would be -- it would have to be at

```
 1    I am confusing you.

 2         A.    You are.

 3         Q.    That's what you mean by they didn't encourage

 4    me.

 5         A.    Right.

 6         Q.    You said Cheryl Yamuder discouraged you, said

 7    don't go.

 8         A.    Correct.

 9         Q.    Is there anything in here that is intended to

10    convey not only were you encouraged to go, but

11    somebody discouraged you from going?

12         A.    No, I did not list the conversation that I

13    had with Cheryl here.

14         Q.    Is there any particular reason why despite

15    all the detail in here and an allegation that you

16    weren't encouraged that you decided to leave out that

17    you were also discouraged?

18         A.    No, I don't remember why I didn't put it in

19    there.

20         Q.    Okay.  Tell me what -- so we have gone

21    through -- you had conversations, ongoing

22    conversations with Lisa Richards about him, talking

23    about your legs and stuff like that, correct?

24         A.    Right.

25         Q.    How about Curt Schneider?  When did you tell
```

1    him you were being sexually harassed?

2         A.   Oh, he witnessed it.

3         Q.   When did you tell him you were being sexually

4    -- we will get to witnessed.  When did you tell Curt

5    Schneider you were being sexually harassed?

6         A.   I never came out and told Curt Schneider

7    using the exact words that I was sexually harassed.

8         Q.   When did you convey to Curt Schneider in any

9    words the suggestion that you were being sexually

10   harassed even if you didn't use those exact words?

11        A.   Well, we had conversations -- I don't

12   remember the exact time period -- that I was unhappy

13   in my current position and the reason why I was

14   unhappy is because Alex was obsessive and, you know,

15   pretty much infatuated with me.

16        Q.   Your testimony is that you told Curt Alex was

17   infatuated with you?

18        A.   I might not have used those exact words.

19        Q.   I need to get as close as possible.

20        A.   I don't remember exact words, but he knew I

21   was not happy in my position because of the

22   relationship I had with Alex.

23        Q.   Isn't it a fact, Ms. D'Angelo, that the words

24   you used with Mr. Schneider were controlling?

25        A.   Yes, probably.

1          Q.   You never used the word sexual to Curt, did
2     you?
3          A.   I didn't feel I needed to.
4          Q.   Okay, I didn't ask you that, really.  We will
5     just go so much faster -- I know it's tough being in
6     that seat.  Been there once and I didn't like it, so I
7     sympathize.
8               When did you ever tell Curt Schneider that
9     Mr. Romer was pressuring you to sleep with him?
10         A.   I never told him that.
11         Q.   Did you ever tell Curt Schneider that you had
12    been touched in a way that was upsetting to you by
13    Mr. Romer?
14         A.   I didn't have to tell him.
15         Q.   Ms. D'Angelo, honest to God, we've got to
16    understand the rules here.  I am not asking you why.
17    I am just asking factual questions.  Did you tell him
18    you were touched?
19         A.   No.
20         Q.   Did you tell him that you were being flirted
21    with?  We will get to what you say he witnessed.
22         A.   Okay.
23         Q.   You are really struggling because you don't
24    want to say I didn't because you are anxious to get to
25    what he -- we're going to get there.  Trust me.

1        A.    I didn't need to tell him.

2        Q.    Okay, so your answer is I didn't tell him I

3   was being sexually harassed.  I didn't tell him that

4   he was touching me.  I didn't tell him he was flirting

5   with me.  Did you tell him he was calling you sexy or

6   precious or commenting about your body?

7        A.    No.

8        Q.    Did you tell him that you felt pressured to

9   participate in sexual banter in any way?  And I am not

10  looking for exact words.  Convey that impression.

11       A.    No.

12       Q.    All right, what is it you contend

13  Mr. Schneider witnessed that should have made him

14  conclude you were being sexually harassed?  Now we are

15  going to get to the question you're dying for me to

16  ask.

17       A.    He saw -- when I was on the Europe trip, he

18  witnessed how Alex was with me, always standing very

19  close to me, putting his arm around me.  And then he

20  was there when Alex was pulling me and trying to get

21  me to sit back down at the table.  And he made the

22  comment in the elevator, What's that about? because

23  he --

24       Q.    Okay, so let's talk about that.  How many

25  incidents like -- how many incidents do you contend

```
 1      Mr. Schneider witnessed like that?
 2           A.   Two.
 3           Q.   Okay.  Let's talk about the first one.  Where
 4      was it and when was it?
 5           A.   The Europe trip in April.
 6           Q.   Of '05?
 7           A.   I think it was '06.
 8           Q.   '06, so toward the end of your employment?
 9           A.   Yes.
10           Q.   Was that the first one?
11           A.   I don't remember if he was on another
12      European trip.
13           Q.   On that trip, he witnessed -- is that what
14      you just described to me?  Were you guys in the hotel
15      bar or something?
16           A.   Yes.
17           Q.   And who was standing or sitting with you
18      all?  It was you, Alex, Curt, and anybody else?
19           A.   Joel.  And then there was two guys from the
20      international office, Toby something.  I don't know
21      his last name.
22           Q.   Okay.
23           A.   Kevin was also another guy from
24      international.  And then this other guy, Jonathan
25      Sully, who worked in Alex's office.  He was a manager
```

```
 1    too.
 2         Q.   Tell me exactly what they witnessed in the
 3    bar?
 4         A.   It was aggressive trying to pull me back down
 5    when I said I am going to go up to my room and get in
 6    the elevator with Joel and Curt.
 7         Q.   What else?  In the bar.
 8         A.   Aside from that?
 9         Q.   Right.
10         A.   I mean, people saw how he was with me.  It's
11    up to them to infer and see what they want to see or
12    what they really see.
13         Q.   I understand that.
14         A.   I am not sure what you are asking me.
15         Q.   I am asking facts.  What happened that you
16    contend they saw in the bar?  We are starting in the
17    bar.  We will get to the elevator.  They saw him grab
18    you where?
19         A.   On my wrist and pull me down.
20         Q.   On your wrist and try to convince you to sit
21    back down.
22         A.   Yes, across from the table as I was like
23    getting up.
24         Q.   I got it.
25         A.   Okay.
```

