# TAB C

World Wrestling Entertainment, Inc.

Employee Handbook

& Code of Business Conduct

World Wrestling Entertainment, Inc.

## LEGALESE

*Our legal department has asked us to provide all of our employees with the following information covering several important policies such as Equal Employment Opportunity and Non-Harassment, as well as other pertinent legal information. Please read the following carefully and be sure to check with the Human Resources Department if you have any questions. The policies in this book are not meant to be all inclusive, and in many cases, you will be required to sign additional acknowledgement forms that you have read and understand various policies. Examples include: Conflict of Interest and Code of Conduct Agreement, Confidentiality/Non-Solicitation Agreement, Intellectual Property Release and Waiver, and Prohibition against Insider Trading.*

## EMPLOYMENT AT WILL

As an employee of WWE, you should understand that this Handbook should not be construed as, nor is it, a contract of employment. While it is hoped that your employment relationship with us will be mutually rewarding and long-term, either you or the Company may terminate your employment at any time, for any reason, with or without cause or notice.

It should also be understood that no manager, supervisor, or representative of the Company, other than an authorized officer, has any authority to enter into any agreement with you for employment for any specified period of time or to make any promise or commitment contrary to the provisions contained in this Handbook. Further, no employment agreement entered into will be valid or enforceable unless it is in writing and signed by an authorized officer of the Company. In the event that a valid and enforceable employment agreement has been entered into between you and WWE, the provisions contained in that agreement shall supersede any contrary provisions contained in this Handbook.

## EQUAL OPPORTUNITY EMPLOYMENT AND NON-HARASSMENT

It is the policy of WWE to provide equal employment opportunity to all employees and applicants for employment without regard to race, color, creed, religion, sex, age, marital status, national origin, disability, or status as a Vietnam-era or special disabled veteran in accordance with applicable Federal law. In addition, WWE complies with applicable State and Local laws prohibiting discrimination in employment in each Locality in which it maintains offices or facilities. This policy applies to all terms and conditions of employment including, but not limited to, hiring, place-

ment, promotion, termination, transfer, leave of absence, compensation and training.

WWE is committed to maintaining a work environment that furthers the development of all its employees, encourages cooperation and teamwork, provides a pleasant work environment and provides fair and ethical treatment of all employment issues.

As part of this commitment, WWE is dedicated to providing a work environment that is free from harassment, whether that harassment is premised on sex, race, sexual orientation, age, religion, national origin or any other legally protected basis. Harassment creates working conditions that are wholly inconsistent with WWE's commitment to its personnel.

Examples of prohibited conduct include, without limitation:

- Interfering with a person's ability to perform his/her job, or creating an offensive work environment through insulting or degrading remarks, gestures, propositions, jokes, tricks, displays of sexually suggestive or other offensive symbols, objects or pictures or similar conduct related to a legally protected basis, including sex, race or sexual orientation.

- Inappropriate physical touching.

- Any threat of, or actual, retaliation against any person for reporting or filing claims of unlawful harassment.

If you believe you have encountered unlawful harassment from any WWE employee or anyone otherwise associated with WWE, whether on WWE premises or at WWE sponsored or related events, you should take the following steps:

- Immediately report the incident to your supervisor, or the Vice President of Human Resources, or any other member of management.

- The Supervisor, or other members of management, must then report the incident to the Vice President of Human Resources.

- The Human Resources Department will discretely investigate the situation.

If you believe someone else at WWE has encountered unlawful harass-

ment, you should encourage him/her to notify any of the appropriate persons. You will not under any circumstances be criticized, punished, or in any other way retaliated against for utilizing this non-Harassment policy or for reporting incidents, which, in good faith, you believe to be violations of this policy.

The Human Resources Department of WWE will investigate your report in as discreet and confidential a manner as is consistent with developing all relevant facts. If WWE determines that unlawful harassment has occurred, appropriate disciplinary action will be taken, up to and including discharge.

IMMIGRATION LAW COMPLIANCE

To be in compliance with the Immigration Reform and Control Act of 1986, WWE is committed to employing any individuals permitted or authorized to work in the United States and/or aliens authorized to work in the United States, and WWE will not unlawfully discriminate on the basis of citizenship or national origin.

Each new employee, as a condition of employment, must present WWE with original documentation establishing his or her identity and eligibility of, or the opportunity for WWE to photocopy, this original documentation. In addition, each new employee must complete the Employment Eligibility Verification Form I-9. Former employees who are rehired must also complete the form if they have not completed an I-9 with WWE within three years, or if their previous I-9 is no longer retained or valid.

Employees with questions or seeking more information on immigration law issues are encouraged to contact any member of the Human Resources Department.

PROHIBITION AGAINST INSIDER TRADING

The term "insider trading" refers to the practice of trading in securities on the basis of material non-public information, a practice which is prohibited under Federal law. Any person trading on the basis of significant information which he or she has reason to believe is not publicly available may be held liable for insider trading. Information will be deemed "material" if it would be likely to influence a reasonable investor's decision to buy, sell or hold WWE securities. Any information about the advances, set-backs or over-all business plan of WWE should be considered material. "Non-public"

World Wrestling Entertainment, Inc.

information includes any information that has not been made available to the public such as through a press release, a prospectus, a quarterly or annual report to stockholders or a filing with the Securities and Exchange Commission. Individuals with information about WWE should consider the information "non-public" until the second full trading day following WWE's wide-spread disclosure of that information.

COMPLIANCE WITH LAWS AND COMPANY POLICY

As a condition of employment with WWE, each employee must comply with all laws and all Company policies, whether or not required by law. Violations will be grounds for termination. When in doubt, employees have the responsibility of seeking clarification from their supervisors or, if necessary, the Legal Affairs Department.

Any violations of law or any of the Company's other policies must be reported, and it is a violation of Company policy not to make such reports. Reports may be written or oral; they should be clear and concise, but as detailed as is helpful to understand the issues. Reports may be made anonymously, if necessary. However, please bear in mind that anonymous reports are often more difficult to verify, and therefore may be less useful to the Company.

Reports of violations may be made (i) to the employee's direct or indirect supervisor; (ii) to an officer(s) of the Company; (iii) to the Company's Director of Internal Audit; or (iv) to the Company's Audit Committee (see Annual Stockholder's Report for current members of the committee), subject to any condition of anonymity requested by discloser. Any supervisor receiving a report pursuant to clause (i) above should notify an appropriate officer of the Company who is not a subject of the disclosure. If any such policy violation constitutes or could result in a violation of law, the Legal Affairs Department should be notified immediately.

Reports of violations may also be made by calling 1-877-993-3689. This voicemail will be monitored by Human Resources and, if specifically request ed, disclosure will be kept confidential, unless required by law.

World Wrestling Entertainment, Inc.

P 0117

undisclosed or unrecorded fund or asset of the Company shall be established for any purpose. No false or artificial entries shall be made in the Company books and records for any reason, and no employee shall engage in any arrangement that results in such prohibited acts. Every Company, an example is expense accounts. Employees are entitled to reimbursement for reasonable expenses to the extent provided by company policy — but only if those expenses are actually incurred. To submit an expense account for meals not eaten, miles not driven, airline tickets not used, or for any other expense not incurred is dishonest reporting and is prohibited.

Dishonest reporting of information to organizations and people outside the Company also is strictly prohibited. It could lead to civil or criminal liability for you and WWE.

BRIBES AND IMPROPER INFLUENCE

You may not give money or any gift to any official or employee of any governmental organization if doing so could reasonably be construed as having any connection with the Company's business. In addition, U.S. law prohibits the offering or acceptance of "kickbacks," that is, anything of value offered or accepted for the purpose of obtaining favorable treatment in connection with a government contract. What is acceptable practice in the commercial business environment, described below, may be entirely unacceptable, and may even violate certain Federal, State or Local laws and regulations, in dealings with government employees or those who act on the government's behalf. Therefore, although the Company generally does not do business with governmental agencies, in those circumstances where you are dealing with a Federal, State or Local government, including any lobbying efforts, you must be aware of and adhere to the relevant laws and regulations.

As a general guideline, you should not try to improperly influence the decisions of, or obtain restricted information from, government officials, including those who act on the government's behalf. Specifically, you should not undertake directly or indirectly any of the following activities:

• Discuss or offer employment or business opportunities that could personally benefit governmental officials.

• Offer or provide gratuities; and/or

• Solicit or obtain proprietary or source selection information.

In dealing with its customers and suppliers, WWE does not seek to gain any unfair advantage through the improper use of business courtesies or other inducements. Good judgment and moderation must be exercised to avoid misinterpretation and adverse effect on the reputation of the Company. Gifts, favors and entertainment may be given only if they:

• are consistent with customary business practices;

• are not excessive in value and cannot be construed as a bribe or payoff;

• do not violate applicable law or ethical standards; and

• will not embarrass the Company or the employee if publicly disclosed.

FRAUD AND FALSE STATEMENTS

In the course of conducting business on the Company's behalf, you shall not make any false or misleading statement that you know to be false or misleading or that with reasonable diligence you should have known to be false or misleading. If you find that any statement you made was unintentionally false or misleading or if you believe any misunderstanding has occurred, promptly correct any such Statement or misunderstanding. The resulting trustworthiness is essential to good business relationships.

ELECTRONIC SYSTEMS USAGE

WWE provides a variety of computer and network resources to its employees, allowing them to perform their duties efficiently and effectively. These resources are administered by the Information Technology Department (IT) and are subject to usage policies outlined below:

• The resources provided, including computer hardware and software, files, E-mail, Internet, telephones, and fax machines, are the property of WWE and are intended for business use only.

• Access to these systems imposes certain responsibilities and obligations and is granted subject to this WWE Electronic Systems Usage Policy.

To ensure compliance with this policy, WWE reserves the right to monitor and/or retrieve any information sent to, stored, or otherwise contained in,

P 0119

lhose systems.

Employees should notify their immediate supervisor, the Human Resources Department or any member of management upon learning of violations of this policy. WWE will take appropriate action in response to user abuse or misuse of computing services. Action may include, but not necessarily be limited to:

· Immediate termination of employment;

· Reimbursement to WWE for resources consumed; or

· Legal action including action to recover damages.

Guidelines

WWE prohibits the use of computers for any non-business related reason, and in any manner prohibited by law or disallowed by licenses, contracts or IT guidelines. All users are accountable for the information they publish across these system resources, and they must be aware of the use of computer systems. In making acceptable use of resources, users must:

· Use resources only for authorized purposes;

· Protect login ID and computer from unauthorized use;

· Assign an obscure account password and change it regularly;

· Access only files and data that are one's own, are publicly available, or to which one has been given authorized access;

· Be considerate in use of shared resources by refraining from monopolizing systems, overloading networks with uals, or other resources;

· Delete unnecessary files from one's account on shared computing resources;

· Refrain from use of sounds and visuals that might be disruptive to others;

· Return all computer equipment if employment at WWE ends.

In making acceptable use of resources, users must NOT:

· Provide login ID and system access for the purpose of using resources in violation of this policy, or in violation of Federal, State and/or Local law;

· Use copyrighted images, text, media, or software without permission or in violation of the copyright laws of the United States, or violate terms of applicable software licensing agreements;

· Use resources to violate WWE codes of conduct or engage in any illegal activity;

· Use resources for other commercial ventures, religious or political causes, or other non-business matters;

· Use resources to intimidate or single out individuals or groups for degradation or harassment in violation of Federal, State and/or Local law and/or other WWE policies;

· Use resources to provide materials whose nature or volume compromise the ability of the Server to serve other users' documents;

· Use a computer account for which authorization has not been granted, use the network to gain unauthorized access to any computer system, attempt to circumvent data protection schemes or uncover security loopholes, or mask the identity of an account or machine;

· Attempt to damage computer hardware or software, or alter the systems so that functionality is impacted;

· Knowingly perform an act that will interfere with the normal operation of computers, terminals, peripherals or networks, including (but not limited to) knowingly running or installing on any computer or network, or giving to another user, a program intended to damage, place excessive load or compromise the security on a computer system or network. This includes programs known as computer viruses, Trojan horses, worms and applications that allow sharing of files

between the internal network and the Internet;

- Install devices or applications that circumvent the network security (e.g. desktop modems, Peer-to-Peer applications, etc.);

- Download any software or install additional hardware without written authorization from the WWE IT department;

- Connect any computer or network equipment to the network without prior approval;

- Share, upload, copy, email, or transfer any data or software to a portable medium (e.g. floppy disk, CD, etc.) or to an external source (e.g. personal email account, ftp account, etc.) without proper authorization;

- Use network resources for non-business related audio/video streams, online chat, games, music, and/or software pirating;

- Remove any computer equipment without written authorization; or

- Use E-mail to send chain letters, unauthorized mass mailings, pictures, jokes, etc.

