**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

-------------------------------------------------------- X
FARA D'ANGELO,                                          :
                                                        :     Case No. 3:08-CV-1548(JCH)
                        Plaintiff,                       :
                                                        :
            v.                                          :
                                                        :
                                                        :
WORLD  WRESTLING  ENTERTAINMENT,                         :
INC.,                                                   :     APRIL 19, 2010
                        Defendant.                       :
                                                        :
-------------------------------------------------------- X

**DEFENDANT'S STATEMENT OF UNDISPUTED FACTS**
**PURSUANT TO LOCAL RULE 56(A)(1)**

Pursuant to Local Rule 56 (A)(1), Defendant, World Wrestling Entertainment, Inc. ("WWE"), hereby respectfully submits its Statement of Undisputed Facts.

### A. Background

1.      Plaintiff was employed by the WWE as a Global Licensing Coordinator in its Stamford, Connecticut headquarters from April 1, 2004 until May 15, 2006 when her resignation was effective.  (Exhibit A to the Memorandum of Law; D'Angelo Dep. p. 23 (Plaintiff's deposition transcript excerpts referred to herein are annexed to the Memorandum of Law as Exhibit B)).

2.      On the first day of her employment, D'Angelo was provided a copy of the WWE Equal Employment Opportunity/Sexual Harassment Policy (Exhibit C to the Memorandum of Law) which set forth in detail the WWE's anti-discrimination and harassment policy, and outlined the procedures to lodge a complaint.  (Id.; Exhibit D to the Memorandum of Law; D'Angelo Dep. pp. 70-71, 73-74)

3.      D'Angelo was initially supervised by Alex Romer, Director, International

Licensing and Joel Satin, Director of Home Video until supervision was assigned solely to Romer.  (D'Angelo Dep. pp. 92-93)

4.      At all times relevant to this action, Romer was physically located in and conducted the majority of his work for WWE out of London, England, and D'Angelo was located in and conducted the majority of her work for WWE in Stamford, Connecticut.  (Exhibit A; D'Angelo Dep. at p. 65)

### B.  D'Angelo's Allegations of Sexual Harassment

5.      Plaintiff claims that towards the end of 2004, she began being sexually harassed by Romer.  (D'Angelo Dep. p. 41)

6.      As Romer was located in England, the majority of the purported harassment took the form of e-mails, instant messages ("IMs"), and phone calls.  (Id. at pp. 65-66)

7.      D'Angelo claims that Romer would talk to her about personal matters, including asking her about her sex life.  Furthermore, she claims that frequent e-mail and instant message exchanges were improper.  Specifically, D'Angelo claims that: in an e-mail Romer told her she had a nice "tail"; Romer would refer to her as "darling", "precious", "special" and "Tinker Bell"; in an instant message Romer told Plaintiff that he was naked; on one occasion Romer told Plaintiff that he wanted to have sex with her and all she had to do was ask; Romer invited Plaintiff to dinner on Valentine's Day 2006; Romer gave her an Ipod; Romer gave Plaintiff $150 and a note saying that he could not stand the thought of her running out of gas somewhere; Romer told Plaintiff that the idea of her doing karate was "fun and sexy"; Romer invited her on a vacation; and that Romer said he was helping her at work by "putting his dick on the line for her".  (D'Angelo Dep. pp. 94-95, 99-101, 147-50; Amended Complaint at ¶¶27-32, 36-42, 58, 60, 61)

8.     D'Angelo concedes that the "putting his dick on the line" comment was made by Romer in reference to complaints that Romer received from Donna Goldsmith, his superior, about D'Angelo, and that D'Angelo perceived the comment to be an indication that Romer was supporting D'Angelo, *i.e.* "going to bat for [her]" and attempting to get her promoted.  (Id. at p. 95)

9.     Plaintiff focuses in particular on the alleged frequency of Romer's contact with her, stating it was constant.  Plaintiff further alleged that Romer would contact other WWE employees to locate her when he could not reach her, and that he would call her at all times of day or night, including on several occasions while drunk.  (Id. at p 101).

10.     Romer had a general reputation for being controlling and constantly contacting his subordinates.  (Yamuder Dep. pp. 62-63 (Yamuder deposition transcript excerpts referred to herein are annexed to the Memorandum of Law as Exhibit E); Affidavit of Kurt Schneider, sworn to on December 20, 2006, Exhibit F to the Memorandum of Law at ¶8: "Indeed, Romer was known to think nothing of calling his reports and co-workers at all hours for work related issues"; Affidavit of Joel Satin, sworn to on December 21, 2006, Exhibit G to the Memorandum of Law at ¶6)

11.     The majority of the claimed "harassment" was conducted across the Atlantic Ocean, via electronic and phone communications.

12.     D'Angelo also voluntarily and unsolicited participated in this type of dialogue with Romer.  For example, on April 20, 2005, Romer sent D'Angelo an e-mail indicating that he was watching Batista, a wrestling talent, doing an interview with Sky Italia.  (Id. at p. 151).  In response, D'Angelo wrote "Oh, my goodness.  Does he have his shirt on or off?"  Romer responded by calling her a tart and stated that Batista was wearing "a rather smart suit and shirt

on." D'Angelo then responds "[laugh out loud] was a joke. Good visual." (Id. at p. 152).

