UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
------------------------------------------------------------ X
FARA D'ANGELO,                                    :     **3:08-CV-1548 (JCH)**
                                                  :
                Plaintiff,                       :
                                                  :
      -against-                              :
                                                  :
WORLD WRESTLING ENTERTAINMENT,                    :
INC.,                                             :
                Defendant.                       :
------------------------------------------------------------ X


# PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT


    Dated: New York, New York
    June 9, 2010


                                                                   THE BOYD LAW GROUP, PLLC

                                                                   Patrick J. Boyd, Esq. (*Pro Hac Vice*)
                                                                   Michael J. Pospis, Esq. (On the Brief)
                                                                   370 Lexington Avenue – Suite 1705
                                                                   New York, NY 10017
                                                                   T:  212.808.3054
                                                                   F:  212.808.3020
                                                                   Attorneys for Plaintiff

Plaintiff Fara McNeil (formerly D'Angelo) ("Plaintiff", "our client", "D'Angelo", or "Plaintiff D'Angelo"), by her attorneys The Boyd Law Group, PLLC, respectfully submits this Memorandum of Law in opposition to Defendant World Wrestling Entertainment, Inc.'s ("Defendant", "WWE", or "Defendant WWE") Motion for Summary Judgment ("Motion") and supporting brief ("Brief").

## PRELIMINARY STATEMENT

Defendant WWE seeks dismissal of our client's sexual harassment case through two arguments.  First, WWE argues that our client's then- supervisor, Alex Romer ("Romer"), did not sexually harass her.  WWE makes this argument notwithstanding documentary evidence that Romer, *inter alia*, called Plaintiff "sexy", asked to sleep with her, texted her to tell her he was "naked" and complimented her for having a nice "tail".  Defendant makes this argument notwithstanding the fact that Plaintiff was, at end, so concerned about Romer's intent to sleep with her that she moved out of her hotel room and slept at the airport in order to avoid the risk of him breaking into her room, and notwithstanding the fact that they fired Romer for his conduct vis-à-vis our client.

Undeterred by the weakness of this above position, WWE unabashedly turns to the most archaic and foul of defenses: they argue, secondarily, that Plaintiff does not have a claim for sexual harassment because she asked for it.  In particular, WWE appears to believe that since Plaintiff made a few jokes, and because she tried to keep her job instead of immediately expressing moral outrage at the actions of her boss, she invited – and even asked for – the harassment that was visited upon her.

We are grateful that the law neither supports nor tolerates these defenses.  Plaintiff D'Angelo was subjected to unlawful and unwanted harassment by a boss that would not

2

permit her to transfer away from him and would neither promote her nor respect the fact that she did not want to sleep with him. The harassment was observed by and reported to numerous supervisory personnel including a Vice President in the Legal Department, Sheryl Yamuder ("Yamuder"). Nothing was done to address the problem, and our client was advised by the supervisors, alternatively, not to go to Human Resources and to find a new job.

As a result, our client looked for and finally found a new position. Before she left, as a way to protect other women that might suffer the same fate, she tendered e-mails Romer sent to her with the expectation that the situation might finally be addressed. She could do so, at this point, without fear of retaliation.

In its brief, Defendant invites the Court to disregard the carefully-delineated summary judgment framework by, among other things, asking this Court to draw inferences from evidence and make credibility determinations. WWE specifically asks the court to find that our client was not offended by Romer's conduct, that she did not complain about the harassment clearly enough to her supervisors and that she did not complain to the correct people. We submit that such findings would be findings of material fact appropriate for contemplation by a jury. As such, we respectfully urge the Court to decline rulings on such disputed facts, and thus to deny Defendant's Motion in its entirety so that Plaintiff may have her day in court.

## STATEMENT OF FACTS

Plaintiff D'Angelo commenced working with Defendant WWE as a Global Licensing Coordinator on or about April 1, 2004. (Transcript of the January 22, 2010 deposition of Plaintiff ("D'Angelo Dep."), at p. 23). Her supervisor for the entirety of her

tenure was Alex Romer. (Id. pp. 92-93). Romer worked in London, but often took trips to Europe with Plaintiff and was in daily contact with her by phone, e-mail and text-messages. (Plaintiff's Amended Complaint dated March 25, 2009 ("Am. Compl.") ¶ 22).