1    Q.   Did Mr. Romer say anything to you while he
2    was pulling your wrist to sit back down?
3    A.   I don't remember exact words.
4    Q.   But he said something?
5    A.   Yes.  I think it was to the fact of, Don't
6    go.
7    Q.   Don't go, okay.  And what else did they
8    witness in the bar?
9    A.   They also witnessed that Alex was trying to
10   make sure that I had enough drinks, so, you know, make
11   -- wanting to make sure that I was drinking and being
12   part of the team.
13   Q.   Well, they were all drinking too, right?
14   A.   Right.
15   Q.   Did he buy anybody else drinks?
16   A.   Alex?
17   Q.   Yes.
18   A.   Not to my knowledge.
19   Q.   You don't know whether or not he did, right?
20   A.   No, I don't.
21   Q.   Did other employees buy you drinks that
22   night?
23   A.   I don't know.  I don't remember.
24   Q.   Was the company paying for the drinks?
25   A.   I think so.  I think that's how it worked.

```
 1        Q.   Okay, what else did they see in the bar?
 2   Joel and Curt, what else did they see in the bar?
 3        A.   Well, nothing else physically happened aside
 4   from the pulling.  So we were all just sitting there
 5   and they saw -- Curt would often make comments to me.
 6   Why or how can you work for Alex?  And, you know,
 7   trying to get me to talk more about it.
 8        Q.   And you wouldn't?
 9        A.   I didn't really want everybody to know.
10        Q.   To know, right.  So other than what they saw,
11   do you contend they heard Alex make any remarks to you
12   that should have conveyed to them that he was sexually
13   harassing you?
14        A.   I am sorry, can you repeat that?
15             MS. GAMBARDELLA:  You can read it back.
16             (Whereupon, the question was read back.)
17             THE WITNESS:  Correct, I didn't -- I felt
18        that I did not need to put a label on it.  It was
19        clear.
20   BY MS. GAMBARDELLA:
21        Q.   Let's stop and let's go back.  The question
22   is, sitting here today is it your claim that something
23   was said by Alex to you that they heard that should
24   have conveyed to them the impression you were being
25   sexually harassed?
```

1      A.   Yes, yes.

2      Q.   What did he say that you contend they heard?

3      A.   Him.  It was more his action, him pulling me

4   down.

5      Q.   Don't go?

6      A.   Yes.

7      Q.   Anything else?

8      A.   At this point that's all I remember, what was

9   said.

10     Q.   Well, this is the time to think about it.

11     A.   Yeah, so --

12     Q.   So there is nothing else that you can

13   remember sitting here today, correct?

14     A.   Correct.

15     Q.   Okay.  Now, what happens is you get up from

16   the table anyway, right?  Did you sit back down?

17     A.   I was pulled back down and I think I got back

18   up.

19     Q.   And then you got immediately back up and then

20   you proceeded to leave the bar area?

21     A.   Yes.

22     Q.   And where did you go?

23     A.   Into the elevator.

24     Q.   And did Alex follow you?

25     A.   Not into the elevator, but I think he got up

1    to --

2        Q.   Not think.  Did you witness Mr. Romer getting

3    up to follow you?

4        A.   Yes, I saw him get up.

5        Q.   And how far did he follow you?

6        A.   Close to the elevator.

7        Q.   But he didn't get in it?

8        A.   No.

9        Q.   Did he touch you again after pulling you back

10   into the seat?

11       A.   No, I had gotten away.

12       Q.   So your answer is no, he didn't touch me,

13   right?

14       A.   No, he didn't touch me.

15       Q.   And who accompanied you or who also left the

16   table physically and went in your direction to the

17   elevator?

18       A.   Joel Satin and Curt Schneider.

19       Q.   Okay.  So you got up.  Joel got up.  Curt got

20   up.  Alex got up.  And you are all going toward the

21   elevator, right?

22       A.   Yes.

23       Q.   Who got in the elevator?

24       A.   Myself, Joel, and Curt.

25       Q.   Tell me all the conversation that happened in

1  the elevator.

2      A.   To my knowledge, I remember Joel and Curt

3  being very perplexed and --

4      Q.   No, what did they say, Ms. D'Angelo?  I don't

5  want perplexed or I think.  What did they say to you

6  and what did you say to them?

7      A.   They said, What was that about?

8      Q.   And what did you say?

9      A.   I -- it's hard for me to remember exactly

10 what I said, but it was to the point of this is what I

11 have been dealing with.

12     Q.   What else did you say?

13     A.   That's Alex.  This is how he acts.

14     Q.   Right.  In fact, Alex had a reputation for

15 being controlling with the people that reported to

16 him, didn't he?  Didn't he?

17     A.   I don't know.

18     Q.   Well, wasn't he called the stalker?

19     A.   I called him the stalker.

20     Q.   You called him the stalker?

21     A.   Yeah, that's what I referred to him as

22 because he would stalk me.

23     Q.   Did you say anything else to them and did

24 they say anything else to you in that elevator?

25     A.   Well, Curt and I had a conversation as we

1   rode after Joel got off.

2      Q.   Okay, well, that counts.  Let's finish that

3   conversation and then I need to break because she

4   needs to go.  What was the conversation --

5         So did Joel get out of the elevator?

6      A.   Yes.

7      Q.   Was there any conversation that occurred in

8   addition while Joel was still in that elevator?

9      A.   Not that I remember.

10     Q.   All right.  So now you and Curt are in the

11  elevator.