---

LIFE AT WWE

*This section of the Employee Handbook is designed to provide you with some tools to help you with your day-to-day life as a WWE employee. We strive to provide you with a comfortable and exciting work environment. Please review the guidelines and policies covered in this section to help maximize your work experience.*

CLASSIFICATIONS OF EMPLOYMENT

For purposes of salary administration, overtime eligibility and employee benefits, World Wrestling Entertainment, Inc. classifies its employees as follows:

Regular Full-Time Employees
Employees hired to regularly work for WWE between 37.5 and 40 hours per week. Such employees may be further classified as either "exempt" or "non-exempt" for purposes of overtime eligibility and computation, as more fully defined below.

Regular Part-Time Employees
Employees hired to regularly work for WWE less than 37.5 hours per week. Such employees may be further classified as either "exempt" or "non-exempt" for purposes of overtime eligibility and computation, as more fully defined below.

Exempt Employees
Salaried employees who are not eligible nor required to be paid overtime, in accordance with applicable Federal and State wage and hour laws. Executives, professional employees, and certain employees in administrative positions are typically exempt.

Non-Exempt Employees
Employees who are required and eligible to receive overtime pay when hours worked exceed 40 hours per week. Overtime is paid at the rate of one and one-half times their regular rate of pay, in accordance with applicable State and Federal wage and hour laws.

You will be informed of your initial employment classification and of your status as an exempt or non-exempt employee at the commencement of your employment. Additionally, if you change positions during your employment as a result of promotion, transfer, or otherwise, you will be informed by the Human Resources Department of any change in your exemption status.

# TAB D



### World Wrestling Entertainment, Inc.
### Equal Employment Opportunity/Sexual Harassment Policy

Equal Employment Opportunity has been and continues to be both policy and practice at World Wrestling Entertainment, Inc. Our policy of Equal Employment Opportunity is to:

1.  Recruit, hire, train and promote persons in all job classifications without regard to race, color, religion, national origin, sex, age, disabilities, veteran, or any other protected status.
2.  Base decisions on employment so as to further the principles of Equal Employment Opportunity.
3.  Ensure that promotion decisions are in accord with principles of Equal Employment Opportunity.
4.  Ensure that all personnel actions such as compensation, benefits, transfers, layoffs, return from layoff, and any social or recreational programs, will be administered in accordance with the principles of Equal Employment Opportunity.

WWE is committed to maintaining a work environment that furthers the development of all its employees, encourages cooperation and teamwork, provides a pleasant work environment and provides fair and ethical treatment of all employment issues.

As part of this commitment, WWE is dedicated to providing a work environment that is free from harassment, whether that harassment is premised on sex, race, sexual orientation, age, religion, national origin or any other legally protected basis. Harassment creates working conditions that are wholly inconsistent with WWE's commitment to its personnel.

Examples of prohibited conduct include, without limitation:

-   Interfering with a person's ability to perform his/her job, or creating an offensive work environment through insulting or degrading remarks, gestures, propositions, jokes, tricks, displays of sexually suggestive or other offensive symbols, objects or pictures or similar conduct related to a legally protected basis, including sex, race or sexual orientation.
-   Inappropriate physical touching.
-   Any threat of, or actual, retaliation against any person for reporting or filing claims of unlawful harassment.

If you believe you have encountered unlawful harassment from any WWE employee or anyone otherwise associated with WWE, whether on WWE premises or at WWE sponsored or related events, you should take the following steps:

-   Immediately report the incident to your supervisor, or the Vice President of Human Resources, or any other member of management.
-   The Supervisor, or other members of management, must then report the incident to the Vice President of Human Resources.
-   The Human Resources Department will discretely investigate the situation.

If you believe someone else at WWE has encountered unlawful harassment, you should encourage him/her to notify any of the appropriate persons. You will not under any circumstances be criticized, punished, or in any other way retaliated against for utilizing this Unlawful Harassment policy or for reporting incidents, which, in good faith, you believe to be violations of this policy.

The Human Resources Department of WWE will investigate your report in as discreet and confidential a manner as is consistent with developing all relevant facts. If WWE determines that unlawful harassment has occurred, appropriate disciplinary action will be taken, up to and including discharge.

ACCEPTED AND AGREEMENT

I, _Fara D'Angelo_, have read and understand the Unlawful Harassment Policy of World Wrestling Entertainment, Inc., and agree to comply with its terms and conditions.

_Fara D'Angelo_        _4-1-04_
PRINT NAME                    DATE

_Fara D'Angelo_
SIGNATURE

**Confidential - Produced Pursuant to Protective Order**

# TAB E

                    Volume 1
                    Pages 1-118
                    Exhibits per index


           UNITED STATES DISTRICT COURT

           DISTRICT OF CONNECTICUT


        Civil Action No. 3:08-CV-1548 (JCH)


------------------------------------:
                                    :
FARA D'ANGELO                       :
              Plaintiff,            :
                                    :
V.                                  :
                                    :
WORLD WRESTLING ENTERTAINMENT, INC.:
              Defendant.            :
                                    :
------------------------------------:


              C O N F I D E N T I A L


           DEPOSITION OF SHERYL YAMUDER, a witness

called on behalf of the Plaintiff taken pursuant to the

Connecticut Federal Rules of Civil Procedure, before

Patricia M. Haynes, a Certified Shorthand Reporter and

Notary Public in and for the Commonwealth of

Massachusetts, CSR No.: 14620F, at the Regus Conference

Offices, 101 Federal Street, Boston, Massachusetts, on

Monday, March 8, 2010, commencing at 10:30 a.m.

1      Q.    Do you recall telling her that his eyes lit up

2   when he saw her?

3                MS. KIMBALL:  Objection.

4   BY MR. BOYD:

5      A.    I don't remember that.

6      Q.    Do you recall any occasion where Mr. Romer

7   seemed to be hitting on Ms. D'Angelo?

8                MS. KIMBALL:  Objection to form.

9   BY MR. BOYD:

10     A.    I don't know what you mean by that.

11     Q.    Do you think Mr. Romer was attracted to Ms.

12  D'Angelo?

13     A.    I don't know.

14     Q.    You didn't have any opinion on that subject?

15     A.    I don't remember.

16     Q.    Do you recall riding in a car with Ms.

17  D'Angelo to a holiday party when Mr. Romer called her on

18  her cell phone?

19     A.    Not specifically, no.

20     Q.    Do you recall her having you answer the phone

21  instead of her answering her phone?

22     A.    No.

23     Q.    Do you recall Mr. Romer ever being drunk and

24  calling Ms. D'Angelo?

1              MS. GAMBARDELLA:  Object to form.

2    BY MR. BOYD:

3         A.    I don't know.  I wouldn't have known.

4         Q.    So you don't recall?

5         A.    No.

6         Q.    Did Mr. Romer ever call you looking for Ms.

7    D'Angelo?

8              MS. GAMBARDELLA:  Object to form.

9    BY MR. BOYD:

10        A.    I don't understand.  Call me looking for her?

11        Q.    I can't find Fara.  Do you know where she is?

12        A.    I don't, I don't -- I don't remember.

13        Q.    Did Mr. Romer ever express to you whether or

14   not he was attracted to Ms. D'Angelo?

15        A.    No.

16        Q.    Did he ever express heightened interest in her

17   as opposed to other employees?

18              MS. KIMBALL:  Objection to form.

19   BY MR. BOYD:

20        A.    I don't know what that means.

21        Q.    Did he seem more interested in Ms. D'Angelo

22   than others?

23              MS. KIMBALL:  Objection.

24              MS. GAMBARDELLA:  Objection.

1   BY MR. BOYD:

2      A.    I don't know.

3      Q.    Did you ever talk with Ms. D'Angelo about

4   trips she took with Mr. Romer.

5      A.    I wasn't aware of any trips she took with him.

6      Q.    You didn't know she took any trips with him?

7      A.    No.

8      Q.    Did you ever see Mr. Romer touching Ms.

9   D'Angelo?

10                 MS. GAMBARDELLA:  Object to form.

11                 MS. KIMBALL:  Objection.

12  BY MR. BOYD:

13     A.    I don't remember.  I don't know.

14     Q.    Did you ever see him try and kiss her?

15     A.    I do not remember that, no.

16     Q.    Did you ever see any evidence that Mr. Romer

17  was attracted to Ms. D'Angelo, any evidence?

18                 MS. GAMBARDELLA:  Object to form.

19  BY MR. BOYD:

20     A.    No.

21     Q.    Did Ms. D'Angelo ever talk to you about

22  problems she had with Mr. Romer?

23     A.    Yes.

24     Q.    When was the first occasion that you recall

1    her communicating that to you?

2        A.    I don't remember.

3        Q.    *Did she communicate that feeling on more than

4    one occasion or just one?

5                    MS. KIMBALL:  Objection to form.

6                    MS. GAMBARDELLA:  Feeling?

7                    MR. BOYD:  Please read back the question.

8                    (*Court reporter reads back noted

9    testimony as recorded.)

10   BY MR. BOYD:

11       A.    I did not say anything about feelings.  You

12   didn't ask me that and that's not what I said.

13       Q.    Can you clarify that?

14       A.    No.

15       Q.    Did Ms. D'Angelo talk to you about Mr. Romer?

16       A.    Yes.

17       Q.    Did she talk to you about feeling

18   uncomfortable because of what Mr. Romer did or the way

19   he acted?

20       A.    No.

21       Q.    Did she ever express concern about her

22   interactions with Mr. Romer?

23       A.    Yes.

24       Q.    What concerns did she express?

1      A.      He overcommunicated, micromanaged.  He put a

2  lot of responsibility on her.  He expected her to be

3  responsive to him more than she felt was necessary.

4      Q.      Anything else?

5      A.      Not that I remember.

6      Q.      Do you recall her expressing any concern that

7  Mr. Romer was interested in her sexually speaking for

8  lack of a better way?

9      A.      No.

10     Q.      What about that he was interested in dating

11  her?

12     A.      No.

13     Q.      Did you ever hear Mr. Romer say anything

14  sexually inappropriate?

15     A.      I don't know what that means.

16     Q.      Did you ever hear Mr. Romer say inappropriate

17  things?

18              MS. KIMBALL:  Objection.

19              MS. GAMBARDELLA:  Same objection to form.

20  BY MR. BOYD:

21     A.      What is inappropriate?

22     Q.      Did you ever hear Mr. Romer say he'd put his

23  dick on the line for Ms. D'Angelo?

24     A.      No.

1    Q.    Did you ever hear him saying he would put his

2    dick on the line for any other worker?

3        A.    No.

4        Q.    Did you ever hear that Mr. Romer invited Ms.

5    D'Angelo to dinner alone, just the two of them?

6        A.    I don't know, I don't know.

7        Q.    So you never heard that?

8        A.    I don't know.  I don't think so.

9        Q.    Did you ever hear that he called Ms. D'Angelo

10   drunk, that he was drunk calling her?

11              MS. KIMBALL:  Objection.  Are you talking

12   about ever heard anyone say it or did she hear him say

13   it?

14   BY MR. BOYD:

15       Q.    When I'm asking the questions, I'm asking

16   whether or not Ms. D'Angelo informed you of this or you

17   heard from some other party of these same things.

18       A.    No.

19       Q.    That is to whether he called her drunk

20   question?

21       A.    Yes.

22       Q.    Did you ever hear that Mr. Romer invited Ms.

23   D'Angelo to go on vacation with him?

24              MS. GAMBARDELLA:  Object to form.

```
 1   BY MR. BOYD:

 2        A.    No.

 3        Q.    Did you ever hear he touched her on the waist?

 4        A.    No.

 5        Q.    How about that he caressed her hair?

 6        A.    No.

 7        Q.    Touched her on the face?

 8        A.    No.

 9        Q.    How about on the butt?

10        A.    No.

11        Q.    Or on the lower back?

12        A.    Not that I recall.

13        Q.    Did you ever hear that he put his arms around

14   her?

15        A.    No.

16        Q.    Did you ever hear or witness that he spoke

17   unusually close to her as if he was about to kiss her?

18        A.    No.

19        Q.    Did you ever hear him use unusual terms of

20   endearment for her, like precious, calling her precious?

21        A.    No.

22        Q.    How about calling her Tinkerbell?

23        A.    No.

24        Q.    Did you ever hear him ask or hear that he
```

1    leaving?

2        A.    No.

3        Q.    Did you talk to Mr. Romer on or about the time

4    you received the e-mail?

5        A.    No.

6        Q.    Did you talk to Mr. Romer on the day that Ms.

7    D'Angelo tendered her resignation?

8        A.    I don't remember.

9        Q.    Did you have occasion to talk to human

10   resources on the day that Ms. D'Angelo resigned?

11       A.    Yes.

12       Q.    With whom did you speak at human resources?

13       A.    Danielle Fisher.

14       Q.    At what point in time was that?

15       A.    Shortly after receipt of the e-mail.

16       Q.    Did you go to speak to Ms. Fisher or did Ms.

17   Fisher come to speak to you?

18       A.    Neither.

19       Q.    What occasioned you to speak with Ms. Fisher?

20       A.    I went to speak to Donna -- Donna, Donna --

21   feel free to give me her last name.