13.     On June 2, 2005, D'Angelo sent Romer an e-mail indicating that she needed to find herself a rich husband so she could retire early. (Id. at  p. 143)

14.     Similarly, on July 22, 2005, D'Angelo forwarded Romer an e-mail she received from an outside vendor calling her a star for some work she did in connection with a wrestler's tattoos. During the e-mail exchange, D'Angelo states that "stars like tattoos" and that she "really should get [her] 3rd [tattoo] soon." (Id. at 110-11)  At the end of this e-mail Romer states "thought you were being a naughty girl again" to which D'Angelo responded "never stopped." (D'Angelo Dep. pp. 112-13)

15.     On December 20, 2005, D'Angelo sent Romer an e-mail indicating that she only had $36 in her checking account, and in response to Romer's follow up question as to how she would be able to pay for her upcoming personal trip to California responded "[w]ith my good looks" and ended the e-mail with a smiley face. (Id. at p. 120)

16.     Similarly, on December 21, 2005, in response to an e-mail from Romer about this same trip and referring to her lack of funds, "I take it it's not exactly a girly trip", D'Angelo responded "[n]ever is", suggesting she would pick up men on the trip to pay her way. (Exhibit H to the Memorandum of Law)

17.     Again, on February 16, 2006, Romer sent D'Angelo an e-mail complaining about a meeting he was in and requesting that D'Angelo send him "gossip". After some e-mails back and forth Romer writes "Need lots of laughs to keep me going. It will be a long day", to which D'Angelo responds "[h]ow are those cookies? Care to make a special delivery to my office with some treats?" (Id. at p. 134).

18.     D'Angelo also forwarded, unprompted, jokes containing sexual images to Romer,

including one joke which included an image of a man placing his penis into a mammogram machine.  (Exhibit H to the Memorandum of Law)

19.     D'Angelo also exchanged e-mails with a fellow co-worker and attempted to set him up with one of her friends.  In connection with this e-mail conversation D'Angelo noted that her friend "doesn't put out  ... she's a prude… I don't think u will be pleased."  (Exhibit H to the Memorandum of Law)

20.     When asked to explain her participatory conduct, D'Angelo agreed that some of the comments she made in e-mails, including a reference that she never stopped being "naughty," could be perceived as flirtatious, and that she regretted her own complicity.  (D'Angelo Dep. pp. 112-13, 128)

21.     D'Angelo testified "[t]here is some things [sic] I wish I, looking back, didn't say … Because I probably shouldn't have sent him a picture of me, knowing the fact that he – how he felt towards me and how he often made comments about my appearance and the things like that …."  (D'Angelo Dep. p. 128)

22.     D'Angelo further testified "do I wish I didn't do or say half the things you are showing me?  Of course, but I was, you know just trying to keep things calm and not stir trouble between him and I so that I can continue working for WWE and not have him kind of make this situation worse by questioning me, what's wrong."  (D'Angelo Dep at pp. 135-36).

23.     D'Angelo consistently testified as well that she sent these types of e-mails so that she would be viewed as a "team player" and not "stiff", so that she could fit in with her boss and have a "fun witty relationship".  (D'Angelo Dep. pp. 130, 133, 153)

24.     Romer never suggested he would fire D'Angelo if she did not engage in these

types of conversations.  (D'Angelo Dep. p. 149-50)

25.    Aside from the electronic communications, D'Angelo claims that during certain business trips, Romer inappropriately "touched" her.  (D'Angelo Dep. pp. 101-04)

26.    With respect to this form of "harassment", D'Angelo concedes that Romer and she were together during three or four business trips, and a few times when Romer was in Stamford, Connecticut for WWE business.  (D'Angelo Dep. pp. 65-66, 98-99)

27.    Specifically, with respect to the allegations of "touchings", D'Angelo claims that Romer once caressed her face, twice pet her hair, two or three times touched her waist, and put his arm around her multiple times.  (Id. at pp. 101-04)

28.    Plaintiff also claims that during business dinners Romer would sit close to her, put his hand on her hand and that the dinner "felt" more like a date than a business dinner.  (Id. p. at 104)

29.    D'Angelo further claims that Romer always wanted to spend time with her, and often pressured her to have drinks with him, so that they "could get to know each other and that kind of thing."  (Id. at p. 106)

30.    On one occasion, during a business trip, D'Angelo was in a hotel lounge with WWE talent (wrestlers and other actors).  Plaintiff claims that Romer put his arm around her shoulders, pulled her out of the bar and told her she should not be there, at that hour, with the talent. (D'Angelo Dep. pp. 97, 203-04)  D'Angelo asserts she was offended by this conduct and told Romer not to touch her.   (Id. at 203-04)  D'Angelo further claims this incident was witnessed by Satin. (Id. at pp. 203-04)

31.    D'Angelo admits she had previously been informed that other WWE employees, including Donna Goldsmith, Romer's direct supervisor, expressed concern that D'Angelo was

getting physically "too close" with the talent, giving the impression she was being flirtatious. (Id. at pp. 96-97, 137-41)