Shortly after Plaintiff commenced work her supervisor, Romer, commenced harassing her. (Am. Compl. ¶ 25; D'Angelo Dep., at pp. 40-41). Romer, *inter alia*, asked D'Angelo about her sex life and asked who she was dating (Am. Compl. ¶ 28; D'Angelo Dep., at p. 208). He told her she had a nice "tail", that she was "sexy", a "naughty girl" and referred to her as "darling", "precious" and "tinker-bell". (Am. Compl. ¶¶ 37-39; D'Angelo Dep., at p. 112).[1] Romer told Plaintiff, in an instant message, that he was "naked" and also told her that he wanted to have sex with her. (Am. Compl. ¶ 41; D'Angelo Dep., at p. 144).

The harassment D'Angelo endured was not limited to the above comments, e-mails and text messages. Romer also gave her gifts, invited her on vacations with him, and took her on business dinners where he would try to hold her hand. (D'Angelo Dep., at pp. 94-101, 104). Equally troubling, Romer touched Plaintiff several times in ways that were inappropriate and uncomfortable to her. (Id. pp. 101-04). He caressed D'Angelo's face, pet her hair, touched her waist and put his arm around her to hold her close several times. Id.

Arguably the worst of the harassment occurred during the course of a trip to Europe one month before D'Angelo resigned. On this occasion, Plaintiff was at a bar, and attempted to leave with several other WWE executives. (D'Angelo Dep., at p. 105). Romer stood up and grabbed D'Angelo's wrist in an effort to force her to stay with him. (Id.) He

---

[1] Opposing counsel, in a trite but illogical footnote observes that Plaintiff's former boyfriend also called her "precious." (Brief at 3 n.1) This observation, if anything, would seem to support Plaintiff's case. Indeed, we cannot imagine in what context it would be appropriate for a supervisor to refer to his subordinate with the same term of endearment she used in an amorous relationship.

4

did this in front of Managerial employees Joel Satin and Curt Schneider, but Plaintiff was successful in pulling away. (Id.) D'Angelo discussed the matter with the supervisors immediately after the incident. (Id.) She told them that this was the way Alex regularly behaved, and took the elevator to her floor. (Id.) Romer was there to confront her for leaving him, and attempted to join Plaintiff in her hotel room. (Id. p. 106). Plaintiff resisted, and finally convinced Romer to leave, but was so scared that she left the hotel hours later instead of staying close to Romer. (Id. p. 103). She was, specifically, concerned he would talk to the concierge and get access to her room. (Id.)[2]

Plaintiff D'Angelo resigned on May 15, 2006, approximately one month after the above-referenced incident. By that point, Romer had failed to grant her any of the promotions she sought, and been the determining factor in her inability to transfer to a different department where he would no longer be her supervisor. (Id. pp. 65-66). She had, moreover, complained about Romer's conduct to: Yamuder, a friend and VP in WWE's Legal Department who discouraged her from going to Human Resources; Bernadette Hawkes, who saw Romer touching Plaintiff's waist, and management employee Michael Archer. Such complaints were consistent with the WWE policy against sexual harassment, which requires an employee to report harassment to their "[s]upervisor, or the vice president of human resources or any other member of management". (D'Angelo Dep at Exh. 5). The complaints occurred during the entire course of Plaintiff's two (2) year tenure at WWE, but had no results.

---

[2] The factual record belies Defendant's unsupported conclusion that Plaintiff "want[ed] to continue working for" Romer. (Brief at 25 n.6.) To the contrary, it illustrates that Plaintiff viewed a promotion as a "way out" and a way to "get away from" Romer. (D'Angelo Dep., at pp. 63-64).

Romer was not disciplined or discharged until Plaintiff gave notice of her intent to resign. Plaintiff D'Angelo has seen a therapist and discussed the negative impact of Romer on her well-being with such therapist. (Am. Compl. ¶ 71; D'Angelo Dep., at pp. 48, 60).

## ARGUMENT

### I.    SUMMARY JUDGMENT STANDARD

A federal court should not grant a motion for summary judgment unless it determines that there is no genuine issue of material fact and the undisputed facts are sufficient to warrant judgment as a matter of law. See Fed. R. Civ. P. 56(c); Zipoli v. Caraballo, 603 F. Supp. 2d 399, 402 (D. Conn. 2009) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)).