12     A.   No, we --

13     Q.   You got out?

14     A.   We dropped Joel off on his floor.  And then

15  we got to Curt's floor and we both stepped out onto

16  his floor and had a conversation.

17     Q.   Okay, tell me about the conversation.

18     A.   He was concerned about what he had just seen

19  and he --

20     Q.   What did he say?

21     A.   He said, Well, what's Alex doing touching you

22  like that?

23     Q.   Um-uh.

24     A.   And I don't remember my exact response, but I

25  told him this is what I have been going through.  I

1    know it's not right.

2              And he asked me, Well, what are you doing

3    about it?  And I told him that I was looking for a new

4    job.  And he gave me advice, saying, well, is it the

5    right job for you?  And are you making the right

6    decision for your career?

7              And I told him that, you know, as much as I

8    don't want to leave WWE, I feel that this -- it's what

9    I have to do in order to get ahead in my career and

10   succeed because working for Alex is not getting any

11   better and I am not going anywhere.

12        Q.   So what he witnessed was him pulling you back

13   in the seat.  Don't go.  And then you had a

14   conversation in the elevator about this is what I have

15   been going through and it's not right.

16        A.   Yes.

17        Q.   Well, how is he supposed to know that you are

18   talking about sexual versus just general overall

19   stalking management style?

20        A.   Well --

21        Q.   How is he supposed to know?

22        A.   It's common knowledge that a boss should not

23   be touching a female employee.

24        Q.   Is that how he is supposed to know?

25        A.   Well, yeah.

1        MS. GAMBARDELLA:   Okay, let's take a quick

2     break.

3        (Briefly off the record, as a break is

4     taken.)

5  BY MS. GAMBARDELLA:

6     Q.   All right, Ms. D'Angelo, can you refer to

7  Exhibit 27, which are some of your handwritten notes.

8  And on the bottom right are those Bates stamps.   And

9  it's PO 443 to 445.   And the top of 443 is Curt

10 Schneider.   Do you see that?

11    A.   Yes.

12    Q.   Can you tell me when you created the notes

13 that are represented by 443, 444, 445, and 446?

14    A.   I don't remember.

15    Q.   Were they after the incidents occurred that

16 are portrayed in the notes?

17    A.   Yes.

18    Q.   Did somebody suggest at some point that --

19 well, what I mean is after all the incidents.   In

20 other words, did you go incident by incident or did

21 you wait until -- just do a running dialogue --

22 narrative, rather, after everything had occurred?

23    A.   I am just -- well, some of the notes were

24 what happened on the trip in April so after that trip

25 happened, I jotted down those notes.   So right after

1   it happened.

2      Q.   Okay.   Did anybody suggest you take notes at

3   this time?

4      A.   Well, my boyfriend/husband now at the time

5   told me that I should write things down to remember

6   what was going on.

7      Q.   Okay.   Starting with 443, it says Curt

8   Schneider would see him in gym, talk about running.

9   He would tell me, Are you getting out of this place?

10   It's crazy here and your boss especially.   AR is out

11   of his mind.   You have to leave.   You deserve better.

12   I agree with him and tell him I am trying.   Right?

13      A.   Yes.

14      Q.   Then saw him in Europe November '05.   Is that

15   the trip we just talked about, the bar, the elevator?

16   Oh, no --

17      A.   No, because the elevator happened in '06.

18      Q.   April '06.

19      A.   So I had another conversation with Curt back

20   before April.

21      Q.   Got it.   Is this April '06 incident again the

22   first incident you claimed they witnessed that should

23   have conveyed to him that you were being sexually

24   harassed?

25      A.   Curt?   You are speaking only about Curt?

1        Q.   Yes.

2        A.   No, Curt had seen me in November in Europe

3   with Alex, so that's --

4        Q.   Well --

5        A.   He'd just seen me.  There was no -- nothing

6   that actually had happened.

7        Q.   Okay, so there is nothing he witnessed?

8        A.   Well, he saw how Alex was always so close to

9   me and he probably thought that was kind of weird.  So

10   that's why he is saying your boss, you know, your boss

11   is crazy; he is out of his mind.  Curt said that to

12   me.

13        Q.   Isn't it true, Ms. D'Angelo, that the context

14   of that communication was that Romer had a reputation

15   of being a workaholic and thought nothing about

16   calling subordinates day and night?  Isn't that the

17   context in which he was talking about Alex Romer being

18   crazy?

19        A.   No.

20        Q.   I mean, he is not the only WWE employee that

21   has ever said it's crazy around here, is he?  This guy

22   says it to me every other day.

23        A.   He is saying that Alex is out of his mind.

24   That's a little bit different.  That's pretty --

25        Q.   That suggests to you that he knows you are

1    being sexually harassed, that your boss is out of his

2    mind?

3       A.   Well, we had numerous conversations about me

4    leaving, trying to leave the company.

5       Q.   Tell me one conversation you had with

6    Mr. Schneider where you told him you were being

7    pressured to have sex with Alex or touched sexually or

8    offended by how you were being touched, anything like

9    that.

10      A.   Like I said, I did not have a conversation

11    stating that.

12      Q.   That's what I thought, okay.  This says in

13    November '05 in Europe, he was talking to me again,

14    meaning Curt, correct?

15      A.   Yes.

16      Q.   About trying to leave the company and made a

17    comment to AR that I was going to go work for Curt.

18    So AR would get nervous the second he would see me

19    talking to Curt.  That's the sum and substance of what

20    happened in November, '05, correct?

21      A.   Yes.

22      Q.   All right.  Now, April '06 is the elevator

23    incident we just went through.

24      A.   Right.

25      Q.   Is that the first incident where you claim

 1    Mr. Schneider witnessed a physical touching between

 2    you and Alex?