22              MS. GAMBARDELLA:  Goldsmith.

23   BY MR. BOYD:

24       A.    Donna Goldsmith.  Donna Goldsmith called

1   Danielle Fisher

2       Q.   So you received the e-mail from Ms. D'Angelo,

3   correct?

4       A.   Yes.

5       Q.   And then Ms. Goldsmith called you?

6       A.   No.

7       Q.   You called Ms. Goldsmith?

8       A.   Yes.

9       Q.   And then what happened?

10      A.   Ms. Goldsmith called Danielle Fisher.

11      Q.   Did Ms. Fisher then call you?

12      A.   No.

13      Q.   Did you go to see Ms. Fisher?

14      A.   No.

15      Q.   Did Ms. Fisher come to see you?

16      A.   No.

17      Q.   Did you speak with Ms. Fisher at all?

18      A.   Yes.

19      Q.   How?

20      A.   I went to see Ms. Goldsmith.  Ms. Goldsmith

21   called Danielle Fisher.

22      Q.   And then did you meet with Ms. Fisher?

23      A.   Yes.

24      Q.   Where did you meet with Ms. Fisher?

1      A.      In Ms. Goldsmith's office.

2      Q.      That is on that same day, if you will?

3      A.      Yes.

4      Q.      Just so I understand the occupants of the

5    office, it was you and Ms. Goldsmith and Ms. Fisher at

6    the time.  Is that right?

7      A.      Yes.

8      Q.      And what was discussed at that point?

9      A.      I was concerned because I had had a

10   conversation with Ms. D'Angelo shortly before she

11   resigned where she shared a story.  I advised her to

12   speak to Donna Goldsmith or HR about her story.  I

13   wanted to be sure she had done that.

14     Q.      Can you tell me what the story was?

15     A.      She had gone to, on a WWE trip to Europe.  She

16   had had, according to her, because I was not in Europe

17   and I did not see anything and I did not hear anything.

18     Q.      Understood.

19     A.      According to her, she went to Europe and she

20   had two negative interactions with Mr. Romer.

21     Q.      Can you tell me what those two interactions

22   were, please?

23     A.      I don't remember the detail.  I remember that

24   there was a negative interaction at a hotel and I

1    believe there was a negative interaction in a cab.

2        Q.    I know you don't recall all the details, but

3    negative interaction, I would like to probe why you

4    characterize it as negative to the extent that I can.

5            Let's take them one at a time.  Let's talk

6    about the negative interaction at the hotel first.  What

7    do you recall about the story and the negative

8    interaction at the hotel?

9        A.    There was a group of people.  They had some

10   kind of disagreement.  She ended up leaving.  I believe

11   they were all in a bar in the hotel.

12       Q.    Do you recall who the group of people

13   included?

14       A.    No.

15       Q.    Was Mr. Romer one of the grouping?

16       A.    Yes.

17       Q.    What else do you recall about the details of

18   that?

19       A.    That's what I recall.

20       Q.    What gave you the mindset to believe that a

21   disagreement in the bar was something you should bring

22   up to HR?

23       A.    It was unusual.  It was something she

24   expressed as something that she was not happy about.

1       Q.      In the course of that story about the hotel,

2   did Ms. D'Angelo express a belief that Mr. Romer was

3   acting inappropriately towards her?

4       A.      What do you mean by inappropriately?

5       Q.      Was he hitting on her?

6               MS. KIMBALL:  Objection.

7   BY MR. BOYD:

8       A.      I don't know.

9       Q.      What was he doing that made her uncomfortable,

10  if anything?

11      A.      I know it had to do with some things he said.

12  I know it had to do with things he said.

13      Q.      Do you know what "things" he said?

14      A.      I don't remember now.  I do believe she said,

15  that Fara said that he had been drinking.

16      Q.      How did she describe his actions beside the

17  fact that he had been drinking?

18      A.      Upsetting to her.

19      Q.      Aggressive?

20              MS. KIMBALL:  Objection.

21  BY MR. BOYD:

22      A.      No.

23      Q.      Did she characterize him, you testified that

24  it was a negative story?

1       A.      Yes.

2       Q.      At this point in time, I understand that Mr.

3   Romer had been drinking because you testified to that --

4   excuse me, that Ms. D'Angelo told you Mr. Romer had been

5   drinking and that it was a negative experience?

6       A.      Yes.

7       Q.      Is there anything else that you recall that

8   made it sound negative?

9               MS. KIMBALL:   Objection to form.

10  BY MR. BOYD:

11      A.      When you say negative, you mean --

12      Q.      I'm using the phrase you gave me.  You said

13  there had been two negative interactions.

14      A.      It bothered her.  The interaction bothered

15  her, was upsetting to her.

16      Q.      Why, did she tell you?

17      A.      I don't remember the details.  I don't

18  remember them now.  I remember it made her

19  uncomfortable.  I remember she was annoyed.  I would be

20  guessing if I tried to say anything else now.

21      Q.      Did you get the impression in any way that

22  part of the reason she felt uncomfortable was because

23  she was a woman?

24              MS. KIMBALL:   Objection.

1           MS. GAMBARDELLA:  Objection.

2    BY MR. BOYD:

3       A.    No.

4       Q.    You didn't get the opinion in any way that Mr.

5    Romer was conducting himself in a manner that suggested

6    he was attracted to her?

7           MS. KIMBALL:  Objection.

8    BY MR. BOYD:

9       A.    I don't know.  No.  I don't know.  I wasn't

10   there.

11      Q.    I know you weren't there.  I'm asking what Ms.

12   D'Angelo expressed to you.  I understand the veracity is

13   not something you would know about.

14          MS. KIMBALL:  I thought you asked if she

15   formed an opinion.

16          MS. GAMBARDELLA:  He did.

17          MS. KIMBALL:  Which is different from what

18   Ms. D'Angelo expressed to her.

19          MR. BOYD:  I'm not trying to be misleading

20   here.

21   BY MR. BOYD:

22      Q.    Do you recall with respect to that negative

23   interaction at the hotel whether or not Mr. Romer tried

24   to get in her room?

1      A.     I don't know.

2      Q.     Do you recall whether she told you that?

3      A.     No.

4      Q.     Do you recall whether she told you that he

5  grabbed her and touched her in any way?

6               MS. GAMBARDELLA:  Objection to form.

7  BY MR. BOYD:

8      A.     Grabbed her?  No.

9      Q.     Do you recall whether or not she thought he

10 was acting in a jealous manner?

11              MS. KIMBALL:  Objection.

12 BY MR. BOYD:

13     A.     I don't know what you mean by that.

14     Q.     Jealous?

15              MS. KIMBALL:  You're asking what she

16 thought.

17              MR. BOYD:  I'm trying to be as clear as I

18 can.  I'll try it differently.

19 BY MR. BOYD:

20     Q.     In every way I'm asking the questions, I'm not

21 asking what you understood to have happened.  I'm merely

22 asking you what Ms. D'Angelo conveyed as her feelings at

23 the time.

24     A.     It would help if you said that.

1      Q.    I understand you weren't there and I

2   understand this was much time thereafter and I

3   understand that you can't possibly know what happened or

4   what he did at this point.  All these things I

5   understand.

6           The only thing I'm trying to cover is what was

7   expressed to you when Ms. D'Angelo shared these events

8   with you?

9      A.    That she was annoyed and upset about his

10  behavior.  That there was a negative interaction in the

11  hotel in the bar, this is my recollection, and that's

12  what I remember.

13     Q.    But there was nothing that she expressed that

14  conveyed to you a feeling that the negativity of the

15  interaction had anything to do with Mr. Romer's

16  attraction for her or desire for her or anything of that

17  sort?

18           MS. KIMBALL:  Objection to form.

19  BY MR. BOYD:

20     A.    She was unhappy about the interaction,

21  extremely unhappy about the interaction.  Is that what

22  you're asking me?

23     Q.    I'm trying to get to whether or not, as you

24  probably know, that she was expressing to you she

1    believed Mr. Romer was sexually harassing her?

2        A.    I don't know --

3                MS. KIMBALL:  Objection to form.

4    BY MR. BOYD:

5        A.    I don't know what that means.

6        Q.    Making her uncomfortable as a woman I guess?

7                MS. GAMBARDELLA:  That doesn't necessarily

8    mean sexual harassment.

9                MR. BOYD:  Nor did I say it does.

10                MS. GAMBARDELLA:  You defined it that way.

11   BY MR. BOYD:

12       A.    He made her uncomfortable.  He made her

13   uncomfortable.  As a person, she was clearly

14   uncomfortable.

15       Q.    But you don't know exactly what he did to make

16   her uncomfortable?

17       A.    There was a negative interaction in the bar.

18   And that made her uncomfortable, annoyed and whatever

19   else I already said.

20       Q.    But she was not expressing to you any

21   sexuality implicit lack of comfort?

22       A.    I don't remember the, I don't remember the

23   detail of the conversation.  I do remember that she was

24   very unhappy and annoyed about the interaction and that

1    it was negative and that it was in a public place.  I

2    think I've said that.  Did I say that already?

3        Q.    A public place is the first time I heard that

4    part.

5        A.    The bar.  Unless it was a private bar.

6        Q.    Let's go back for a second.  This conversation

7    that you had with Ms. D'Angelo, when was it that she

8    recited to you about the negative interaction in the

9    hotel and the negative interaction in the car or taxi?

10   When did she share these things with you?

11       A.    Not long before she resigned.

12       Q.    Was it a week before, a month before?

13       A.    I think it was something like a week before.

14   I don't remember exactly.

15       Q.    Could it have been a month before?

16             MS. GAMBARDELLA:  Object to form.

17             MS. KIMBALL:  Objection.

18   BY MR. BOYD:

19       A.    I don't think so.  I don't, no.

20             MS. GAMBARDELLA:  I don't know or no?

21             THE WITNESS:  No.

22   BY MR. BOYD:

23       Q.    Where was the interaction, where did you have

24   the discussion with Ms. D'Angelo?

1      A.      I don't remember.

2      Q.      You testified that there was a second negative

3   interaction that she described to you?

4      A.      Yes.

5      Q.      I believe you said that occurred in a car or

6   taxi?

7      A.      I think I remember her saying that it was in a

8   taxi.

9      Q.      Can you tell me everything you remember about

10   that negative interaction and what she told you?

11      A.      Again, she was annoyed.  She objected to what

12   she said was a negative exchange of some kind.  I

13   remember that it followed the first incident on the same

14   trip.  I remember that she was very unhappy about it.  I

15   don't know what was said.

16      Q.      What about the interaction in the taxi that

17   she shared with you gave you the impression she was

18   unhappy about it?

19      A.      She said so.

20      Q.      What did she say happened?

21      A.      I don't remember.

22      Q.      You don't remember anything about what she

23   said happened?

24      A.      No.  I remember her telling me about it.  I

1    remember her saying that it bothered her.  I remember

2    her saying that it was a negative experience.  I do not

3    recall what the interaction was.

4         Q.    Let's talk about it this way.  The cab we are

5    referring to or she was referring to and we are now

6    talking about, was she in the cab with Mr. Romer?

7         A.    She said she was in a cab with Mr. Romer as I

8    recall.

9         Q.    Was anybody else in the cab?

10        A.    I don't know.

11        Q.    They were both in the cab and something

12   happened that made her feel negative?

13        A.    Yes.

14        Q.    Did she tell you anything about what happened

15   that made her feel negative?

16        A.    Yes.

17        Q.    What do you remember about what she said

18   happened?

19        A.    I don't.

20        Q.    You don't remember anything about what she

21   said happened in the cab?

22        A.    Did you ask me this already?

23              MS. KIMBALL:  She already said she doesn't

24   recall what was said or what happened.

1    BY MR. BOYD:

2        A.    I don't remember what the interaction that she

3    described -- I don't remember what she described to me

4    as the interaction.

5        Q.    You remember nothing?

6               MS. GAMBARDELLA:   Asked and answered.

7    Objection.

8    BY MR. BOYD:

9        A.    No.

10       Q.    Do you know if there was a disagreement

11   between Ms. D'Angelo and Mr. Romer?

12       A.    It was expressed to me as a negative

13   interaction.   There was discord.   I remember there was

14   discord.

15       Q.    But that's all you remember?

16       A.    Other than what I already told you, yes.

17       Q.    Bringing us to the day of Ms. D'Angelo's

18   resignation.   You told HR about the two negative

19   interactions?

20       A.    Yes.

21       Q.    With no more detail than you told me at this

22   point?

23               MS. GAMBARDELLA:   Objection.

24               MS. KIMBALL:   Objection.

1    wanted to report anything to human resources?