32.     Romer admittedly expressed his own concern to D'Angelo that others would not take her seriously if they perceived her in that light.   (Id. at pp. 139-41; Exhibit I to the Memorandum of Law)

33.     D'Angelo claims that after this incident, she went out to dinner with Satin and Romer, and she did not say a word during the dinner.  She claims that she went to the bathroom and started crying, and when she returned to the table Satin asked her if she was okay because he allegedly "saw her expression" and "could tell that she had been crying" or was upset.  D'Angelo did not respond to Satin.  (Id. at pp. 203-04)

34.     In April 2006, D'Angelo claims that she was again at a bar with Romer, Satin, and Kurt Schneider, Executive Vice President of Marketing.  (D'Angelo Dep. pp. 104-05, 184-85)  D'Angelo claims that Romer was attempting "to make sure that [she] had enough drinks, so you know, – wanting to make sure that [she] was drinking and being part of the team."  (Id. at p. 187)  D'Angelo concedes that Schneider and Satin were also drinking.  (Id.)

35.     Towards the end of the evening, Satin and Schneider proceeded to get up to leave, and she attempted to follow them.  (D'Angelo Dep. pp. 186-87, 189)  D'Angelo claims that Romer "grabbed" her arm and attempted to pull her back in order to prevent her from leaving the table, as he did not want her to leave yet.  (Id.)

36.     D'Angelo allegedly resisted Romer's efforts and proceeded to follow Satin and Schneider into the hotel elevator.  (Id. at pp. 189-90)  D'Angelo claims that Romer started to follow them, but then did not.  (Id. at 189-90)  Thereafter, D'Angelo, Satin and Schneider rode together in the elevator.  (Id. at 190).

37.     Satin and Schneider asked D'Angelo "what was that about?" to which she replied "[t]hat's Alex.  This is how he acts."  (<u>Id</u>. at p. 191)  The elevator then arrived at Satin's floor and he exited the elevator.  (<u>Id</u>. at p. 192)  D'Angelo and Schneider then took the elevator to Schneider's floor where they continued the conversation.  (<u>Id</u>.)

38.     Schneider asked her why Romer was "touching her like that", and she responded to the effect that this " is what [she has] been going through".  (<u>Id</u>. at p. 192)  Schneider allegedly thereafter inquired as to what D'Angelo "was doing about that", to which D'Angelo replied that she had a new job offer at a paint company. (<u>Id</u>. at pp. 192-93, 200-01)

39.     Schneider inquired as to whether this was the best career move for her and informed her that he thought she had a better career path at the WWE.  D'Angelo informed Schneider that this "is what I have to do in order to get ahead in my career and succeed because working for [Romer] is not getting better and I am not going anywhere", thus leaving was the best choice for her. Nothing more was said, nor did D'Angelo specify the factual bases for why "working for [Romer was] not getting any better"  (<u>Id</u>. at. pp. 192-93, 199-201)

40.     In his affidavit submitted to the Connecticut Commission on Human Rights and Opportunities Schneider averred "[a]fter Mr. Satin got out of the elevator, Ms. D'Angelo informed me that she had a new job offer at a paint company.  She said it was a better opportunity and was closer to home.  I believed that her mind was made up to leave and only cautioned her that taking a job with a paint company may preclude her from finding work in the entertainment field in the future." (Exhibit F to the Memorandum of Law at ¶5)

41.     Upon the conclusion of her conversation with Schneider, D'Angelo got back in the elevator and went to her floor to retire for the evening. (D'Angelo Dep. pp. 105-06)

42.     According to D'Angelo, when she got off the elevator, Romer was waiting for her

on her floor, and inquired why it had taken so long to get to her floor and what she had discussed with Schneider.  (Id.)  D'Angelo claims that Romer asked to come to her room to discuss this further.  (Id.)  D'Angelo refused and went back to her room alone.  (Id. at p. 106)

43.     D'Angelo claims that at the conclusion of this same trip, Romer hugged her closely and attempted to kiss her.  She claimed she resisted these efforts and went back to her room for the evening.  D'Angelo insists that that she feared Romer would attempt to enter her room, and thus went to the airport in the middle of the night to await her return flight home.  (D'Angelo Dep. p. 103)

44.     D'Angelo had already obtained an alternative job offer outside of WWE by the time this alleged series of incidents had occurred during the April 2006 tour.  (Job Offer from Sherwin Williams, Exhibit I to the Memorandum of Law; D'Angelo Dep. pp. 24, 193, 199)

45.     Electronic and verbal communications, in addition to the above described incidents of "touchings", comprise the sum total of what D'Angelo claims created the actionable, sexually hostile working environment.  (D'Angelo Dep. pp. 94-95, 99-105, 184-201, 210-14; Amended Complaint ¶¶27-32, 36-42, 58, 60, 61)

## C.  Plaintiff Concedes That She Did Not Complain about Alleged Harassment

46.     Plaintiff concedes that she was provided with a copy of WWE's sexual harassment policy, which included a complaint procedure.  She did not file a complaint of sexual harassment against Romer during her employment, nor did she ask anyone at WWE to file a complaint on her behalf.  (D'Angelo Dep. pp. 70-71, 78-79, 106-07; Exhibit D to the Memorandum of Law)