The "moving party bears the burden of showing that he or she is entitled to summary judgment." Huminski v. Corsones, 396 F.3d 53, 59 (2d Cir. 2004). "When deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the non-moving party and draw all inferences in that party's favor." Diana v. Schlosser, 20 F. Supp. 2d 348, 349 (D. Conn. 1998) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

"[T]he duty of a court on a motion for summary judgment is to determine whether there are any genuine issues of material fact to be resolved by trial and not to decide factual issues. In this regard, the court's task is issue identification, not issue resolution." Diana, 20 F. Supp. 2d at 349 (quoting Repp v. Webber, 132 F.3d 882, 889-90 (2d Cir. 1997)); accord, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences

6

from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict.").

An "extra measure of caution is merited … in a discrimination action because direct evidence of discriminatory intent is rare and such intent must often be inferred from circumstantial evidence found in affidavits and depositions." Gallo v. Prudential Residential Servs., 22 F3d 1219, 1224 (2d Cir. 1994); accord, Gorzynski v. Jetblue Airways Corp., 596 F.3d 93, 103 (2d Cir. 2010) (noting that the Second Circuit "has repeatedly emphasized the need for caution about granting summary judgment to an employer in a discrimination case where … the merits turn on a dispute as to the employer's intent" and that "affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.").

It is respectfully submitted that, upon application of these well-settled standards, Defendant's Motion – which is replete with invitations attempts to, inter alia, draw inferences from evidence and make credibility determinations[3] – must be denied.

## II. GENUINE ISSUES OF MATERIAL FACT EXIST REGARDING PLAINTIFF'S HOSTILE WORK ENVIRONMENT CLAIM

### A. Plaintiff Has Satisfied Her *Prima Facie* Burden To Demonstrate A Hostile Work Environment

"In order to establish a hostile work environment claim under Title VII, a plaintiff must produce enough evidence to show that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to

---

[3] See, e.g., Brief at 5 (stating what an excerpted portion of Plaintiff's deposition testimony "clearly suggest[s]"); id. (stating "[w]hat becomes clear from" identified emails); id. at 5-6, n.2 (stating what a specified email "further evinc[es]"); id. at 7 (speculating as to what a third party "clearly" decided); id. at 11 (stating that particular testimony was responsible for "giving the clear impression" as to what a third party "thought"); id. at 13-14 (noting the "minimal details of the conversation that [Plaintiff] could remember"); id. at 32 (stating what referenced yet unspecified testimony "suggests").

7

alter the conditions of the victim's employment and create an abusive working environment." Gorzynski, 596 F.3d at 102.  The evidence of record – including Romer's calling Plaintiff "darling", "sexy", and "precious"; Romer's telling Plaintiff he was naked and that he wanted to have sex with her; Romer's inappropriate attempts at physical intimacy with Plaintiff; and Plaintiff's resulting fear for her safety and her resort to therapy to ameliorate the trauma caused by Romer's antics (see supra, at pp. 3-6) – represents classic examples of sexual harassment.  At the very least, it raises issues of fact incapable of resolution on the instant motion.

### B. Defendant May Not Avail Itself Of The *Faragher/Ellerth* Defense

"When … the alleged harasser is in a supervisory position over the plaintiff" – as Romer indisputably was – "the objectionable conduct is automatically imputed to the employer." Gorzynski, 596 F.3d at 103.[4]  "But even then the defending employer may be permitted … to raise the *Faragher/Ellerth* affirmative defense to liability or damages." Id.  However, as set forth below, this defense is unavailable to Defendant, for at least two reasons.

#### 1. The *Faragher/Ellerth* Defense Does Not Apply In The First Instance

"An employer may raise the *Faragher/Ellerth* defense only if either (1) the employee's supervisor took no 'tangible employment action,' which involves an official company act, against the employee; or (2) any tangible employment action taken against the employee was not part of the supervisor's discriminatory harassment." Gorzynski,

---

[4] This case is thus distinguishable from those, relied upon by Defendant, in which the alleged harasser was not the plaintiff's "supervisor" within the meaning of Title VII. See, e.g., Feliciano v. Alpha Sector, Inc., 2002 U.S. Dist. LEXIS 12631, at *27-30 (S.D.N.Y. July 12, 2002).

8

596 F.3d at 103.  A "tangible employment action" includes, among other things, "failing to promote" the plaintiff.  Petrosino v. Bell Atlantic, 385 F.3d 210, 225 (2d Cir. 2004).