 3         A.   Yes.

 4         Q.   All right, so we already went through your

 5    recollection of what happened.  Starting on the next

 6    page, Joel and Curt were leaving the bar so I was

 7    going to leave with them because it was late.  AR

 8    bugged out, grabbed my arm.  So don't leave.  I pulled

 9    away and said, I am going to go.  I am tired.  Is that

10    what happened?

11         A.   Correct.

12         Q.   All right.  And then it's, Face turned red,

13    meaning Alex's, I take it?

14         A.   Yes.

15         Q.   I ran.  Did you run?

16         A.   Yes.  I trust my writing.

17         Q.   Into elevator with Joel and Curt.  So these

18    notes were created much closer in time than what you

19    related to me today, correct, closer in time to the

20    actual events?

21         A.   Yes.

22         Q.   Joel -- what's the next word, something drop

23    off?

24         A.   Joel was the first drop off.

25         Q.   Where in your notes do you talk about any

1    conversation that happened with Joel in that elevator

2    about Alex?

3         A.   I am sorry, say that again.

4         Q.   It says, Joel first drop off.  What does that

5    mean?

6         A.   We dropped Joel off first.  Then --

7         Q.   Where in your notes is your conversation with

8    Curt while Joel is in the elevator?

9         A.   It says, Then me and Curt in elevator.  I

10   told him I got job offer.

11        Q.   Okay, so hold on a second.  You told me

12   earlier that there was some conversation while Joel

13   was also in that elevator.  Specifically, you told me

14   Curt said to you while Joel was in the elevator,

15   What's that all about?  So is that not right?

16        A.   No, that happened.  I just did not write that

17   down.

18        Q.   You didn't write that down.  Then met Curt in

19   the elevator and told him I got a job offer.  But it

20   doesn't say that Curt started the conversation by,

21   What was that all about?  Right?

22        A.   No.  It says then me and Curt were in the

23   elevator.

24        Q.   And I told him I got a job offer.

25        A.   Correct.

```
 1          Q.   I got an out.

 2          A.   Correct.

 3          Q.   What does the next line say?

 4          A.   It says, Then got off at his floor,

 5     meaning --

 6          Q.   Where is any reference to any other

 7     conversation between you and Curt in that elevator?

 8          A.   There was no other conversation in the

 9     elevator.  I said that we got off on his floor and

10     then Jonathan Sully saw us talking, so that's when

11     Curt and I were having additional conversation.

12          Q.   All right, where in your notes is the

13     reference to the conversation you had with Curt after

14     you and he stepped out of the elevator?

15          A.   It's right here.  It says:  Jonathan Sully

16     saw us talking on the floor.  That's referring to the

17     conversation we were having.  I was telling him about

18     the offer.

19          Q.   Who is him?

20          A.   Curt.

21          Q.   I got it.  And he was giving me advice.

22          A.   Right.  That I have to be happy.  Is it a

23     good step for my career?  That's exactly what he

24     said.

25          Q.   So is that the sum and substance of the
```

1    conversation you had with Curt outside the elevator?

2        A.   Yes.

3        Q.   So these notes are accurate?

4        A.   Yes.

5        Q.   You didn't have any other conversation with

6    Curt outside that elevator, correct?

7        A.   Correct.

8        Q.   And then there was an incident with Alex that

9    was not witnessed by anybody, correct?  You say

10   here --

11       A.   Correct.  It was just me and him.

12       Q.   All right.  Were there any other incidents

13   actually witnessed by Curt Schneider which you contend

14   should have conveyed to him that you were being

15   sexually harassed by Alex Romer?

16       A.   Not aside from what we already talked about.

17       Q.   Okay.  What incidents other than what you

18   have already described do you contend Joel Satin

19   witnessed that should have conveyed to him you were

20   being sexually harassed by Alex Romer?

21       A.   Other than what I described in the notes?

22       Q.   Right.  No, what you have already described

23   in your testimony.

24       A.   Today.

25       Q.   Yes.

1       A.   Well, there was an incident after, which I

2   think I already talked about.

3       Q.   Which one?

4       A.   Where Alex had his arm around me and I told

5   him, Don't touch me.  And Joel was right there and he

6   saw.

7       Q.   No, you didn't tell me about that at all.

8       A.   Okay.

9       Q.   Let's go there.  Are we done with Curt?

10  Right?

11      A.   Yes.

12      Q.   So no conversations.  We have gone through

13  all the incidents that he witnessed and conversations

14  surrounding those incidents, right?

15      A.   Yes.

16      Q.   Now, let's go to Joel.  Other than the

17  incident where he was in the elevator for a short

18  period with you and saw what happened in the bar, tell

19  me all incidents Joel witnessed that should have

20  conveyed to him you were being sexually harassed?  Do

21  you need to look at your notes in order to answer the

22  question?