2         A.    No.

3         Q.    Did she tell you she was afraid to report

4    these negative incidents to human resources?

5         A.    No.

6         Q.    Were you aware of the complaint procedure at

7    WWE for reporting complaints of harassment or

8    discrimination?

9         A.    I was aware that if people had issues, they

10   should go and speak to someone.

11        Q.    In fact, you utilized it?

12        A.    I went and spoke to someone.

13        Q.    I'm not going to get into that.  The question

14   I was leading up to was did you ever understand that you

15   were a designated recipient of those kind of complaints

16   at the company?

17               MR. BOYD:  Objection.

18   BY MS. GAMBARDELLA:

19        A.    No.

20        Q.    Were you responsible for receipt of

21   discrimination or harassment complaints at any time at

22   that company?

23        A.    No.

24        Q.    Did you supervise or have any managerial

1      Q.    Counselor, would you say that in addition to

2   interacting with Ms. D'Angelo in terms of your work

3   responsibilities, you were also friends with her?

4      A.    Yes.

5      Q.    And I'm not going to go into the substance, I

6   have a generic question.  Did you and she share

7   confidences about your personal lives?

8      A.    Yes.

9      Q.    During the friendship that you two had

10   together, did she tell you at any point in time she was

11   being sexually harassed by Mr. Romer?

12      A.    No.

13      Q.    In fact, is it accurate to state, let's leave

14   all the negative incidents aside, the two incidents,

15   that the main complaint she had about Alex was his

16   micromanaging style?

17      A.    Yes.

18      Q.    And the 24/7 expectation that he needed her to

19   be responsive, that kind of thing you testified to?

20      A.    Yes.

21      Q.    Did you ever communicate with Fara D'Angelo in

22   writing at any time either during your employment at WWE

23   or afterwards concerning Alex Romer?  Strike that.

24   Since you left WWE, did you travel with Ms. D'Angelo?

# TAB F

CHRO Charge Number:  0720125
Fara D'Angelo v. World Wrestling Entertainment, Inc.

<u>AFFIDAVIT OF KURT SCHNEIDER</u>

| | | |
|---|---|---|
| STATE OF CONNECTICUT | ) | |
| | ) ss: | Stamford, CT |
| COUNTY OF FAIRFIELD | ) | |

The undersigned, having been duly sworn, hereby deposes and says:

1. I am Executive Vice President of Marketing of the Respondent, WWE. I have been employed by the WWE since February 24, 2003. I make this statement based on my personal knowledge of the facts hereinafter set forth and in support of the Respondent's Statement of Position and Admit/Deny Statement.

2. I am not, and never have been, Fara D'Angelo's supervisor.

3. I understand that in Ms. D'Angelo's CHRO Complaint, she claims that during an April 2006 trip to Milan, Italy, that Joel Satin and I, Senior Director of Multi-Media, witnessed Romer "acting ridiculously and sexually possessive," and that we discussed the issue with Ms. D'Angelo. Ms. D'Angelo asserts that neither Joel Satin nor I suggested Romer's behavior was improper, did not report it, and did not encourage her to report it to Human Resources. Ms. D'Angelo claims that I offered only to help find her a new job. I deny Ms. D'Angelo's allegations.

4. A number of WWE employees, including Joel Satin, Alex Romer, Fara D'Angelo and I, were in the bar of the hotel where we were staying. Nothing I witnessed in the bar led me to believe that there was any improper behavior on the part of Alex Romer towards Ms. D'Angelo, nor did I witness behavior which was "sexually possessive."

5.  Mr. Satin, Ms. D'Angelo, and I left the bar at the same time. I rode up in the elevator with Mr. Satin and Ms. D'Angelo. After Mr. Satin got out of the elevator, Ms. D'Angelo told me she had a new job offer at a paint company. She said it was a better opportunity and was closer to her home. I believed that her mind was made up to leave and only cautioned her that taking a job with a paint company may preclude her from finding work in the entertainment field in the future.

6.  However, in response, Ms. D'Angelo stressed that she would have a better career path as a Product Manager of the paint company. She never once suggested she was leaving the WWE due to problems with Mr. Romer.

7.  While in the elevator with me, Ms. D'Angelo's cell phone rang. She remarked that it was Alex Romer, who had been "annoying" her. I told her that if she did not want to return his call she should go back to her room and simply go to sleep. Given Romer's reputation as being somewhat "work-obsessed", I assumed this call was work related.

8.  Indeed, Romer was known to think nothing of calling his reports and co-workers at all hours for work-related issues. In fact, Ms. D'Angelo never indicated that Romer's behavior was anything other than work-related.

9.  I learned of Ms. D'Angelo's resignation only after it had been submitted. I was interviewed during the Human Resource Department investigation about Ms. D'Angelo's allegations made on the heels of that resignation. I was surprised by Ms. D'Angelo's allegations that I was aware she was sexually harassed by Mr. Romer by virtue of the Milan events. Again, I never witnessed any behavior indicating such conduct was occurring, nor did Ms. D'Angelo ever raise such allegations to me.

ERROR

# TAB G

CHRO Charge Number:  0720125
Fara D'Angelo v. World Wrestling Entertainment, Inc.

## AFFIDAVIT OF JOEL SATIN

| | | |
|---|---|---|
| STATE OF CONNECTICUT | ) | |
| | ) ss:  Stamford, CT | |
| COUNTY OF FAIRFIELD | ) | |

**The undersigned, having been duly sworn, hereby deposes and says:**

1.  I am Senior Director of Multi-Media of the Respondent, WWE.  I have been employed with the WWE since September 18, 2000.  I make this statement based on my personal knowledge of the facts hereinafter set forth and in support of the Respondent's Statement of Position and Admit/Deny Statement.

2.  I am not, and never have been, Fara D'Angelo's supervisor.

3.  I understand that in Ms. D'Angelo's CHRO Complaint, she claims that during an April 2006 trip to Milan, Italy, me and  Kurt Schneider, Executive Vice President of Marketing for WWE, witnessed Romer "acting ridiculously and sexually possessive," and that we discussed the issue with Ms. D'Angelo.  Ms. D'Angelo asserts that neither Kurt Schneider nor I suggested Romer's behavior was improper, did not report it, and did not encourage her to report it to Human Resources.  I deny Ms. D'Angelo's allegations.

4.  A number of WWE employees, including me, Kurt Schneider, Alex Romer and Fara D'Angelo, were in the bar of the hotel where we were staying.  Nothing I witnessed in the bar led me to believe that there was any improper sexual behavior on the part of Alex Romer towards Ms. D'Angelo, nor did I witness behavior which was "sexually possessive."

NY:1526519v1

5. Mr. Schneider, Ms. D'Angelo and I left the bar at the same time. I rode up in the elevator with Mr. Schneider and Ms. D'Angelo, left them in the elevator and went to my room to go to sleep. At no time did I discuss any actions or behavior of Romer with Ms. D'Angelo related to the Milan trip. Again, I did not witness any improper sexual behavior, and no one, including Ms. D'Angleo, raised any concern to me of sexually harassing behavior by Romer.

6. Since I was under the impression shared by a number of WWE employees that Romer, who was D'Angelo's supervisor, was a "workaholic", approximately one week after returning to WWE's Stamford, Connecticut office from Milan, I initiated a conversation with Ms. D'Angelo about the workload and corresponding pressures I observed being imposed on her by Romer while on the Milan trip. While I cannot recall her exact response, the entire discussion was work-related, and she did not respond in any way that indicated or implied Romer was sexually harassing or pressuring her on a personal level.

7. Subsequently, I learned from Romer's supervisor, Donna Goldsmith, that Ms. D'Angelo had submitted her resignation in early May, 2006. I was subsequently interviewed as part of a Human Resources investigation of Ms. D'Angelo's allegations. It was only then that I learned that Ms. D'Angelo alleged Romer had been sexually harassing her, and that she further claimed I was aware of such sexual harassment based on events which had occurred during the Milan trip.

8. Again, I never witnessed any behavior indicating sexual harassment was occurring, nor did I discuss any such conduct with Ms. D'Angelo. Had I observed or been made aware of any improper conduct by Romer towards Ms. D'Angelo at any time, I would have reported such conduct immediately to Human Resources.

9. Indeed, it defies credibility that I would be concerned about Ms. D'Angelo's general

   well-being and level of stress due to a heavy workload, and follow up with her as to how

   she was feeling in that regard, but not follow up with a report, or even suspicion, that she

   was being sexually harassed.

*JOEL SATIN*

     On this 21ST day of  December,  2006, before me, personally appeared **JOEL SATIN**, who affirmed under oath the truth of the foregoing Affidavit to the best of his knowledge, information, and/or belief.

Subscribed and Sworn to
before me this 21ST day of
December , 2006.

*Margaret M. Ytuarte*
Notary Public

**MARGARET M. YTUARTE**
*NOTARY PUBLIC*
MY COMMISSION EXPIRES JULY 31, 2007

# TAB H

| | |
|---|---|
| **From:** | D'Angelo, Fara |
| **Sent:** | Tuesday, July 13, 2004 4:01 PM |
| **):** | Terranova, Chris |
| **Subject:** | RE: |

Barely.. doesn't put out.. she s a prude... I don't think u will be pleased.

Fara D'Angelo
World Wrestling Entertainment
Global Licensing Coordinator
Phone +1(203) 406-3602
fara.d'angelo@wwecorp.com


-----Original Message-----
From: Terranova, Chris
Sent: Tuesday, July 13, 2004 4:00 PM
To: D'Angelo, Fara
Subject: RE:

Yeah but does she put out... I can fake as though I have money for a night.

Christopher Terranova
Brand Equity Assistant
World Wrestling Entertainment
1241 East Main Street
Stamford, CT 06902
 'one: 203-352-8758
 .x: 203-353-5007


-----Original Message-----
From: D'Angelo, Fara
Sent: Tuesday, July 13, 2004 3:54 PM
To: Terranova, Chris
Subject: FW:

Chris  - look what she wrote...

Ahh. I don't know if I like her anymore for u ... she s superficial and into guys spending a lot of
$ on her.

Fara D'Angelo
World Wrestling Entertainment
Global Licensing Coordinator
Phone +1(203) 406-3602
fara.d'angelo@wwecorp.com


-----Original Message-----
From: Korn, Morgan L. [mailto:Korn@northjersey.com]
Sent: Tuesday, July 13, 2004 3:44 PM
To: D'Angelo, Fara
Subject: RE:

,ou're right about me always looking for cuties! he's cute -- set us up on a blind date, haha! how
tall is he though?

**CONFIDENTIAL**                                                                     D 00000950

> -----Original Message-----
> From:      D'Angelo, Fara [SMTP:Fara.DAngelo@wwecorp.com]
> Sent:      Tuesday, July 13, 2004 3:03 PM
  To: Korn, Morgan L.
> Subject:   RE:
>
> Check him  out for yourself.  I just know how you are always looking
> for cute boys and he is one of them. That s all.
>
> Fara D'Angelo
> World Wrestling Entertainment
> Global Licensing Coordinator
> Phone +1(203) 406-3602
> fara.d'angelo@wwecorp.com
>
>
> -----Original Message-----
> From: Korn, Morgan L. [mailto:Korn@northjersey.com]
> Sent: Tuesday, July 13, 2004 3:01 PM
> To: D'Angelo, Fara
> Subject:
>
> hey --
> please resend the photo to my work address: korn@northjersey.com.
> i can't open my aol mail here at work.
> thanks and are you trying to set me up with him? is he really that
> cute??? << File: My Pictures0002.jpg >>

CONFIDENTIAL

**From:**          D'Angelo, Fara
**ent:**           Wednesday, December 29, 2004 11:48 AM
**.o:**            'alyssa'
**Subject:**       RE:


Who is the doctor? Will it be a sausage fest? I d like to go somewhere with good music and get all prettied up!!