47.     Plaintiff asserts that that other employees of WWE were aware of the harassment;  specifically Bernadette Hawks, Satin, Schneider, Michael Archer, Lisa

Richards, and Peter Clifford. (Id. at pp. 159-61)

48.     More specifically, Plaintiff claims the following incidents should have placed WWE on notice she was being sexually harassed by Romer:

49.     In June of 2005, Bernadette Hawks, a non-managerial employee, saw Romer touch D'Angelo on her lower waist.  (D'Angelo Dep. pp. 210-11)  According to D'Angelo, Hawks told Archer, Senior Director of Quality Assurance and Hawks' then supervisor, that she had seen Romer touch D'Angelo's lower waist, which, according to Archer, Hawks deemed "troublesome".  (Id.; see also Affidavit of Michael Archer, sworn to on December 21, 2006, Exhibit K to the Memorandum of Law at ¶4)

50.     Thereafter, Archer approached D'Angelo to follow up regarding Hawks' observations, a conversation Archer initiated.  (Id. at p. 211; Exhibit K to the Memorandum of Law at ¶4)  D'Angelo testified that she confirmed to Archer and Archer "offered to punch [Romer's] lights out . . . He was kind of joking acting like a tough guy, like, you know, do you want me to punch his lights out for you kind of thing."  (D'Angelo Dep. at p. 211)

51.     Archer also asked D'Angelo if she wanted him to talk to Romer for her, to which she replied "that [she] did not want him to talk to Alex about what happened." (D'Angelo Dep. pp. 212-13; see also Exhibit K to the Memorandum of Law at ¶5: "I followed up directly with Ms. D'Angelo as to Ms. Hawks' observations and concerns.  I initiated the conversation because I wanted to help.  Ms. D'Angelo assured me that there was no problem to report.  I emphasized to Ms. D'Angelo that the matter would be reported to Human Resources, or to Romer's supervisor Donna Goldsmith, if she had any concern whatsoever.  Ms. D'Angelo unequivocally assured me everything was fine, and there was no situation to report."

52.     Even complaints regarding troublesome managerial styles, wholly unrelated to sexual harassment, could be reported to and addressed by the Human Resources department at WWE (Exhibit C to the Memorandum of Law)

53.     D'Angelo claims that, during this same conversation, she informed Archer that Romer was "constantly calling [her], harassing [her], stalking [her]", and was controlling, obsessive and a "stalker."  (D'Angelo Dep. pp. 213-14.)

54.     D'Angelo never told Archer that Romer was pressuring her sexually, or otherwise that the meaning of "harassing" or "stalking" had any meaning other than the one consistent with Romer's general reputation as controlling and "stalking" with subordinates. Nor did D'Angelo relay any other incidents of touching.  (Id.)  D'Angelo never approached Archer again about Romer.  (Id. at pp. 215-16)

55.     D'Angelo claims she told Schneider on a few occasions that Romer was "controlling" and that she was "unhappy" working with Romer.  (D'Angelo Dep. pp. 181-82)  D'Angelo did not tell Schneider that Romer was sexually harassing her, that Romer was pressuring her sexually,  that Romer was calling her "sexy" or "precious", or commenting about her body.  (D'Angelo Dep. pp. 183-85.)

56.     D'Angelo claims that Schneider "would often make comments to [her], why or how can you work for [Romer]? And you know trying to get [her] to talk more about it", and that she would not talk more because "[she] didn't really want everybody to know."  (Id. at p. 188)

57.     Finally, D'Angelo claims that in November 2005, Schneider saw on one occasion that Romer was "always so close to [her] and [Schneider] probably thought that was kind of weird.  So that's why he is saying, your boss, you know is crazy, he is out of his

mind" (Id. at p. 196)

58.    When asked to explain how the incident in the bar in April 2006 provided Schneider with this knowledge of sexual harassment, as opposed to Romer generally acting with a controlling management style, D'Angelo simply stated "[i]t's common knowledge that a boss should not be touching a female employee." (Id. at p. 193)

59.    D'Angelo claims that one evening she approached Satin and informed him that she was "frustrated" with Romer as Romer was constantly asking her personal questions while she was trying to get work done.  (D'Angelo Dep. at pp. 206, 228)

60.    Satin suggested she threaten Romer that she would report this matter to Human Resources.  (Id. at pp. 206-07, 228-29).

61.    D'Angelo concedes that Satin also offered to speak to Romer directly, but she declined this offer, indicating instead that she would speak with Romer herself.  (Id. at p. 228)

62.    D'Angelo could not recall that she ever told Satin the "personal" questions meant questions about her sex life or any other matter of a sexual nature.  She further could not recall ever telling Satin that Romer was complimenting her body, or about any other potentially sexually harassing remarks.  (Id. at pp. 207-09; Exhibit G to the Memorandum of Law at ¶¶ 6,8)

63.    D'Angelo next alleges that she approached another WWE employee, Lisa Richards, Director of Marketing, "as a friend" for career advice.  D'Angelo told Richards she did not like the way Romer talked to her, nor his constant calls.  (D'Angelo Dep. pp. 164-65)

64.    D'Angelo also claims to have mentioned that Romer had called her when he

was drunk.  (D'Angelo Dep. pp. 163-65:"I told her details of how my boss was talking to me because I was looking for career advice from her on how I could handle the situation.  And I looked to her because she was older than me and she had more work experience.")