Romer took at least one "tangible employment action" with respect to Plaintiff, and renders this defense inapplicable.  In particular, the record evidence establishes, *inter alia*, that Plaintiff specifically asked Romer (her supervisor) for a promotion (see D'Angelo Dep., at pp. 39-41), which promotion Plaintiff never received.  Plaintiff also sought a transfer from Romer, to a position where a promotion might be easier.  (D'Angelo Dep., at pp. 39-41).  To borrow what appears to be one of Defendant's favorite phrases,[5] query why Plaintiff's supervisor – who, according to the record evidence, harbored an obvious, yet unreciprocated, sexual interest in Plaintiff – would decline to grant the requested promotion or transfer.  This and other such questions are for the trier of fact; their very existence underscores the impropriety of summary judgment here.

### 2. Even If The *Faragher/Ellerth* Defense Applies, Its Requirements Are Not Satisfied

The *Faragher/Ellerth* "defense consists of two elements:  that (1) the employer exercised reasonable care to prevent and correct promptly any … harassing behavior, and (2) the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."  Gorzynski, 596 F.3d at 103 (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998); Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998)) (citations omitted).

The record evidence reflects, *inter alia*, that Plaintiff utilized the corrective measures available to her to extricate herself from the professionally detrimental and

---

[5]   See, e.g., Brief at 3 n.1; id. at 8; id. at 25 n.6.

9

demoralizing effects of Romer's harassment. In particular, Defendant's "Equal Employment Opportunity/Sexual Harassment Policy" (which was signed by Plaintiff on or about April 1, 2004) (Plf. Dep. Exh. 5), instructs anyone who "believe[s] [they] have encountered unlawful harassment from any WWE employee" to report the incident to their "***supervisor, or the Vice President of Human Resources, or any other member of management***." (Emphasis added.) The evidence of record includes the testimony of Sheryl Yamuder – Defendant's Vice President of Legal Affairs[6] – that Plaintiff brought to Yamuder's attention, prior to Plaintiff's resignation, "two negative interactions" that Plaintiff had with Romer that made Plaintiff "extremely unhappy" and "uncomfortable". (Transcript of the March 8, 2010 deposition of Sheryl Yamuder, at pp. 69-78.) This evidence vitiates the legal conclusion – which Defendant now asks this Court to draw – that Plaintiff "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Gorzynski, 596 F.3d at 102.

**III.   Genuine Issues of Material Fact Exist Regarding Plaintiff's Constructive Discharge**

In order to sustain a constructive discharge claim, the plaintiff must "prove that her employer deliberately and discriminatorily created work conditions 'so intolerable that a reasonable person in the employee's position would have felt compelled to resign.'" Bolden v. Potter, 2010 WL 1286756, at *6, n.3 (D. Conn. March 29, 2010) (quoting

---

[6]   Defendant's conclusion (based largely on Third Circuit case law) that "Yamuder … does not qualify as management" (Brief at 31) is patently ludicrous.

10

Ferraro v. Kellwood Co., 440 F.3d 96, 101 (2d Cir. 2006)).[7]  Here, the record evidence reveals a pattern of Romer's consistent, unrelenting harassment that, *inter alia*, actually caused Plaintiff to fear for her safety and to seek the services of a therapist.  (See supra at pp. 3-6).  This evidence, at the very least, presents a genuine issue of material fact sufficient to defeat Defendant's Motion.

## CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that the Court deny Defendants' Motion in its entirety.

Dated:   New York, NY
         June 9, 2010

                                               THE BOYD LAW GROUP, PLLC


                                               /s/ Patrick J. Boyd
                                               Patrick J. Boyd, Esq. (*Pro Hac Vice*)
                                               Michael J. Pospis, Esq. (On the Brief)
                                               370 Lexington Avenue – Suite 1705
                                               New York, NY 10017
                                               T:  212.808.3054
                                               F:  212.808.3020

                                               PETER L. TRUEBNER, ESQ.


                                               /s/ Peter L. Truebner
                                               Peter L. Truebner, Esq.
                                               1150 Summer St.
                                               Stamford, CT 06905
                                               T:  203.323.4540

                                               Attorneys for Plaintiff

---

[7] Defendant's argument that Plaintiff does not "state an actionable claim" for constructive discharge because her "departure from [Defendant] was of her own volition" (Brief at 33) is nonsensical, since, by definition, a ***constructive*** discharge entails a voluntary departure.

11