23      A.   Yes.

24      Q.   So you don't have an independent recollection

25  sitting here today?

```
 1          A.    Well, I do.  I just want to make sure I

 2    mentioned it in my notes.  And I am pretty sure I did.

 3          Q.    Got it.

 4          A.    Okay.  So it is on the first page of --

 5          Q.    Use the bottom right numbers because that's

 6    the best way to do it.

 7          A.    PO 441.  This was an incident that I was

 8    interviewing one of the wrestlers and Alex got upset.

 9          Q.    Oh.  And this is the one where he pulled you

10    out?

11          A.    Yes.

12          Q.    By the neck and said get away?

13          A.    No, that was -- this is he just kind of

14    pulled me away and told me he wanted to talk to me.

15    He did not want me talking to the talent.  I was

16    actually interviewing the talent for a project.

17          Q.    And he just said don't talk to them?

18          A.    Yeah, he wanted to talk to me.  So he pulled

19    me away and I immediately told him you can talk to

20    me.  Don't touch me.  You don't need to touch me.

21          Q.    Where was he touching you?

22          A.    Like he had me like really close to his body

23    and --

24          Q.    Where was he touching?  Like in other words,

25    I know -- like around your shoulder with his arm and
```

```
 1    then he was pulling you out and so you were getting

 2    close being pulled out?

 3         A.   Yes, yes, I was getting --

 4         Q.   Okay.  Where was Joel physically when that

 5    was happening?

 6         A.   Right behind us.

 7         Q.   And how do you know he saw the whole thing?

 8         A.   Because he walked right past us as I said

 9    don't -- I screamed.  I said, Don't touch me.  And

10    then Joel walked right past us so he was behind us

11    when it happened.  He was very close to us.  And then

12    he obviously realized that we were fighting.

13         Q.   Not obviously.  What did he say to you, if

14    anything, to confirm for you that he heard what you

15    said?

16         A.   Okay, I'll get to that.  So he walked past

17    us.  And then Alex and I were talking and got into a

18    bit of an argument.  And then after that whole thing,

19    the three of us ended up going to dinner.  And I

20    didn't say one word the entire dinner.  And Joel said

21    to me, Are you okay?

22              And I just looked at him and I remember

23    holding back tears.  And I ended up going to the

24    bathroom right after that.  And I was crying.  And I

25    came back and Joel just looked at me and was, you
```

```
 1          Q.   Right.
 2          A.   And then I had a conversation with Joel one
 3     night.  It was after business hours but Joel was still
 4     in the office.  I was there and I was frustrated
 5     because I had just gotten off the phone with Alex.
 6     And I went to Joel because this was after the fact I
 7     used to report to Joel so I felt let me go talk to
 8     Joel how this is going on.
 9          Q.   Right.
10          A.   It's not -- I feel uncomfortable about it.
11     Let me see if I can kind of get some guidance from my
12     old supervisor.
13               So I told Joel that, you know, I am just very
14     frustrated with Alex.  He is constantly asking about
15     my personal business and not wanting to talk about
16     work.  I can't -- I feel like I can't get anything
17     done and he is just always prying into my personal
18     life.
19               And Joel said, Well, maybe you should kind of
20     threaten him, saying, you know, it's inappropriate
21     that he is talking to you like that and --
22          Q.   Like what?
23          A.   Asking about your personal life.
24          Q.   About your personal life, um-uh.
25          A.   Right.  And that you should say, If you keep
```

207

```
 1    it up, then I will go to HR with that, you know, with
 2    the fact that you are asking all these personal
 3    questions and, you know, or whatever.  So Joel was
 4    kind of directing me that I should --
 5         Q.   Go to HR?
 6         A.   -- threaten to say that I would go to HR.
 7         Q.   Okay.  Didn't that suggest to you that he
 8    meant maybe you should go to HR if that didn't work?
 9         A.   Well, he didn't tell me I should go to HR
10    with what was going on.
11         Q.   But he said threaten Alex.  Tell him to knock
12    it off or I am going to HR.
13         A.   Correct.
14         Q.   And the sum and substance of what you told
15    Joel Alex was doing was asking personal questions?
16         A.   Yeah, inappropriateness.
17         Q.   Well, tell me what exactly you said.  Did you
18    say he was always asking me personal questions or did
19    you say he asks me about my sex life or -- did you say
20    anything like that?
21         A.   I don't remember exactly what I said, but
22    I --
23         Q.   Does looking through your notes help you?
24    Feel free.
25         A.   I don't know.  I don't think I wrote that one
```

1    down.  But I did convey to Joel that I was

2    uncomfortable and upset with how -- the conversations

3    that were going on.

4        Q.   Well, what did you tell him, Ms. D'Angelo?  I

5    mean, this is really important.  I am not trying to

6    badger you, but if you say he is asking me a lot of

7    personal questions, did you give him examples of the

8    personal questions?

9        A.   He often asked me like who I was dating and

10   who I was sleeping with, so yeah, I probably did tell

11   Joel.

12       Q.   Did you give --

13       A.   I don't remember.

14       Q.   No, not probably.  A perfect answer.  I don't

15   recall.  Okay.  Did you tell Mr. Satin that Mr. Romer

16   was complimenting your body?

17       A.   I don't remember.

18       Q.   Did you tell Mr. -- other than telling

19   Mr. Satin that you were being asked a lot of personal

20   questions, did you tell -- anything you remember

21   specifically today that you told Mr. Satin about Alex

22   Romer's behavior that was of any concern to you

23   whatsoever?

24       A.   I don't remember the specifics of the

25   conversation.

1    Q.   Do you remember generally what you told him

2    besides what you already testified to?

3    A.   Just the fact that I was unhappy with what

4    was going on.

5    Q.   What was it that was going on that you were

6    unhappy with that you conveyed to Mr. Satin?

7    A.   The personal questions.

8    Q.   I don't know what everything means.  If you

9    can't remember specifics, I don't know what you mean

10   by everything?

11   A.   So that's what I am saying my answer is.  I

12   don't remember the specifics.

13   Q.   Thank you.  That's perfectly fine.  And

14   Mr. Satin said to tell him if he doesn't stop asking

15   you personal questions, I am going to HR, right?

16   A.   No.

17   Q.   Tell me again.

18   A.   He said you should threaten Alex by saying

19   you will go to HR.

20   Q.   You will go to HR.  Okay, Mr. Archer.  You

21   said Mr. Archer saw things or heard things or was told

22   things that should have conveyed to him that you were

23   being sexually harassed, correct?

24   A.   He was told things.

25   Q.   Okay, so he didn't witness any behavior?

210

1          A.    No.

2          Q.    All right.   Tell me everything Mr. Archer was

3    told that you contend should have conveyed to him that

4    you were being sexually harassed.

5          A.    He -- his direct report, which was Bernadette

6    Hawks, told him that she saw Alex touch me on my lower

7    waist.