Fara D'Angelo
Global Licensing Coordinator
World Wrestling Entertainment
1241 East Main St.
Stamford, CT 06902
(phone) +1.203.406.3602
(fax) 203.359.5115

> -----Original Message-----
> **From:** alyssa [mailto:lysmonks@hotmail.com]
> **Sent:** Wednesday, December 29, 2004 11:29 AM
> **To:** D'Angelo, Fara
> **Subject:** Re:
>
> option 3 sounds good.  where you think?
> I might be tagging with you, if you do something low key and locally and not too expensive....
> I don't want to just go hang out at Colin's restaurant like a fan club.  plus he doesn't really want people there to know about us b/c it
> would suck for his ex and make shit worse and I want to respect that.  although, I'd like to show up there at the end of the night and
> kiss him........
> I got invited to a party with a bunch of doctors in the east village - could be interesting....free anyway, and we'd be the hottest pieces of
> ass there....with all doctors...
>
>> ----- Original Message -----
>> **From:** D'Angelo, Fara
>> **To:** alyssa
>> **Sent:** Tuesday, December 28, 2004 9:52 AM
>> **Subject:** RE:
>>
>> Not sure yet... trying to find something to do....
>>
>> Option 1 – Studio 4 in fort lee nj – with a bunch of guy friends – I need a wing man  though....
>> Option 2 – this place called Cotton w her boy and me.. – don't think I will be there
>> Option 3 – somewhere with Sheila in city – not sure yet
>> Option 4 – home – doing nothing....
>> Option 5 – I have a feeling Rob will call me last minute and ask to hang out??? ...
>>
>> I m not all that excited about the plans bc nothing is definite yet....
>>
>> What are u thinking?
>>
>> Fara D'Angelo
>> Global Licensing Coordinator
>> World Wrestling Entertainment
>> 1241 East Main St.
>> Stamford, CT 06902
>> (phone) +1.203.406.3602
>> (fax) 203.359.5115

CONFIDENTIAL

**From:**          D'Angelo, Fara
**Sent:**          Wednesday, April 20, 2005 2:06 PM
**To:**            Romer, Alex
**Subject:**       RE:


:-)

Fara D'Angelo
Global Licensing Coordinator
World Wrestling Entertainment
1241 East Main St.
Stamford, CT 06902
(phone) +1.203.406.3602
(fax) 203.359.5115


-----Original Message-----
From: Romer, Alex
Sent: Wednesday, April 20, 2005 2:00 PM
To: D'Angelo, Fara
Subject: Re:

No idea. Sure we will be able to feed you though
--------------------------
Sent from my BlackBerry Wireless Handheld


-----Original Message-----
From: D'Angelo, Fara <Fara.DAngelo@wwecorp.com>
To: Romer, Alex <alex.romer@wwecorp.com>
Sent: Wed Apr 20 13:39:37 2005
Subject: RE:

Just a crush...
do they sell fish and chips at the arenas in London? Or ny style pretzels?

Fara D'Angelo
Global Licensing Coordinator
World Wrestling Entertainment
1241 East Main St.
Stamford, CT 06902
(phone) +1.203.406.3602
(fax) 203.359.5115


-----Original Message-----
From: Romer, Alex
Sent: Wednesday, April 20, 2005 1:35 PM
To: D'Angelo, Fara
Subject: Re:

More like an obsession...
--------------------------
Sent from my BlackBerry Wireless Handheld


-----Original Message-----

**CONFIDENTIAL**

D 00000836

Fr   D'Angelo, Fara <Fara.DAngelo@wwecorp.com>
To: Romer, Alex <alex.romer@wwecorp.com>
Sent: Wed Apr 20 13:31:54 2005
Subject: RE:

Lol.... was a joke... good visual though...

Me - sitting here eating gross rubbery curly fries -- cant wait to eat some good European grub..

Fara D'Angelo
Global Licensing Coordinator
World Wrestling Entertainment
1241 East Main St.
Stamford, CT 06902
(phone) +1.203.406.3602
(fax) 203.359.5115


-----Original Message-----
From: Romer, Alex
Sent: Wednesday, April 20, 2005 1:21 PM
To: D'Angelo, Fara
Subject: Re:

You tart...he have a rather smart suit and tie....and shirt on
--------------------------
Sent from my BlackBerry Wireless Handheld


-----Original Message-----
From: D'Angelo, Fara <Fara.DAngelo@wwecorp.com>
To: Romer, Alex <alex.romer@wwecorp.com>
Sent: Wed Apr 20 13:18:26 2005
Subject: RE:

Oh my goodness.... does he have shirt on or off?

Fara D'Angelo
Global Licensing Coordinator
World Wrestling Entertainment
1241 East Main St.
Stamford, CT 06902
(phone) +1.203.406.3602
(fax) 203.359.5115


-----Original Message-----
From: Romer, Alex
Sent: Wednesday, April 20, 2005 1:16 PM
To: D'Angelo, Fara
Subject:

Standing here watching batista doing an interview with sky italia....
--------------------------
Sent from my BlackBerry Wireless Handheld

CONFIDENTIAL

D 00000837

| From: | D'Angelo, Fara |
|---|---|
| ( : | Thursday, April 21, 2005 11:38 AM |
| To: | Romer, Alex |
| Subject: | RE: Danilo |

Wow... that sounds rough... esp. the part about ur zippo. Be sure to show me what the zippo is.

Well be sure to get some rest bc Tinks is coming to town.....:-)

Fara D'Angelo
Global Licensing Coordinator
World Wrestling Entertainment
1241 East Main St.
Stamford, CT 06902
(phone) +1.203.406.3602
(fax) 203.359.5115


-----Original Message-----
From: Romer, Alex
Sent: Thursday, April 21, 2005 11:11 AM
To: D'Angelo, Fara
Subject: Re: Danilo

Thank you. Had a bad day. Got to the wrong airport in berlin, had to post my zippo home as they
wouldn't let me have it on the plane, my hotel room in dublin was cancelled by someone and some of
    merch for la gazzette was stolen from the van in italy. At pa with cena and torrie so things
are getting better

3am to bed. Tired

Bring them with you
-------------------------
Sent from my BlackBerry Wireless Handheld


-----Original Message-----
From: D'Angelo, Fara <Fara.DAngelo@wwecorp.com>
To: Romer, Alex <alex.romer@wwecorp.com>
Sent: Thu Apr 21 10:55:39 2005
Subject: RE: Danilo

I can see the wheels turning.... :-)

How u feeling today?

I will have the cena jerseys by noon today.  Shall I bring them with me?

Fara D'Angelo
Global Licensing Coordinator
World Wrestling Entertainment
1241 East Main St.
S*amford, CT 06902
    one) +1.203.406.3602
(fax) 203.359.5115


CONFIDENTIAL Produced Pursuant to Protective Order

```
-----Original Message-----
From: Romer, Alex
Sent: Thursday, April 21, 2005 10:52 AM
To: D'Angelo, Fara
Subject: Re: Danilo
```

Ah I knew they had invoiced
-------------------------
Sent from my BlackBerry Wireless Handheld

```
-----Original Message-----
From: D'Angelo, Fara <Fara.DAngelo@wwecorp.com>
To: Stinchfield, Erin <Erin.Stinchfield@wwecorp.com>
CC: Romer, Alex <alex.romer@wwecorp.com>
Sent: Thu Apr 21 10:26:25 2005
Subject: FW: Danilo
```

Hi Erin

See below

Fara D'Angelo

Global Licensing Coordinator

World Wrestling Entertainment

1241 East Main St.
Stamford, CT 06902

(phone) +1.203.406.3602

(fax) 203.359.5115

```
-----Original Message-----
From: McGuire, Gemma (CPLG UK) [mailto:gmcguire@cplg.com]
Sent: Thursday, April 21, 2005 9:07 AM
To: D'Angelo, Fara
Subject: RE: Danilo
```

Hi Fara,

I agree with your reconciliation for Danilo,  this amount has been invoiced and was paid to us on
the 11th April.

The amount will be wired to you with the rest of the April receipts at the end of May.

Kind regards

**CONFIDENTIAL Produced Pursuant to Protective Order**

D 00001518

Gemma

-----Original Message-----
From: D'Angelo, Fara [mailto:Fara.DAngelo@wwecorp.com]
Sent: 20 April 2005 22:39
To: gmcguire@cplg.com
Subject: FW: Danilo

Hi Gemma


Please see the attached reconciliation for Danilo.  See the note below. Can you let me know if our records match and if so when do you expect that Danilo will pay the amount that is now in arrears?


Thanks



Fara D'Angelo

Global Licensing Coordinator

World Wrestling Entertainment

1241 East Main St.
Stamford, CT 06902

(phone) +1.203.406.3602

(fax) 203.359.5115


-----Original Message-----
From: Stinchfield, Erin
Sent: Wednesday, April 20, 2005 12:03 PM
To: D'Angelo, Fara
Cc: Romer, Alex; Bergamasco, Tom
Subject: Danilo


Fara,


We received an Redacted advance from Danilo for their new contract starting January 1, 2005.
ilo owes us Redacted for the excess of their 4th quarter earnings over their Redacted advance
contract year 2 on their old contract. (Please see rec for details).


CONFIDENTIAL Produced Pursuant to Protective Order

D 00001519

**Romer, Alex**

| | |
|---|---|
| **From:** | Romer, Alex |
| **Sent:** | Thursday, June 02, 2005 6:10 PM |
| **To:** | D'Angelo, Fara |
| **Subject:** | RE: grace samples |

If you believe in your self you can ☺

> ——Original Message——
> **From:** D'Angelo, Fara
> **Sent:** Thursday, June 02, 2005 1:01 PM
> **To:** Romer, Alex
> **Subject:** RE: grace samples
>
> Ha... that's a funny one...
>
> Fara D'Angelo
> Global Licensing Coordinator
> World Wrestling Entertainment
> 1241 East Main St.
> Stamford, CT 06902
> (phone) +1.203.406.3602
> (fax) 203.359.5115
>
> > ——Original Message——
> > **From:** Romer, Alex
> > **Sent:** Thursday, June 02, 2005 10:31 AM
> > **To:** D'Angelo, Fara
> > **Subject:** RE: grace samples
> >
> > Told you – you can have anyone you want....
> >
> > > ——Original Message——
> > > **From:** D'Angelo, Fara
> > > **Sent:** Thursday, June 02, 2005 10:28 AM
> > > **To:** Romer, Alex
> > > **Subject:** RE: grace samples
> > >
> > > I will probably have to retire early , maybe at 32  - find me a rich one...
> > >
> > > Fara D'Angelo
> > > Global Licensing Coordinator
> > > World Wrestling Entertainment
> > > 1241 East Main St.
> > > Stamford, CT 06902
> > > (phone) +1.203.406.3602
> > > (fax) 203.359.5115
> > >
> > > > ——Original Message——
> > > > **From:** Romer, Alex
> > > > **Sent:** Thursday, June 02, 2005 10:28 AM

5/8/2006

Confidential - Produced Pursuant to Protective Order

D 0299

**To:** D'Angelo, Fara
**Subject:** RE: grace samples

You wait until you get to my dizzy heights!

-----Original Message-----
**From:** D'Angelo, Fara
**Sent:** Thursday, June 02, 2005 10:26 AM
**To:** Romer, Alex
**Subject:** RE: grace samples

I must be getting alzheimer's with my old age...

Fara D'Angelo
Global Licensing Coordinator
World Wrestling Entertainment
1241 East Main St.
Stamford, CT 06902
(phone) +1.203.406.3602
(fax) 203.359.5115

-----Original Message-----
**From:** Romer, Alex
**Sent:** Thursday, June 02, 2005 10:25 AM
**To:** D'Angelo, Fara
**Subject:** RE: grace samples

-----Original Message-----
**From:** D'Angelo, Fara
**Sent:** Thursday, June 02, 2005 10:22 AM
**To:** Romer, Alex
**Subject:** FW: grace samples

So squat is allowed to put our authentic designs on the jewelry and wallets that they do? When did this happen? *[Alex Romer]* ages ago – you were there!

To clarify , Satoko must request the authentic artwork through me and then send the submission to Bern? Right?*[Alex Romer]* right

Fara D'Angelo
Global Licensing Coordinator
World Wrestling Entertainment
1241 East Main St.
Stamford, CT 06902
(phone) +1.203.406.3602
(fax) 203.359.5115

-----Original Message-----
**From:** Satoko Murai [mailto:smurai@smj.jp]
**Sent:** Thursday, June 02, 2005 4:30 AM
**To:** D'Angelo, Fara

5/8/2006

Confidential - Produced Pursuant to Protective Order

D 0300

**From:**        D'Angelo, Fara
**Sent:**        Friday, July 22, 2005 11:59 AM
**_o:**        Romer, Alex
**_ubject:**        RE: Orton tats

:-)  never stopped

Fara D'Angelo
Global Licensing Coordinator
World Wrestling Entertainment
1241 East Main St.
Stamford, CT 06902
(phone) +1.203.406.3602
(fax) 203.359.5115


-----Original Message-----
From: Romer, Alex
Sent: Friday, July 22, 2005 11:58 AM
To: D'Angelo, Fara
Subject: RE: Orton tats

Ah..thought you were being a naughty girl again :-)

-----Original Message-----
From: D'Angelo, Fara
Sent: Friday, July 22, 2005 11:53 AM
‾o: Romer, Alex
 ubject: RE: Orton tats

No.. that's not what I was saying.. read the emails again and see what I wrote. Meant to write
"Star" likes tattoos

Fara D'Angelo
Global Licensing Coordinator
World Wrestling Entertainment
1241 East Main St.
Stamford, CT 06902
(phone) +1.203.406.3602
(fax) 203.359.5115


-----Original Message-----
From: Romer, Alex
Sent: Friday, July 22, 2005 11:49 AM
To: D'Angelo, Fara
Subject: RE: Orton tats

First hand knowledge that (our) stars like Tattoos? I hope not.....