65.     When asked at her deposition whether she had raised any claims of sexual harassment to Richards, D'Angelo responded that she might have to told her that Romer said she "looked sexy in a karate suit", and that she had "nice legs", but had no specific recollection she made these statements at all, or any similar ones.  (D'Angelo Dep. pp. 165-66).

66.     D'Angelo claims that Richards "understood the situation to be not healthy so that's when she started saying, well, maybe you should talk to [Clifford] about a possible position in my department."  (Id. at p. 165)

67.     The details of the conversation that D'Angelo could remember are consistent with the affidavit submitted by Richards to the Connecticut Commission on Human Rights and Opportunities wherein Richards averred: "D'Angelo never mentioned any conduct by Romer to me that resembled sexual harassment during any discussion I had with her. Rather, the only statements made to me by Ms. D'Angelo about Romer were that she did not like working for him.  Ms. D'Angelo also expressed to me that she was interested in any opening in the Affiliate Sales and Marketing Department, because she was looking for a better opportunity"  (Affidavit of Lisa Richards, sworn to on December 20, 2006, Exhibit L, at ¶4.)

68.     D'Angelo thereafter interviewed with Peter Clifford for a position in his department.  During this interview, D'Angelo expressed to Clifford that she was unhappy working with Romer; that Romer would be unhappy if he learned that she was interviewing

for a different position; that Romer was possessive and controlling; and that it was stressful working for him.  (D'Angelo Dep. pp. 162-63)

69.     Plaintiff did not tell Clifford that Romer was sexually harassing her, nor any facts on which such a perception could be based.  (Id. at p. 164).  In short, the sum and substance of what D'Angelo claims she conveyed to Clifford in no way suggested sexually harassing behavior.

70.     D'Angelo asserts she did not pursue a position further in Clifford's department because Human Resources suggested Romer had plans for her advancement in the WWE, and thus, the better career move would be to stay in her position. (D'Angelo Dep. p. 65).

71.     D'Angelo had actively sought at least one other promotion directly from Romer, which would compel her to continue reporting to him.  (D'Angelo Dep. at pp. 39-41, 62-63)

72.     Finally, Plaintiff claims that she was friendly with Sheryl Ann Yamuder, an attorney who worked in WWE's legal department.  (D'Angelo Dep. at pp. 37, 217, 219)

73.     D'Angelo claims that she told Yamuder Romer was "obsessed" with her, was constantly calling and sending her e-mails and IMs.

74.     According to D'Angelo, in 2005, Yamuder remarked to her that she thought Romer was "in love" with D'Angelo.  (Id. at pp. 172, 217)

75.     D'Angelo further claims that Yamuder was with her on one occasion when she received a call from Romer when he was drunk, and she told Yamuder this was not the first time Romer had called her drunk.  (Id. at p. 219)

76.     D'Angelo also claims that on one occasion when she was arriving late to

work, Romer contacted Yamuder, who allegedly told D'Angelo that Romer was "going nuts." (Id. at p. 219-20).

77.     The sum and substance of what Yamuder knew in terms of affirmative conduct by Romer was "[Romer's] IMs, constant calling and e-mailing [and that] he would call [Yamuder] looking to have [her] paged." (Id. at p. 220).

78.     Yamuder, when deposed, testified as to her perception, consistent with that of others at WWE, that Romer had a reputation for constantly contacting his subordinates, was a micromanager, and vehemently denied ever being provided with any information by D'Angelo that suggested she was being sexually harassed.  (Yamuder Dep. pp. 61-62: stating that D'Angelo's concerns about Romer were that "[h]e overcomunicated, micromanaged.  He put a lot of responsibility on her.  He expected her to be responsive to him more than she felt necessary"; see also Yamuder Dep at pp. 58-64, 105.)

79.     Yamuder presumed the conduct described by D'Angelo was consistent with that reputation, and nothing more.  (Id. at pp. 58-64, 105)

80.     Yamuder denied being informed by D'Angelo, or otherwise witnessing or hearing that Romer was interested in D'Angelo "sexually speaking".   Yamuder further denied any knowledge of any accusation that Romer touched D'Angelo in any improper way, or that Romer called D'Angelo names such as "precious" or "Tinker bell."  (Id. at pp. 62-64).