8          Q.    How do you know that?

9          A.    Because she told me that she went to her

10   boss.   And then he came to me and told me what

11   Bernadette told me what she saw.

12         Q.    And what did you say?

13         A.    Well, I was embarrassed.

14         Q.    No, what did you say?   Not how did you feel.

15   What did you say?

16         A.    I confirmed it, that it did happen.

17         Q.    And what else did you say?

18         A.    I don't remember.

19         Q.    Wasn't it a fact, Mr. D'Angelo, Mr. Archer

20   came to you because he heard this allegation from

21   Ms. Hawks, who, by the way, was not a member of

22   management, correct?

23         A.    She was higher up than me.   I don't remember

24   her exact title.

25         Q.    Okay, so you don't know that.   So she saw

211

```
1    something.  She went to Mike.  Mike came to you and
2    said what?
3         A.   What's this that I hear that Alex touched
4    you?
5         Q.   And you said?
6         A.   I said yes, he did.
7         Q.   Did you tell him where he touched you?
8         A.   Yes.
9         Q.   Or did he say he knew where he touched you?
10        A.   I don't remember who told -- if he said it or
11   if I just said, yeah, it happened.
12        Q.   Didn't he offer to do something about it?
13        A.   He offered to punch Alex's lights out, were
14   the exact words.  He was kind of jokingly acting like
15   a tough guy, like, you know, do you want me to punch
16   his lights out for you kind of thing.
17        Q.   And what did you say?
18        A.   I said no, I don't think that would be
19   necessary.
20        Q.   Didn't Mr. Archer ask you if you wanted him
21   to do something about it?  And I don't mean punch
22   Alex's lights out.
23             Did he say he wanted to help if you wanted
24   him to?
25        A.   Yes, I think he said, Do you want me to talk
```

212

1    to Alex for you?

2        Q.   And you said, no, there was no problem to

3    worry about, right?

4        A.   Well, that would have made my situation a

5    little bit more awkward.

6        Q.   I am asking you what you said, not why you

7    said it or why you didn't say something.  It's a very

8    simple question.  Did you not -- didn't you tell

9    Mr. Archer, no, I don't have a problem, don't worry

10   about it, or words to that effect?

11       A.   I told him I did not want him to talk to Alex

12   about what had happened.

13       Q.   Didn't you also tell him there is no

14   problem.  I am not having any problem.  It's not a

15   problem or words to that effect?

16       A.   No, I don't remember telling him I didn't

17   have a problem because we --

18       Q.   I am sorry.

19       A.   -- we had a conversation that I expressed to

20   him I was unhappy with working there for Alex.

21       Q.   Well, Ms. D'Angelo, do you have any idea why

22   Mr. Archer would bother to come to you, offer to help,

23   and then you only say, Don't talk to Alex.  And then

24   what does he do?  He just goes away and leaves it

25   alone.  Is that what you are saying?

```
 1        A.   Well, yeah.  He didn't do anything else.
 2        Q.   I didn't ask you that.  Isn't it a fact that
 3   he came to you because he said, Do you need me to help
 4   you?  You said no, there is no problem to report or
 5   words to that effect.  Isn't that what you guys talked
 6   about?
 7        A.   I told him that I did not want him to talk to
 8   Alex.  I did not say that there was no problem.
 9   Because we had a conversation that I expressed there
10   was a problem that I was having with working for
11   Alex.
12        Q.   When did that conversation occur?
13        A.   During the same meeting.
14        Q.   And what was the conversation with Mr. Archer
15   where you said you were having a problem with Alex?
16        A.   I was telling him how Alex was treating me
17   constantly.
18        Q.   You have to tell me specifically.  What did
19   you tell Mr. Archer?
20        A.   Constantly calling me, harassing me, stalking
21   me.
22        Q.   Harassing you in what way?  Did you say
23   sexual?
24        A.   I don't remember if I used the exact word,
25   but I said -- I referred to him as a stalker.  He is
```

214

```
 1    constantly --
 2         Q.   Stalking you?
 3         A.   Yes.
 4         Q.   He is controlling?
 5         A.   Yes, obsessive with me.
 6         Q.   Right.  What else did you say?
 7         A.   I think that's it.
 8         Q.   Did you complain that Alex was frustrating,
 9    disorganized, and could often not be tracked down or
10    words to that effect?
11         A.   No.
12         Q.   You said he was controlling and obsessive?
13         A.   Yes.
14         Q.   Did you tell him that you were being
15    pressured to sleep with Mr. Romer, being touched
16    inappropriately?
17         A.   Well, we talked about how he inappropriately
18    touched me --
19         Q.   You mean --
20         A.   -- in the back.
21         Q.   Right.  Other than that?
22         A.   That was it.
23         Q.   Didn't you also tell Mr. Archer you didn't
24    want him to go any further not just with Alex but with
25    anybody else about you being touched around your
```

```
 1   waist?
 2        A.   I am sorry, can you repeat that?
 3        Q.   Is it a fact or is it not that you also told
 4   Mr. Archer not only not to talk to Alex about it but
 5   that it was nothing to tell anybody else about?
 6        A.   That never.
 7             MR. BOYD:  Objection.  I'm sorry.
 8             THE WITNESS:  I never.
 9   BY MS. GAMBARDELLA:
10        Q.   Okay.  When did Ms. Hawks witness this
11   incident where Alex put his arm around your waist?
12        A.   It was after a licensing show in New York
13   City, so it was in the month of June.
14        Q.   Of '05?
15        A.   It was either '05 or '04.  I can't recall.
16        Q.   Well, after Mr. Archer offered to do
17   something for you, whatever that something was, why
18   didn't you go back to him later and tell him, I need
19   to talk to you about something else that's going on or
20   I am being harassed or he is touching me or he is
21   flirting or whatever?  Why didn't you go back to
22   Mr. Archer?
23        A.   Because I was afraid that I would -- by, you
24   know, approaching the subject, I was afraid that I
25   would lose my job.  So if I had Mike Archer or anybody
```

1    say something to Alex, number one, it would have made

2    my working relationship with Alex even more horrible

3    than it already was.  And I feared of the fact that I

4    would have been fired because of the fact that I was

5    saying my boss was sexually harassing me.