-----Original Message-----
From: D'Angelo, Fara
Sent: Friday, July 22, 2005 10:11 AM
To: Romer, Alex
 ubject: RE: Orton tats

Of course... I really should get my 3rd soon.


**CONFIDENTIAL**                                                   D 00000850

Fara D'Angelo
Global Licensing Coordinator
World Wrestling Entertainment
1241 East Main St.
:amford, CT 06902
(phone) +1.203.406.3602
(fax) 203.359.5115


-----Original Message-----
From: Romer, Alex
Sent: Friday, July 22, 2005 9:19 AM
To: D'Angelo, Fara
Subject: RE: Orton tats

First hand knowledge?

-----Original Message-----
From: D'Angelo, Fara
Sent: Friday, July 22, 2005 8:58 AM
To: Romer, Alex
Subject: RE: Orton tats

Stars like tattoos

Fara D'Angelo
Global Licensing Coordinator
World Wrestling Entertainment
1241 East Main St.
Stamford, CT 06902
)hone) +1.203.406.3602
(fax) 203.359.5115


-----Original Message-----
From: Romer, Alex
Sent: Friday, July 22, 2005 8:54 AM
To: D'Angelo, Fara
Subject: RE: Orton tats

Stop drooling over the tattoos :-)

-----Original Message-----
From: D'Angelo, Fara
Sent: Friday, July 22, 2005 8:51 AM
To: Romer, Alex
Subject: FW: Orton tats

See below... awe.. :-)

Fara D'Angelo
Global Licensing Coordinator
World Wrestling Entertainment
1241 East Main St.
Stamford, CT 06902
(phone) +1.203.406.3602
(fax) 203.359.5115


-----Original Message-----

**CONFIDENTIAL**

**D 00000851**

From: Sam Topley [mailto:SamTopley@ryebypost.com]
Sent: Friday, July 22, 2005 4:52 AM
To: D'Angelo, Fara
Subject: RE: Orton tats

..any thanks for these Fara, you're a star.

Many thanks,


Sam Topley
Tel: 0845 330 3310
International: +44 1797 367788
Fax: 01797 367799
http://www.ryebypost.com/
Rye By Post Ltd, Cinque Ports Road, Mountfield Road Industrial Estate, New Romney, Kent, UK, TN28
8XU



-----Original Message-----
From: D'Angelo, Fara [mailto:Fara.DAngelo@wwecorp.com]
Sent: 15 July 2005 22:04
To: Sam Topley
Subject: FW: Orton tats

Hi Sam

Sorry for the delay. Attached are images of Orton's tattoos.

 ¯hanks


Fara D'Angelo
Global Licensing Coordinator
World Wrestling Entertainment
1241 East Main St.
Stamford, CT 06902
(phone) +1.203.406.3602
(fax) 203.359.5115

CONFIDENTIAL

Message

### Romer, Alex

| | |
|---|---|
| **From:** | D'Angelo, Fara |
| **Sent:** | Thursday, September 01, 2005 3:14 PM |
| **To:** | Romer, Alex |
| **Subject:** | FW: pics! |

Look at the lovely girls of wwe

Fara D'Angelo
Global Licensing Coordinator
World Wrestling Entertainment
1241 East Main St.
Stamford, CT 06902
(phone) +1.203.406.3602
(fax) 203.359.5176
-----Original Message-----
**From:** Vogestad, Jennifer
**Sent:** Wednesday, August 31, 2005 4:12 PM
**To:** D'Angelo, Fara
**Subject:** pics!



5/8/2006

Confidential - Produced Pursuant to Protective Order

Message



*Jennifer Vogestad*
Licensing Manager
WWE, Inc.
203.353.2866

5/8/2006

Confidential - Produced Pursuant to Protective Order

**From:**     Romer, Alex
**Sent:**     Tuesday, December 20, 2005 5:07 PM
**To:**       D'Angelo, Fara
**Subject:**  Re:

2me - yes :-)
--------------------------
Sent from my BlackBerry Wireless Handheld

-----Original Message-----
From: D'Angelo, Fara
To: Romer, Alex
Sent: Tue Dec 20 17:06:29 2005
Subject: RE:

Bc I am precious :-)

Fara D'Angelo
Global Licensing Coordinator
World Wrestling Entertainment
1241 East Main St.
Stamford, CT 06902
(phone) +1.203.406.3602
(fax) 203.359.5176

-----Original Message-----
From: Romer, Alex
Sent: Tuesday, December 20, 2005 5:06 PM
To: D'Angelo, Fara
Subject: Re:

Whatever...just don't get hurt....
--------------------------
Sent from my BlackBerry Wireless Handheld

-----Original Message-----
From: D'Angelo, Fara
To: Romer, Alex
Sent: Tue Dec 20 17:04:50 2005
Subject: RE:

Never is

Fara D'Angelo
Global Licensing Coordinator
World Wrestling Entertainment
1241 East Main St.
Stamford, CT 06902
(phone) +1.203.406.3602
(fax) 203.359.5176

-----Original Message-----
From: Romer, Alex
Sent: Tuesday, December 20, 2005 5:04 PM
To: D'Angelo, Fara

CONFIDENTIAL

D 00000660

Subject: Re:

I take it its not exactly a girly trip then!!
------Original Message------
From: Fara D'angelo
To: Romer, Alex
Sent: Dec 20, 2005 9:55 PM
Subject: RE:

Come on.. u know better

Fara D'Angelo
Global Licensing Coordinator
World Wrestling Entertainment
1241 East Main St.
Stamford, CT 06902
(phone) +1.203.406.3602
(fax) 203.359.5176

-----Original Message-----
From: Romer, Alex
Sent: Tuesday, December 20, 2005 4:54 PM
To: D'Angelo, Fara
Subject: Re:

I take that as not exactly then.....
--------------------------
Sent from my BlackBerry Wireless Handheld


-----Original Message-----
From: D'Angelo, Fara
To: Romer, Alex
Sent: Tue Dec 20 16:52:10 2005
Subject: RE:

:-)

Fara D'Angelo
Global Licensing Coordinator
World Wrestling Entertainment
1241 East Main St.
Stamford, CT 06902
(phone) +1.203.406.3602
(fax) 203.359.5176

-----Original Message-----
From: Romer, Alex
Sent: Tuesday, December 20, 2005 4:52 PM
To: D'Angelo, Fara
Subject: Re:

I thought it was girls only?
--------------------------
Sent from my BlackBerry Wireless Handheld


-----Original Message-----
From: D'Angelo, Fara
To: Romer, Alex
Sent: Tue Dec 20 16:51:16 2005

CONFIDENTIAL                                                        D 00000661

Subject: RE:

With my good looks :-)

Fara D'Angelo
Global Licensing Coordinator
World Wrestling Entertainment
1241 East Main St.
Stamford, CT 06902
(phone) +1.203.406.3602
(fax) 203.359.5176

-----Original Message-----
From: Romer, Alex
Sent: Tuesday, December 20, 2005 4:49 PM
To: D'Angelo, Fara
Subject: Re:

And how r u paying to go to cali?
--------------------------
Sent from my BlackBerry Wireless Handheld


-----Original Message-----
From: D'Angelo, Fara
To: Romer, Alex
Sent: Tue Dec 20 16:39:26 2005
Subject: RE:

Only 36 dollars in my checking...

Fara D'Angelo
Global Licensing Coordinator
World Wrestling Entertainment
1241 East Main St.
Stamford, CT 06902
(phone) +1.203.406.3602
(fax) 203.359.5176

-----Original Message-----
From: Romer, Alex
Sent: Tuesday, December 20, 2005 4:31 PM
To: D'Angelo, Fara
Subject: Re:

Don't tell me you have run out of food favors or are you on iou's? They should have left monday so
with you tomorow/thurs....
--------------------------
Sent from my BlackBerry Wireless Handheld


-----Original Message-----
From: D'Angelo, Fara
To: Romer, Alex
Sent: Tue Dec 20 15:59:14 2005
Subject:

Do u know when the psp games are going to be coming to me? Santa????

CONFIDENTIAL                                                    D 00000662

Fara D'Angelo

Global Licensing Coordinator

World Wrestling Entertainment

1241 East Main St.
Stamford, CT 06902

(phone) +1.203.406.3602

(fax) 203.359.5176

---------------------------
Sent from my BlackBerry Wireless Handheld

**CONFIDENTIAL**

D 00000663

```
From:                   Romer, Alex
'ent:                   Wednesday, December 21, 2005 10:09 AM
 o:                     D'Angelo, Fara
Subject:                Re: Curious
```

Ok - :-)
--------------------------
Sent from my BlackBerry Wireless Handheld


-----Original Message-----
From: D'Angelo, Fara
To: Romer, Alex
Sent: Wed Dec 21 09:54:21 2005
Subject: RE: Curious

Don't worry about it.

Fara D'Angelo
Global Licensing Coordinator
World Wrestling Entertainment
1241 East Main St.
Stamford, CT 06902
(phone) +1.203.406.3602
(fax) 203.359.5176

-----Original Message-----
'om: Romer, Alex
Jent: Wednesday, December 21, 2005 9:53 AM
To: D'Angelo, Fara
Subject: Re: Curious

Right - how do the great looks pay for the trip then????
--------------------------
Sent from my BlackBerry Wireless Handheld


-----Original Message-----
From: D'Angelo, Fara
To: Romer, Alex
Sent: Wed Dec 21 09:51:17 2005
Subject: RE: Curious

It is girls but that doesn't mean I wont meet anyone

Fara D'Angelo
Global Licensing Coordinator
World Wrestling Entertainment
1241 East Main St.
Stamford, CT 06902
(phone) +1.203.406.3602
(fax) 203.359.5176