81.     D'Angelo concedes she never asked Yamuder to file a complaint with Human Resources on her behalf.  (Id. at pp. 79, 220)

82.     Yamuder, despite being an in-house attorney, did not have the power to fire Romer or otherwise make any changes to Romer's employment (nor did she have any

supervisory authority over D'Angelo).  Nor was Yamuder employed or expected by WWE to be a designated recipient for complaints of sexual harassment.  (Yamuder Dep. p. 103)

83.   When pressed for the reason she never followed the complaint procedure at WWE, D'Angelo testified that she was afraid of retaliation.  (D'Angelo Dep. at p. 78)

84.   The factual bases offered for this fear were as follows: (1) an unnamed WWE employee was allegedly sexually harassed and thereafter terminated.  (Id. at pp. 79-81); (2) the claim of "common knowledge" that the CEO had sexually harassed a female wrestler, gleaned from gossip on the Internet; (Id. at p. 81-83); and (3) an allegation that Yamuder "went to human resources with something that was going on with her [and that Yamuder] confided in Human Resources and … they ended up using that against her with her boss" and that Yamuder somehow discouraged her based upon this experience from complaining to Human Resources.(D'Angelo Dep. p. 80).

85.   With regard to the unnamed WWE employee, D'Angelo testified that "it was just chatter that was going around the office.  It was more than one.  I have heard…." (Id. at p. 80)

86.   With respect to the allegation regarding Yamuder's experience, likewise, D'Angelo did not know the exact nature of Yamuder's complaint.  (Id.)

87.   Yamuder complained to Human Resources (and not regarding a sexual harassment allegation, nor about Romer) months after D'Angelo resigned.  (Exhibit M at ¶6)

**D.  D'Angelo's Resignation and Romer's Termination**

88.   On May 5, 2006, D'Angelo gave ten days notice to the WWE that she would be resigning from her employment.  (D'Angelo Dep. p. 224)

89.   Shortly after giving notice, D'Angelo was approached by Goldsmith, then

Executive Vice President, Consumer Products, who D'Angelo believes was informed by Yamuder "about the sexual harassment that I was telling her about."  (D'Angelo Dep. pp. 221-23).

90.     Yamuder, a person with direct, first-hand knowledge of the conversation between Goldsmith and, Yamuder herself, testified as follows:  Approximately one week before D'Angelo's notice of resignation, D'Angelo told Yamuder about what was described by D'Angelo as two "negative interactions" between D'Angelo and Romer during the April 2006 tour.  (Yamuder Dep. pp. 69-80)

91.     Yamuder could not remember the details of these "negative interactions" except to state that she "remembered that it made [D'Angelo] uncomfortable.  I remember she was annoyed."  (Yamuder Dep. pp. 70-72, 75, 79)  Yamuder encouraged D'Angelo to report the incident to Goldsmith or Human Resources.  (Id. at pp. 67-68)

92.     Yamuder herself relayed this conversation with D'Angelo to Goldsmith, who contacted Danielle Fisher, Senior Vice President for Human Resources.  Fisher then reached out to D'Angelo, who still had not contacted Human Resources or Goldsmith.  (D'Angelo Dep pp. 221-23)

93.     D'Angelo indirectly reported to Goldsmith and interacted with her approximately twice a month—yet never reported Romer's troublesome behavior to her. (D'Angelo Dep. pp. 93, 221-23).

94.     Plaintiff further concedes that during this discussion with Human Resources, she provided Ms. Fisher with copies of Romer's allegedly problematic e-mails to her, but did not provide the WWE with e-mails from her to Romer, thinking they were "irrelevant". (Exhibit H to the Memorandum of Law; D'Angelo Dep. pp. 109-36, 141-46, 150-55)

95.     WWE conducted a complete and thorough investigation of D'Angelo's allegations, including interviewing D'Angelo, Romer, Yamuder, Satin and Schneider. (D'Angelo Dep. pp. 222-24; Exhibit G to the Memorandum of Law at ¶7; Exhibit F to the Memorandum of Law at ¶9)

96.     At the conclusion of the investigation, and before D'Angelo's last day of employment, WWE terminated Romer's employment.  D'Angelo was informed of Romer's termination by WWE, before her last planned day of employment, and agreed at deposition that WWE asked her to rescind her resignation.  D'Angelo further admitted that WWE offered her a promotion and a commensurate raise.  (D'Angelo Dep. pp. 83-84).

97.     D'Angelo declined the offer, and began employment with Sherwin Williams with an annual salary of $70,000, which was approximately $20,000 more than she had been earning with WWE.  (D'Angelo Dep. pp. 25, 84, 87).

98.     D'Angelo told Fisher that she would never accept the promotion or raise offered by the WWE as the position with Sherwin Williams had an even higher salary. (Exhibit M to the Memorandum of Law at ¶5).

99.     On May 16, 2006, D'Angelo's last day of employment (and after she had already conveyed her allegations about Romer to Human Resources), D'Angelo filled out an exit interview form and indicated that the reason for her leaving the WWE was that a "better opportunity arose for me to advance in my career" and the attraction for the new opportunity was "money, location."  (Exhibit N to the Memorandum of Law)

100.    D'Angelo is currently employed by Sherwin Williams and concedes that she has not suffered any lost wages. (D'Angelo Dep. pp. 25, 32)  She has since received a raise at her current employment, making her current salary $90,000 per year--$45,000 more than

she was earning when she left WWE.  (Id.)

### E.  D'Angelo Cannot Satisfy Her *Prima Facie* Burden

101.    The alleged conduct, even if true, does not constitute actionable hostile work environment sexual harassment within the scope of Title VII.  The majority of the allegedly problematic behavior occurred via electronic communications, with the allegations of "touchings" relating to episodic, infrequent behavior during the isolated business trips where Plaintiff and Romer were in the same room together.