6        Q.   That's it?  You didn't utilize Mr. Archer at

7    all or Mr. Schneider or Mr. Satin, correct?

8        A.   I am not sure how you mean utilize them.

9        Q.   Go back and say, I do want to talk to you

10   about something.  I am being offended or upset or

11   harassed.

12       A.   Well, we had already had conversations.  I

13   didn't go back a second time and have more to tell.

14       Q.   Ms. D'Angelo, you haven't told me one

15   conversation with Mr. Schneider or Mr. Satin where you

16   told them you were being sexually harassed or words to

17   that effect?

18            MR. BOYD:  Objection?

19   BY MS. GAMBARDELLA:

20       Q.   So which is it?  That you told him you were

21   being sexually harassed in words or substance or you

22   did not?

23       A.   Well, Curt --

24            MR. BOYD:  Objection again.

25            THE WITNESS:  Curt Schneider witnessed it.

```
 1    BY MS. GAMBARDELLA:
 2         Q.   I heard that part.
 3         A.   I did not need to tell him specifically.
 4         Q.   So you didn't tell him, right?
 5              MR. BOYD:   Objection.
 6    BY MS. GAMBARDELLA:
 7         Q.   You didn't tell him, correct?
 8         A.   I did not say the exact words.
 9         Q.   You didn't even say words like that.  Your
10    claim is that based on what he witnessed, which you
11    have gone through in detail, he should have known.
12         A.   What he saw was enough to realize that sexual
13    harassment doesn't take a --
14         Q.   Got it.  I got it.  Now, let's go to Cheryl
15    Yamuder.  You were friends with her, correct?
16         A.   Correct.
17         Q.   And when she first started, you said she said
18    something like he is totally in love with you.
19         A.   That is correct.
20         Q.   And that you told her what?  Did you say
21    anything to her when she said -- the three of us went
22    out to lunch.  And she said, Oh, my God.  It's clear
23    he is totally in love with you.
24              Did you say anything back to her?
25              MR. BOYD:   Could you just steer us to the
```

1    obsessed with me and constantly calling.  I gave her

2    some details of what was going on.  So then when she

3    saw how he interacted with me, that's what led her to

4    make that comment.

5        Q.   XMAS party '05.  Was in car with Cheryl going

6    to party.  AR called my cell.  It was 6:30 P, USA

7    time, so by 11:30 midnight in England.  He was calling

8    me when he was drunk just to say hi.  Cheryl was like,

9    Why is he calling you?  And what did you say?

10       A.   Because he typically calls me when he is

11   drunk to talk.

12       Q.   Okay.

13       A.   I told her that was not the first time that

14   he calls me when he is drunk.

15       Q.   And March '05, which you say should be '06?

16       A.   Yes.

17       Q.   I was interviewing.  Told Alex my car broke

18   down on the way to work.  AR was calling Cheryl

19   flipping out because he suspected I was interviewing.

20   She called me to tell me he is going nuts on her and

21   asked her to find out so she had to cover?

22       A.   Correct.

23       Q.   For me because she knows I was interviewing

24   and how I was trying to leave.  I would go hang in her

25   office to get away from AR in the --

220

```
1            A.   As he was stalking me.

2            Q.   His IMs, constant calling, and e-mailing.  He

3     would call Cheryl looking to have me paged.  Is that

4     what Cheryl knew, the sum and substance of what Cheryl

5     knew?

6            A.   Yes.

7            Q.   And you agree there is nothing in these notes

8     that said Cheryl told you don't go to HR, it's no

9     use?  Or I am sorry.  I forget what you told me.

10           A.   It's not going to get you anywhere.  I did --

11    right, I did not write that down.

12           Q.   Did you have any reporting relationship with

13    Cheryl Yamuder?

14           A.   Reporting meaning did I report to her?

15           Q.   Yes.

16           A.   No.

17           Q.   Isn't it a fact that you didn't even complain

18    to HR at the end; they reached out to you?

19                MR. BOYD:  Objection.

20    BY MS. GAMBARDELLA:

21           Q.   The first conversation you had -- I will

22    withdraw it.

23                The first conversation you had with human

24    resources, they reached out to you because they heard

25    you were about to resign.  Is that right or not right?
```

1    A.   They heard I did resign.  And that's, that's

2    when they heard.  Because I resigned first and then I

3    presented all the information and I came out with what

4    had happened.

5    Q.   Okay.  Do you know how HR heard that your

6    resignation had anything to do with Alex?

7    A.   I am assuming through Donna.

8    Q.   Please don't assume.  Tell me if you know.

9    And if you don't know, that's a perfectly acceptable

10   answer.  Do you know how HR found out your resignation

11   had something to do with Alex?

12   A.   I don't know.

13   Q.   Okay.  So when you handed your resignation,

14   you said nothing to HR about these things, correct?

15   A.   I did not have a chance to.

16   Q.   You didn't have a chance?

17   A.   No, because when I resigned, Cheryl --

18   actually when I resigned, I sent the resignation

19   letter to Alex and Donna.  Alex was I think on the

20   phone with Cheryl when it happened.  And then Cheryl

21   got off the phone with Alex and went down to Donna and

22   told her about the sexual harassment that I had been

23   telling her about.