-----Original Message-----
 om: Romer, Alex
Sent: Tuesday, December 20, 2005 5:16 PM
To: D'Angelo, Fara
```

CONFIDENTIAL

D 00000706

Subject: Curious

Why did you tell me it was girls only then?
--------------------------
Sent from my BlackBerry Wireless Handheld

CONFIDENTIAL

**From:**          D'Angelo, Fara
**Sent:**          Thursday, February 16, 2006 2:04 PM
**To:**            Romer, Alex
**Subject:**       RE:

Ah.. that's good. How are those cookies? Care to share some and make a special delivery to my
office w/ some treats?

Fara D'Angelo
Global Licensing Coordinator
World Wrestling Entertainment
1241 East Main St.
Stamford, CT 06902
(phone) +1.203.406.3602
(fax) 203.359.5176

-----Original Message-----
From: Romer, Alex
Sent: Thursday, February 16, 2006 2:01 PM
To: D'Angelo, Fara
Subject: Re:

We wrote individual parts over the past week or so and now we are "editing" it all. Its not too bad
- we have not sat down together like this for the 3 years I have been here and we are getting on
for a change and having a laugh which is a bit of a bonus. U ok? Need lol to keep me going. It will
be a long day!!!
-------------------------
 ent from my BlackBerry Wireless Handheld


-----Original Message-----
From: D'Angelo, Fara
To: Romer, Alex
Sent: Thu Feb 16 13:50:10 2006
Subject: RE:

Wow it was getting hot in there. I feel bad for u. are u guys actually writing the presentation all
together? How come u are not each doing ur part and then piecing it together.

Fara D'Angelo
Global Licensing Coordinator
World Wrestling Entertainment
1241 East Main St.
Stamford, CT 06902
(phone) +1.203.406.3602
(fax) 203.359.5176

-----Original Message-----
From: Romer, Alex
Sent: Thursday, February 16, 2006 10:53 AM
To: D'Angelo, Fara
Subject:

 If u have any gossip or anything to make me smile or give me lol please share as this is mind
 umbing.... :-)
-------------------------
Sent from my BlackBerry Wireless Handheld


**CONFIDENTIAL**                                                                    D 00000906

**Romer, Alex**

| | |
|---|---|
| **From:** | D'Angelo, Fara |
| **Sent:** | Thursday, February 16, 2006 8:19 PM |
| **To:** | Romer, Alex |
| **Subject:** | this will humor u |

Fara D'Angelo
Global Licensing Coordinator
World Wrestling Entertainment
1241 East Main St.
Stamford, CT 06902
(phone) +1.203.406.3602
(fax) 203.359.5176

**Subject:**

# WOMAN'S PERFECT BREAKFAST

*She's sitting at the table with her gourmet coffee.
Her son is on the cover of the Wheaties box.
Her daughter is on the cover of Business Week.
Her boyfriend is on the cover of Playgirl.
And her husband is on the back of the milk carton.*

### WOMEN'S REVENGE

*"Cash, check or charge?" I asked, after folding items the woman wished to purchase.
As she fumbled for her wallet I noticed a remote control for a television set in her purse.
"So, do you always carry your TV remote?" I asked.
"No," she replied, "but my husband refused to come shopping with me,
and I figured this was the most evil thing I could do to him legally."*

# UNDERSTANDING WOMEN
## (A MAN'S PERSPECTIVE)

*I know I'm not going to understand women.
I'll never understand how you can take boiling hot wax,
pour it onto your upper thigh, rip the hair out by the root,*
### and still be afraid of a spider.

# MARRIAGE SEMINAR

5/8/2006

Confidential - Produced Pursuant to Protective Order

D 0322

While attending a Marriage Seminar dealing with communication,
Tom and his wife Grace listened to the instructor,
"It is essential that husbands and wives know each other's likes and dislikes."
He addressed the man,
"Can you name your wife's favorite flower?"
Tom leaned over, touched his wife's arm gently and whispered, "It's Pillsbury, isn't it?

# CIGARETTES AND TAMPONS

A man walks into a pharmacy and wanders up and down the aisles.
The sales girl notices him and asks him if she can help him.
He answers that he is looking for a box of tampons for his wife.
She directs him down the correct aisle
A few minutes later, he deposits a huge bag of cotton
balls and a ball of string on the counter.
She says, confused, "Sir, I thought you were looking for some tampons for your wife?
He answers, "You see, it's like this,
yesterday, I sent my wife to the store to get me a carton of cigarettes,
and she came back with a tin of tobacco and some rolling
papers; cause it's sooo-ooo—oo-ooo much cheaper.
So, I figure if I have to roll my own, so does she.
(I figure this guy is the one on the milk carton!)

## WIFE VS. HUSBAND

A couple drove down a country road for several miles, not saying a word.
An earlier discussion had led to an argument and
neither of them wanted to concede their position.
As they passed a barnyard of mules, goats, and pigs,
the husband asked sarcastically, "Relatives of yours?"
"Yep," the wife replied, "in-laws."

# W O R D S

A husband read an article to his wife about how many words women use a day...
30,000 to a man's 15,000.
The wife replied, "The reason has to be because we have to repeat everything to men...
The husband then turned to his wife and asked, "What?"

# CREATION

A man said to his wife one day, "I don't know how you can be
so stupid and so beautiful all at the same time.
"The wife responded, "Allow me to explain.
God made me beautiful so you would be attracted to me;
God made me stupid so I would be attracted to you!

# WHO DOES WHAT

A man and his wife were having an argument about who
should brew the coffee each morning.
The wife said, "You should do it, because you get up first,
and then we don't have to wait as long to get our coffee."

5/8/2006

Confidential - Produced Pursuant to Protective Order

The husband said, "You are in charge of cooking around here and you should do it, because that is your job, and I can just wait for my coffee." Wife replies, "No, you should do it, and besides, it is in the Bible that the man should do the coffee." Husband replies, "I can't believe that, show me." So she fetched the Bible, and opened the New Testament and showed him at the top of several pages, that it indeed says............"HEBREWS"

## The Silent Treatment

A man and his wife were having some problems at home and were giving each other the silent treatment. Suddenly, the man realized that the next day, he would need his wife to wake him at 5:00 AM for an early morning business flight. Not wanting to be the first to break the silence (and LOSE), he wrote on a piece of paper, "Please wake me at 5:00 AM." He left it where he knew she would find it. The next morning, the man woke up, only to discover it was 9:00 AM and he had missed his flight. Furious, he was about to go and see why his wife hadn't wakened him, when he noticed a piece of paper by the bed. The paper said, "It is 5:00 AM. Wake up." Men are not equipped for these kinds of contests.

God may have created man before woman, but there is always a rough draft before the masterpiece.

SEND THIS TO SMART WOMEN WHO NEED A LAUGH AND TO MEN YOU THINK CAN HANDLE IT!

==============================================================================

This email message is for the sole use of the intended recipient (s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message. To reply to our email administrator directly, send an email to EmailAdmin@toysrus.com.

Toys "R" Us, Inc.

5/8/2006

Confidential - Produced Pursuant to Protective Order

D 0324

## Romer, Alex

**From:**    Romer, Alex
**Sent:**    Tuesday, February 21, 2006 3:12 PM
**To:**      D'Angelo, Fara
**Subject:** RE: If Women controlled the world!!

Just read these fantastic. Big smile ☺

**From:** D'Angelo, Fara
**Sent:** Wednesday, February 15, 2006 8:09 PM
**To:** Romer, Alex
**Subject:** FW: If Women controlled the world!!


Fara D'Angelo
Global Licensing Coordinator
World Wrestling Entertainment
1241 East Main St.
Stamford, CT 06902
(phone) +1.203.406.3602
(fax) 203.359.5176

**From:** Silverman, Lee - MTV [mailto:Lee.Silverman@mtvstaff.com]
**Sent:** Wednesday, February 15, 2006 9:02 AM
**To:** Glenn Edelman; Allyson Edelman; D'Angelo, Fara; Harris, Jennifer; Maria Mendez
**Subject:** FW: If Women controlled the world!!


he he!

# *IF* WOMEN CONTROLLED THE WORLD...

5/8/2006

Confidential - Produced Pursuant to Protective Order

D 0303





5/8/2006

Confidential - Produced Pursuant to Protective Order

D 0304







5/8/2006

Confidential - Produced Pursuant to Protective Order

D 0305



5/8/2006

Confidential - Produced Pursuant to Protective Order

D 0306

Page 5 of 7



5/8/2006

08/05 2006 18:54 FAX +44 20 8834 1119      WWE International Ltd      @017/034

Confidential - Produced Pursuant to Protective Order

D 0307

Page 6 of 7





5/8/2006

Confidential - Produced Pursuant to Protective Order

D 0308



# MAKE ANOTHER WOMAN'S DAY, AND SHARE THE SMILES

Relax. Yahoo! Mail virus scanning helps detect nasty viruses!

5/8/2006

Confidential - Produced Pursuant to Protective Order

D 0309

| | |
|---|---|
| **From:** | D'Angelo, Fara |
| **Sent:** | Monday, March 20, 2006 10:07 AM |
| **To:** | Romer, Alex |
| **Subject:** | RE: job description |

Were they good or bad?

Fara D'Angelo
Global Licensing Coordinator
World Wrestling Entertainment
1241 East Main St.
Stamford, CT 06902
(phone) +1.203.406.3602
(fax) 203.359.5176

**From:** Romer, Alex
**Sent:** Monday, March 20, 2006 8:10 AM
**To:** D'Angelo, Fara
**Subject:** RE: job description

Tinks you know me better than anyone. What do you think my first thoughts were?

Call me

**From:** D'Angelo, Fara
**Sent:** Friday, March 17, 2006 11:16 PM
**To:** Romer, Alex
**Subject:** job description

Hi Alex

I hope you are enjoying your vacation.

I know we discussed on a few occasions my existing and future role at WWE.  In regards to this topic, I wanted to share the below job description of a Manager of International Licensing position that I found online. As you can see from the description, I am currently doing the role of a manager and I am being compensated as a Coordinator. I thought this information would be helpful to you to give you a better understanding of how other companies, comparable to WWE, compensate and title someone in my role. The position described below is paying a salary range of $65K-$75K.

Please let me know you thoughts.

Fara D'Angelo
Global Licensing Coordinator
World Wrestling Entertainment
1241 East Main St.
Stamford, CT 06902
(phone) +1.203.406.3602
(fax) 203.359.5176

**Manager of International Licensing**

Company: XXXXXX: New York City, NY
Status: Full Time, Employee Job Category: Advertising/Marketing/Public Relations
Relevant Work Experience: 2+ to 5 Years Career Level: Experienced (Non-Manager)

**CONFIDENTIAL**

D 00000932

Education Level: Bachelor's Degree

## DESCRIPTION AND DUTIES:

Primary support person to Director-International Licensing, for building, developing and maintaining merchandise, promotion, and publishing programs involving XXXX's licensed comic and non-comic characters in: Asia (excluding Japan), Australia, New Zealand, and South Africa.

• Maintain daily contact with agents and meet with agents, licensees and key regional business partners. Research and display solid understanding of local markets. Support agents by providing property information and updates as well as promotional and presentational materials.

• Manage Australia and South Africa under the guidance of the Director – International Licensing. Oversee marketing initiatives, budget, infringements and territory development. Provide weekly territory updates.

• Responsible for day-to-day support of Designated Territory, which includes over 200 accounts and three agents.

• Coordinate daily liaison between Director-International Licensing, talent agents, attorneys, domestic managers and property managers in support of contract proposal approval and drafting. Provide information on DT to management via monthly and quarterly reports and trip summaries in a timely manner.

• Work closely with agents and Director-International Licensing, to prepare yearly licensing, retail co-op, and trade budgets. Ensure that all contracts in DT are current and follow-up with agents, Cincinnati accounting and Director-International-Licensing.

• Monitor licensing royalties in DT on a monthly basis, and plan legal strategies with B&H and internal legal staff.

## QUALIFICATIONS AND SKILLS:

• 4-6 years licensing experience preferred. Experience in Asia/International business helpful.

• College degree preferred.

• Excellent interpersonal and written and verbal communication skills

• Must be organized and able to handle multiple tasks simultaneously.

• Independent worker, who requires minimal daily supervision.

• Ability to interact with a wide and varied range of clients and agents.

Please submit resumes to xxxxxx

CONFIDENTIAL

D 00000933

| | |
|---|---|
| **From:** | D'Angelo, Fara |
| ~~ent:~~ | Tuesday, April 25, 2006 4:38 AM |
| ~~o:~~ | Romer, Alex |
| **Subject:** | FW: Equations |

**From:** Giorno, Joe
**Sent:** Tue 4/18/2006 3:56 PM
**To:** Pelz, Randi; Tarzia, Gale; Kramer, Katherine; D'Angelo, Fara; Swalagin, Shannon
**Subject:** FW: Equations

### ROMANCE MATHEMATICS

Smart man + smart woman = romance
Smart man + dumb woman = affair
Dumb man + smart woman = marriage
Dumb man + dumb woman = pregnancy

---

# OFFICE ARITHMETIC

Smart boss + smart employee = profit
Smart boss + dumb employee = production
Dumb boss + smart employee = promotion
Dumb boss + dumb employee = overtime

---

# SHOPPING MATH

A man will pay $20 for a $10 item he needs.
A woman will pay $10 for a $20 item that she doesn't need.

---

CONFIDENTIAL

## GENERAL EQUATIONS & STATISTICS

A woman worries about the future until she gets a husband.
A man never worries about the future until he gets a wife.
A successful man is one who makes more money than his wife can spend.
A successful woman is one who can find such a man.

―――――――――――――――――――――

## HAPPINESS

To be happy with a man, you must understand him a lot and love him a little.
To be happy with a woman, you must love her a lot and not try to understand her at all.

―――――――――――――――――

## LONGEVITY

Married men live longer than single men do, but married men are a lot more willing to die.

―――――――――――――――――――――

## PROPENSITY TO CHANGE

A woman marries a man expecting he will change, but he doesn't.
A man marries a woman expecting that she won't change, and she does.

―――――――――――――――――――――

## DISCUSSION TECHNIQUE

D 00000424

A woman has the last word in any argument.
\nything a man says after that is the beginning of a new
argument.

---

## HOW TO STOP PEOPLE FROM BUGGING YOU ABOUT GETTING MARRIED

Old aunts used to come up to me at weddings, poking me in the ribs and cackling, telling me, "You're next." They stopped after I started doing the same thing to them at funerals.

**SEND THIS TO A SMART WOMAN WHO NEEDS A LAUGH AND TO THE SMART GUYS YOU KNOW CAN HANDLE IT**

CONFIDENTIAL

D 00000425

# TAB I

| | |
|---|---|
| **From:** | Romer, Alex |
| **ent:** | Monday, January 30, 2006 10:17 AM |
| **,o:** | Fisher, Danielle |
| **Subject:** | John Laurinaitis |
| | |
| **Sensitivity:** | Confidential |

Hi Danielle

Further to our meeting I had a phone conversation with John Laurinaitis Friday

First off he had no concerns that anything untoward happened on the tour. If it had he would have known about it in an instant (talent can't help bragging).

Whilst admitting he doesn't know her very well he was very complementary about Fara, that she was obviously very bright and that he could see that the talent were comfortable speaking to her in a work capacity which he saw as very important and a big positive.

Acknowledging that she is an attractive young woman who may attract the unwanted attention of one or two of the male talent, the email to Donna was simply a reminder that we should ensure to emphasize to our staff that professional boundaries should not be crossed as it is the executive that gets hurt, not the talent.

His main concern was that the perceptions of others about Fara's professional ability as a manager should not be tainted by rumors regarding out of work socializing either whilst on tour or working with talent elsewhere. "Chinese whispers" happen too often in this business.

˜ opened the conversation by explaining I was looking to promote Fara this year – which he thought was a great idea. I think that ays it all.

If you wish, please give me a call.

It looks like I am in Stamford again w/c 13ᵗʰ February and I will drop by to discuss how we can progress this project further.

Many thanks

Alex

*Alex Romer*
*Senior Director, International Consumer Products*
*World Wrestling Entertainment*
*26-28 Hammersmith Grove*
*London W6 7BA*
*+44 (0)20 8834 1424 (direct line)*
*+44 (0)7789 433 094 (cell phone)*

CONFIDENTIAL Produced Pursuant to Protective Order

# TAB J

April 20, 2006

Fara D'Angelo
99 North Street
Elmwood Park, NJ 07407

Dear Fara:

I am pleased to confirm the verbal offer of employment that was given to you by Beverly Welch, Senior Product Manager of Marketing, Thompson's Water Seal. Our offer is as follows:

|   |   |
|---|---|
| Title: | Assistant Product Manager |
| Grade: | 24.c |
| Bi-Weekly Salary: | $2692.31 |
| Proposed Start Date: | May 25, 2006 |

In addition, you will be eligible for three (3) personal holidays and seven (7) vacation days for the remainder of 2006 (10 days annually prorated for your start date). Subsequent to 2006, your vacation entitlement will be according to Sherwin-Williams' vacation policy. Per policy, vacation days cannot be carried over into the next year.

Our offer, as well as your acceptance, is contingent upon your passing a drug screen, completion of a physical capabilities sheet and satisfactory completion of a security investigation.

This offer of employment is also contingent upon you accepting the terms and conditions of the Group/Division Problem Resolution Procedures and the Corporate Employment Dispute Mediation and Arbitration Policy, policy summary attached. For a complete copy of the Group/Division Problem Resolution Procedures and the Corporate Employment Dispute Mediation and Arbitration Policy, including the "Appeal to Mediation" form, the Mediation Rules, the "Appeal to Arbitration" form, and the Rules for Arbitration, you may request copies from Human Resources.

In addition, the new federal immigration law requires us to confirm the identity and authorization to work in the United States of all employees. Accordingly, we ask that prior to reporting to work, or on the first day that you report to work, you bring with you two original documents, one containing a photograph and confirming your authorization to work in the United States. Examples of such documents include a United States passport, an alien registration card, if it includes a photograph; or a combination of documents such as a United States birth certificate or social security card, together with a driver's license.

We are extremely pleased to extend this offer of employment and are confident that you will make a fine addition to Sherwin-Williams.

Sincerely,

Michael Kozlowski
Director of Marketing

I accept the terms and conditions of the Group/Division Problem Resolution Procedures and the Corporate Employment Dispute Mediation and Arbitration Policy (email attachment)

_Fara D'Angelo_                          _4/21/06_
Employee Signature                       Date Accepted

Attachment

P 0663

# TAB K

CHRO Charge Number:  0720125
Fara D'Angelo v. World Wrestling Entertainment, Inc.

### AFFIDAVIT OF MICHAEL ARCHER

| | |
|---|---|
| STATE OF CONNECTICUT | ) |
| | ) ss:  Stamford, CT |
| COUNTY OF FAIRFIELD | ) |

The undersigned, having been duly sworn, hereby deposes and says:

1.  I am Senior Director of Quality Assurance of the Respondent, WWE.  I make this statement based on my personal knowledge of the facts hereinafter set forth, and in support of the Respondent's Statement of Position and Admit/Deny Statement.

2.  I understand that in her CHRO Complaint Ms. D'Angelo alleges that in 2005, during a work-related discussion with me, she had cried and told me of Romer's sexual harassment.  She claims that I expressed concern and compassion for her situation, but did not offer to report Romer's conduct nor encourage her to do so.  She further alleges that instead, I asked her what she was doing about it, and encouraged her to find a new job.

3.  Ms. D'Angelo's characterization of this conversation is completely inaccurate.  The conversation Ms. D'Angelo references was a tense, work-related conversation I had with her about her job performance.  During this discussion, Ms. D'Angelo did start crying and complained about Romer's poor managerial skills, specifically stating that Romer was frustrating, disorganized, and could often not be tracked down.  Ms. D'Angelo never made any statement, suggestion or implication that Romer was sexually harassing her.  In fact, I believed Romer displayed a poor management style, so I naturally thought Ms.

D'Angelo's reaction in our conversation was related to this perception. I did not state to Ms. D'Angelo that she should find another job.

4.  I understand that Ms. D'Angelo's CHRO Complaint allegations also reference Bernadette Hawks, Senior Coordinator, specifically, that Ms. Hawks witnessed Romer touch her waist during a WWE business function. Ms. Hawks did disclose to me that she had witnessed Romer putting his hands on Ms. D'Angelo's hips to get around her at a bar during a licensing show. Ms. Hawks raised the issue with me because she deemed the touching troublesome.

5.  I followed up directly with Ms. D'Angelo as to Ms. Hawks' observations and concerns. I initiated the conversation because I wanted to help. Ms. D'Angelo assured me that there was no problem to report. I emphasized to Ms. D'Angelo that the matter would be reported to Human Resources, or to Romer's supervisor, Donna Goldsmith, if she had any concern whatsoever. Ms. D'Angelo unequivocally assured me everything was fine, and there was no situation to report.

_____
MICHAEL ARCHER

On this 21st day of December, 2006, before me, personally appeared MICHAEL ARCHER, who affirmed under oath the truth of the foregoing Affidavit to the best of his knowledge, information, and/or belief.

Subscribed and Sworn to
before me this 21st day of
December, 2006.

_____
Notary Public

MARGARET M. YTUARTE
NOTARY PUBLIC
MY COMMISSION EXPIRES JULY 31, 2007

- 2 -

# TAB L

**CHRO Charge Number:  0720125**
**Fara D'Angelo v. World Wrestling Entertainment, Inc.**

<u>**AFFIDAVIT OF LISA RICHARDS**</u>

STATE OF CONNECTICUT     )
                                ) ss:  Stamford, CT
COUNTY OF FAIRFIELD        )

       **The undersigned, having been duly sworn, hereby deposes and says:**

1. I am Director of Marketing of the Respondent, WWE.   I make this statement based on my personal knowledge of the facts hereinafter set forth and in support of the Respondent's Statement of Position and Admit/Deny Statement.

2. I am not, and never have been, Fara D'Angelo's supervisor.  Additionally, I have never worked in Ms. D'Angelo's department.

3. I understand that in Ms. D'Angelo's CHRO Complaint, she claims she had an ongoing dialogue with me about Alex Romer's harassment, starting in late 2005.  She further alleges that I talked with her about how "horrible" Human Resources was, and I told  Ms. D'Angelo she should not go to Human Resources to complain, but rather, to simply find a new job. These allegations are completely inaccurate.

4. Ms. D'Angelo never mentioned any conduct by Romer to me that resembled sexual harassment during any discussion I had with her.  Rather, the only statements made to me by Ms. D'Angelo about Romer were that she did not like working for him.

5. Ms. D'Angelo also expressed to me that she was interested in any openings in the Affiliate sales and marketing department, because she was looking for a better opportunity.  She was also looking in the NY metro area to both shorten her commute, and for a better work opportunity.

6. I recall that on the day Ms. D'Angelo resigned, she told me she was resigning because she had a new job with a better opportunity and shorter commute. At that time, Ms. D'Angelo told me for the first time that she considered Alex Romer to have behaved inappropriately, and asked me if she should tell Human Resources. I advised Ms. D'Angelo to indeed notify Human Resources, and that if Ms. D'Angelo was leaving solely because of Romer, that Human Resources might help her stay. At no time, even during my communication with Ms. D'Angelo on the day she resigned, did I know the specifics of the behavior Ms. D'Angelo was claiming to have been "inappropriate.

**LISA RICHARDS**

On this 20th day of December, 2006, before me, personally appeared **LISA RICHARDS**, who affirmed under oath the truth of the foregoing Affidavit to the best of her knowledge, information, and/or belief.

Subscribed and Sworn to
before me this 20th day of
December, 2006.

Margaret M. Ytuarte
Notary Public

MARGARET M. YTUARTE
*NOTARY PUBLIC*
MY COMMISSION EXPIRES JULY 31, 2007

# TAB M

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