102.    The e-mails and telephone calls, which D'Angelo portrayed as constant, traversed over three thousand miles, and the content, at best was flirtatious, and certainly not even remotely similar to the type of conduct dismissed as insufficient by other courts.  Moreover, D'Angelo cannot sustain her burden of establishing that the frequency of the contact was on account of sex or gender, as opposed to Romer's known managerial style.

103.    Plaintiff actively participated in and initiated numerous communications with Romer of a personal and sexual nature, demonstrating the fact that she was neither offended, nor that the conduct was unwelcome.  As set forth in detail above, D'Angelo's own statements unequivocally reveal that these conversations did not become "unwelcome" until she knew she was not being promoted.  (D'Angelo Dep. pp. 39-40, 63-64, 130, 133)

104.    An employee who sends a joke image of a man putting his penis into a mammogram machine, along with making her own jokes about her picking up men, including paying for her trip to California with her good looks and needing to find a rich husband, can hardly be said to be offended by sexual banter by Romer, even if Romer was clearly smitten with her. (Exhibit H to the Memorandum of Law; D'Angelo Dep. pp. 109-35, 141-46, 150-53).  Given these undisputed facts, such feigned offense to Romer's e-

mails after resigning from the WWE rings hollow.

### F.  Even If Romer's Actions Were Tantamount to Sexual Harassment, Plaintiff's Claims are Barred

105.    Even if this Court deems the conduct of which D'Angelo complains to constitute actionable sexual harassment, this claim must nevertheless be dismissed as no tangible employment action was taken against her and it is undisputed that: (a) the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and (b) Plaintiff was unreasonable in not taking advantage of the corrective opportunities provided by WWE.

106.    It is undisputed that D'Angelo did not suffer any tangible employment action as a constructive discharge solely based upon a hostile work environment does not qualify as a tangible employment action sufficient to negate the result of a Faragher/Ellerth defense. Moreover, it is undisputed that D'Angelo concedes that submission to sexual conduct was not a condition of employment.  In any event, even if a factual allegation of constructive discharge can form the basis of finding a tangible employment action occurred, it clearly cannot do so here for those reasons set forth in Section I, below.

107.    It is undisputed that the WWE promulgated, and D'Angelo received, a sexual harassment policy which provided an avenue for employees to file complaints of harassment.  (Exhibit D to the Memorandum of Law; D'Angelo Dep. p.78)  It is equally undisputed that after hearing D'Angelo's allegations for the first time (a conversation which WWE's Human Resources department initiated, not D'Angelo-D'Angelo Dep. pp. 221-23), WWE immediately investigated, and took prompt corrective action, which included the expedited termination of Romer's employment before D'Angelo left.  (D'Angelo Dep. pp. 221-24; 83-84)

108.    Thereafter, WWE informed D'Angelo of its actions, asked D'Angelo to rescind her resignation, and offered D'Angelo a promotion and a raise.  (Id.)  D'Angelo refused (i.e., refused to avail herself of WWE's remedial actions), opting instead to another position at a higher salary.  (Id.)

109.    These undisputed facts should be fatal to D'Angelo's claim, even if this Court deems Romer's alleged conduct to be sufficiently actionable.

### G.  D'Angelo's Failure to Utilize the Complaint Procedure is Not Excused by Her Allegations of Constructive Knowledge, Even if True

110.    Recognizing WWE's compliance with each of its obligations, D'Angelo asserts that the WWE had constructive notice prior to her resignation by virtue of what other employees saw or heard.  To this end, Plaintiff relies solely on the conversations she allegedly had with Satin, Schneider, Archer, Richards, Clifford and Yamuder as detailed above, and the November 2005 and April 2006 tour incidents.  (D'Angelo Dep. pp. 96-97, 104-07, 160-66, 172, 183-220, 228-29)  However, even taking her testimony as true, none of these allegations are sufficient to impute WWE with prior knowledge of sexual harassment.

111.    D'Angelo only recaps generic statements to certain management level employees and describes isolated incidents they allegedly observed which do not connote sexual behavior in the least.  Such observations, even viewed in a light most favorable to Plaintiff, are patently insufficient, especially given the reputation Romer had with respect to his obsessive managerial style, to establish actual or constructive notice that D'Angelo was being sexually harassed.  (See, e.g., Exhibits F and G to the Memorandum of Law)[1]

112.    D'Angelo's claim that she confided in Yamuder cannot impute knowledge to WWE.  First, it is undisputed that D'Angelo failed to ever "complain" to Yamuder about

---

[1] Hawks was not a management level employee.

Romer, but rather, spoke in generalities with her in a social context--as a friend.  (D'Angelo Dep. pp. 170, 217).  D'Angelo never asked Yamuder to take any action.  (D'Angelo Dep. p. 79).