24   Q.   And then who called you from HR?

25   A.   I don't remember.

```
 1          Q.    But you met with Danielle Fisher, correct?
 2          A.    Yes.
 3          Q.    Did you say to Danielle Fisher you were not
 4     going to report it until you resigned because you were
 5     asked why you had never reported it?  Let me withdraw
 6     it.
 7                Did Danielle ask you why you had never
 8     reported it?
 9          A.    I don't remember if she asked me that.
10          Q.    Did you tell Danielle Fisher while she was
11     interviewing you about these incidents that your claim
12     that Joel, Mike, and Curt knew about it?
13          A.    I don't really remember the specifics of what
14     I told her when I resigned.  I was very emotional that
15     day and as that -- all of that was unfolding so it's
16     kind of a little bit foggy.
17          Q.    The fact is, you never told anybody during
18     those last two days, those few days, that Joel, Curt,
19     or Mike witnessed anything, correct?
20          A.    I told HR because I did have a deposition
21     when I resigned.
22          Q.    You had a deposition?
23          A.    Well --
24          Q.    This is a deposition.  You had one of these?
25          A.    I don't know what -- they called it a
```

223

1    deposition.

2        Q.   An interview?

3        A.   I sat down with Ed Kaufman, who was general

4    counsel.

5        Q.   You had an interview.

6        A.   Right.  And they took notes and I gave them

7    the details of the -- of some of the things that

8    happened.

9        Q.   And it's your contention that you told them

10   that Joel, Curt, and Mike knew you were being

11   harassed.

12       A.   I don't remember if I told them at that

13   interview about those people.

14       Q.   Did you ever tell them before you left WWE

15   that people knew about it?

16       A.   I remember telling -- at the interview

17   telling them of what had happened in April where Curt

18   saw and Joel saw the incidents, so I remember those

19   two specifically.

20       Q.   Did you tell them what Cheryl knew?

21       A.   No, I didn't.

22       Q.   Why?

23       A.   She had already told HR what had happened.

24       Q.   How do you know that?

25       A.   Because she told Donna and then Donna told

1   HR, so she was the one that came --

2       Q.   Ms. D'Angelo --

3       A.   -- and gave all the information.

4       Q.   Ms. D'Angelo, your claim now is that Cheryl

5   told HR before you got into HR that you were sexually

6   harassed by Alex Romer and that she had known it all

7   along?

8       A.   I don't know if she told them that she had

9   known it all along, but she told Donna that I was --

10  that this was sexual harassment that has been going

11  on.

12      Q.   Right.  But you don't know whether she told

13  Donna she had known about it before, correct?

14      A.   No, I don't know.

15      Q.   My question to you is, did you tell human

16  resources that Cheryl Yamuder knew about you being

17  sexually harassed before you resigned?

18      A.   No.

19      Q.   And how long after you tendered your

20  resignation did you find out that Alex Romer had been

21  fired?

22      A.   It was within a week.  I resigned on the 5th,

23  May 5th, and I know that they brought him to the

24  office shortly after that and he was fired within a

25  day.  So it was a couple of days after I resigned that

```
 1          Q.   All right.  Now, it starts with, One night I
 2    was working late and Joel was still in office.  I was
 3    frustrated because AR was still calling me.
 4               And just let me know if I am not reading it
 5    right, okay?
 6          A.   Um-uh.
 7          Q.   It as after 6:30, so after midnight --
 8          A.   His time.
 9          Q.   -- his time.  So when you say he called you
10    late, sometimes you are referring to late overseas,
11    correct?
12          A.   Yes, but he called me late my time also.
13          Q.   His time.  And he was just calling me to say
14    hi.  I went to Joel because I was frustrated how I
15    stayed after work to get things done, but he continues
16    to bother me.
17               And that's something you told Joel?
18          A.   Yes, that he continues to bother me and ask
19    personal questions while I was trying to work.
20          Q.   While I was trying to work, ask me personal
21    questions while I was trying to work.  Is that the
22    same conversation we were talking about earlier when
23    you said, I told Joel he asked me a lot of personal
24    questions?
25          A.   Yes.
```

1      Q.   So what happened was he asked me personal

2  questions while I am trying to work.

3      A.   Right.  And I said I was frustrated not

4  because I was working late but because Alex was still

5  calling me and it was 6:30 and I had set time aside

6  after work so I could get my work done.

7      Q.   Right.  And he was still pestering you with

8  other work.

9      A.   Right.  He wanted to call and chat about who

10  I am going out with tonight for drinks.

11      Q.   Well, it doesn't say that, right?

12      A.   No, I am giving you an example.

13      Q.   Joel told me I should threaten AR by saying I

14  don't think that's something HR would approve of, you

15  asking me --

16      A.   AR, Alex Romer.

17      Q.   Okay, now, what does that last line say?

18      A.   If you keep this up, I will go to HR.

19      Q.   Joel said, Do you want me to talk to AR?  So

20  Joel offered to talk to Alex.

21      A.   Right.

22      Q.   I thought that would make my situation worse

23  and was afraid it definitely would, so I told Joel I

24  would talk to Alex.

25      A.   Right.

230

```
1        Q.   And as far as you and Joel talked about
2    leading up to Joel saying, I will talk to Alex, was
3    you said he keeps calling me.  I am trying to work to
4    get things done.  He is pestering me or asking me
5    personal questions while I am trying to work.
6        A.   Correct.
7        Q.   Okay, that's that.  We had you submit early
8    in the case names of people who you contend have
9    information that is relevant.  And basically I think I
10   know about everybody, but there is one I want to ask
11   you about.  Barry Knight of Proctor & Knight.
12       A.   Right.
13       Q.   What does he know?
14       A.   He was one of the security guards that I was
15   talking about, the international --
16       Q.   International.
17       A.   An outside vendor that WWE hires for security
18   on the overseas trips.
19       Q.   Proctor & Knight is the vendor, right?
20       A.   Correct.
21       Q.   So he is an outside vendor?
22       A.   Yes.
23       Q.   All right, I have got that?
24            MS. GAMBARDELLA:  I have two more exhibits.
25       And this one --
```