```
-------------------------------------------------------- X
FARA D'ANGELO,                               :
                                             :       Case No. 3:08-CV-1548(JCH)
              Plaintiff,                     :
                                             :
       v.                                    :
                                             :
                                             :
WORLD  WRESTLING  ENTERTAINMENT,             :
INC.,                                        :
                     Defendant.              :
                                             :
-------------------------------------------------------- X
```

## AFFIDAVIT OF DANIELLE FISHER IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

```
STATE OF CONNECTICUT        )
                            ) ss: Stamford, CT
COUNTY OF FAIRFIELD         )
```

The undersigned, having been duly sworn, hereby deposes and says:

1.      I am Senior Vice President, Human Resources of the Defendant, World Wrestling Entertainment, Inc. ("WWE").  I make this statement based upon my personal knowledge of the facts and circumstances hereinafter set forth, and in support of Defendant's Motion for Summary Judgment.

2.      On May 5, 2006, Fara D'Angelo notified WWE by e-mail that she was resigning effective May 16, 2006.  On that same day, Donna Goldsmith, the then Executive Vice President, Consumer Products, and Alex Romer's direct superior, stated to me that she had information suggesting that Ms. D'Angelo's resignation had something to do with Mr. Romer. Based on this information, I asked to meet with Ms. D'Angelo that same day.

3.      During that May 5th meeting, Ms. D'Angelo presented for the first time

some e-mail communications she had exchanged with Mr. Romer which she deemed sexually harassing. She further described some of Mr. Romer's alleged behavior that she characterized as unwelcome.

4.      I then initiated an investigation pursuant to WWE's standard policy. The investigation culminated with the termination of Mr. Romer's employment on May 9, 2006.

5.      I met with Ms. D'Angelo before her last day of employment and advised her of Mr. Romer's termination, and offered her a promotion with a raise in pay. Ms. D'Angelo emphatically stated she was not interested in the WWE promotion or higher pay offer because she had found a better opportunity at Sherwin Williams, making substantially more money. Ms. D'Angelo further stated that her new job was a better career move for her, and was closer to home.

6.      With respect to an allegation by Ms. D'Angelo that she was deterred from complaining to the Human Resources department prior to her resignation, WWE Human Resource department records reveal that Ms. Yamuder never complained to Human Resources about any matter during Ms. D'Angelo's employment. She may have commenced some unofficial conversations in this regard, but no earlier than in mid-September of 2006. On or about November 30, 2006, more than six months after Ms. D'Angelo's last day of employment with WWE, Ms. Yamuder approached me expressing a concern about her personal interactions with her supervisor. Ms. Yamuder's concerns were not in any way connected to allegations of sexual harassment, nor did they involve Mr. Romer.

_Danielle Fisher_
Danielle Fisher

On this 14 day of April, 2010, before me, personally appeared Danielle Fisher, who

2

affirmed under oath the truth of the foregoing to the best of her knowledge, information recollection, and/or belief.

Subscribed and Sworn to me this
14 day of April, 2010

_Donna L. Pietrzak_
Notary Public
My Commission Expires: 3/31/14

20324\4\2359957.1

DONNA L. PIETRZAK
*NOTARY PUBLIC*
My Commission Expires: 3/31/20 14

3

# TAB N



## Exit Interview

Name: _Tara D'Angelo_          Department: _CPG_

Hire Date: _4/1/04_          Termination Date: _5/16/06_

Manager: _Alex Romer_

1) Why did you originally come to work for WWE?

   _I was a fan of WWE and always wanted to work for Vince McMahon_

2) What expectations did you have for the position you were hired for?

   _That I would learn a lot about licensing and the consumer products int'l business_

3) Were you able to achieve these expectations? If no, what were the barriers?

   _yes_

4) Do you think the appropriate opportunities for advancement were available?
   Please explain.

5) Did you receive enough information regarding what was occurring in company
   and in your department specifically?

   _yes_

F:\HR_Share\Forms\Exit Interview (WWE)                    7/25/02

Confidential - Produced Pursuant to Protective Order

D 0001

6)   Do you think you were paid fairly for the work you performed?

_No_

7)   What is your opinion of the supervision you received?

8)   How is the morale in your department?

_Great_

9)   What did you like most about working for WWE?

_Working the events, seeing the fans, feeling the energy, learning about the business from the inside_

10)  What was your least favorite experience working for WWE?

11)  What is your opinion of the working conditions?

12)  What did you think about the company's benefit program?

_Great_

13)  What is your opinion about the training you received?

_Good_

Confidential - Produced Pursuant to Protective Order

14)   Why did you decide to leave the company?

*Better opportunity arose for me to advance in my career*

15)   Do you have any suggestions for improvement?

16)   What attracted you to your new company/position?

*-opportunity, money, location*

*Fara Dingelo*
(Print Name)

*5/16/02*
(Date)

*(signature)*
(Employee Signature)

_____
(HR Representative Signature)

7/25/02

Confidential - Produced Pursuant to Protective Order

D 0003