113.   Yamuder was not a member of management.  Yamuder was neither Plaintiff's supervisor, nor was she Romer's supervisor.  Yamuder, despite holding an in-house counsel position, was not in a position to discipline Romer or make any changes to D'Angelo's working environment.  (Yamuder Dep. p. 103)  Nor was Yamuder employed by WWE to respond to complaints of sexual harassment.  (Id.)  Thus, Yamuder's knowledge cannot be imputed to the WWE.

114.   Even assuming that there is an issue of fact as to whether Yamuder was a member of management, the information allegedly imparted to and/or witnessed by Yamuder, as described above, is equally vague and conclusory, and thus, failed to provide WWE with actual or constructive notice of sexual harassment.[2]  This holds true even if, as D'Angelo testified, Yamuder remarked that Romer was "in love with her", as even this perception is not an equivalent to an admission of or recognition that D'Angelo was enduring hostile environment sexual harassment.

### H.  D'Angelo's Failure to Utilize the Complaint Procedure is Further Not Excused by Her Vague Alleged Fear of Retaliation

115.   Finally, D'Angelo excuses her failure to follow the prescribed internal complaint procedure on an unsupported and generic fear of retaliation.  Initially, such testimony suggests that D'Angelo was waiting to resign to complain.  Yet again, D'Angelo did not initiate any complaint, even after her notice of resignation   Rather, she was

---

[2] As outlined above, the majority of the information provided to Yamuder by D'Angelo consisted of statements that Romer would constantly try to contact D'Angelo, and that he would seek out other individuals including Yamuder to locate D'Angelo when he could not reach her.  (D'Angelo Dep. p. 220)

approached by Human Resources after Human Resources spoke to Yamuder about two allegedly negative interactions she heard D'Angelo had with Romer. (Yamuder Dep. pp. 67-68)

116.    Second, her articulated reasons for this fear were comprised solely of gossip about individuals she could not even identify.   (D'Angelo Dep. 79-80).   Third, her reference to Yamuder should be outright rejected, as Yamuder did not complain about her supervisor until after D'Angelo resigned from WWE.  (Exhibit M at ¶6)

117.    As a matter of law, D'Angelo's patently vague statements about unidentifiable claimants (from hearsay and gossip), as well as a statement about a complainant whose situation did not arise under after D'Angelo left WWE, are insufficient to support a fear of retaliation that would excuse her lack of complaint.

## I.  Plaintiff Was Not Constructively Discharged

118.    Plaintiff alleges that she was constructively discharged from her employment in violation of Title VII. (Amended Complaint ¶77)

119.    Yet, first Plaintiff's departure from WWE was of her own volition by resigning to accept a position with another employer for a higher salary, certainly not a "deliberate" act on Defendant's part.  Second, WWE's treatment of Plaintiff cannot even remotely be described as intolerable. Third, Plaintiff had other options available to her, rather than resigning.

120.    Plaintiff's constructive discharge claim is based upon the same facts as her hostile work environment claim, which, as a matter of law, is insufficient to establish a constructive discharge.

121.    Moreover, Plaintiff has not alleged one fact that would indicate that WWE

deliberately set out to create arduous working conditions that would have caused a reasonable person in her position to resign.   To the contrary, it is undisputed that once WWE was apprised of the alleged sexual harassment, it proceeded expeditiously to investigate and remedy the situation, which included the termination of Romer's employment before Plaintiff's last day of work, and the offer to Plaintiff of a promotion and raise in salary which Plaintiff refused.  These undisputed facts are likewise fatal to a constructive discharge claim.  Plaintiff resigned to accept a position at Sherwin Williams at a higher salary, her true reason for resigning.  As previously noted, on her exit interview form and in statements to several WWE employees, D'Angelo never indicated that was resigning due to the alleged hostile work environment.   To the contrary, D'Angelo stated in her own handwriting and in these conversations that she resigned to accept a better opportunity with a better salary and a better location.  (Exhibit N)

122.    In sum, Plaintiff cannot establish that her working conditions were so intolerable that she had no option other than resignation.


DEFENDANT,
WORLD WRESTLING ENTERTAINMENT, INC.


By:  _____/s/_____
     Mary Gambardella, Esq.
     Federal Bar No. ct05386
     Jonathan Bardavid, Esq.
     Federal Bar No. ct27763
     Wiggin and Dana LLP
     400 Atlantic Street
     Stamford, CT  06911-0325
     (203) 363-7662
     (203) 363-7676 (fax)
     mgambardella@wiggin.com
     jbardavid@wiggin.com

     *Attorneys for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

This will certify that, on April 19, 2010, a copy of the foregoing was filed electronically.

Notice of this filing will be sent by email to all parties listed below by operation of the Court's

electronic filing system.  Parties may access this filing through the Court's CM/ECF System.

Patrick J. Boyd, Esq.
The Boyd Law Group, PLLC-NY
230 Park Avenue, Suite 1000
New York, NY 10169
212-808-3020
pboyd@theboydlawgroup.com
Lead Attorney
Pro Hac Vice
Counsel for Plaintiff

Peter L. Truebner, Esq.
1150 Summer St.
Stamford, CT 06905
203-323-4540
ptruebner@aol.com
Lead Attorney
Counsel for Plaintiff

                              _____/s/_____
                              Jonathan Bardavid (ct27763)


20324\4\2359804.1