UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| FARA D'ANGELO, | : | CIVIL ACTION NO. |
| Plaintiff, | : | 3:08-CV-1548 (JCH) |
| | : | |
| v. | : | |
| | : | |
| WORLD WRESTLING | : | OCTOBER 15, 2010 |
| ENTERTAINMENT, INC. | : | |
| Defendant. | : | |

**RULING RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 36)**

**I.      INTRODUCTION**

Plaintiff, Fara D'Angelo ("D'Angelo"), brings this action against defendant, World Wrestling Entertainment, Inc. ("the WWE"), for damages for injuries she allegedly sustained as a result of sexual harassment while working for the WWE and as a result of her constructive discharge from her job in violation of Title VII of the Civil Rights Act of 1964 ("Title VII").  See 42 U.S.C. § 2000e et seq.

Pursuant to Fed. R. Civ. P. 56, the WWE moves the court for summary judgment.  For the following reasons, the court denies defendant's Motion for Summary Judgment.

1

## II.     FACTUAL BACKGROUND[1]

D'Angelo was employed as a Global Licensing Coordinator by the WWE for two years, from April 2004 until May 2006.  L.R. 56(a)(1) Stmt. at ¶ 1 (Doc. No. 38).  During the majority of her time with the WWE, she was located in Stamford, Connecticut.  See id. at ¶¶ 1, 4.  Initially she reported to both Joel Satin ("Satin"), Director of Home Video, and Alex Romer ("Romer"), Director of International Licensing.  Id. at ¶ 3.  However, at some point in the two years, she stopped reporting to Satin and reported exclusively to Romer.  Id.

During the course of her employment, D'Angelo claims to have been repeatedly harassed by Romer.  See id. at ¶ 7.  These allegations range from relatively minor incidents, such as Romer referring to her as "darling," to much more extreme instances of touching, requesting sex, and giving of gifts.  Id.   According to D'Angelo, these events were not isolated instances, but "constant."  See id. at ¶ 9; Dep. of Fara D'Angelo at 101 ("D'Angelo Dep."), Ex. A to L.R. 56(a)(2) Stmt. (Doc. No. 42).  Romer repeatedly communicated with D'Angelo on her personal email account, called her

---

[1] For the purposes of this section, undisputed facts will be cited to the WWE's Local Rule 56(a)(1) Statement (Doc. No. 38).
  It bears noting that Local Rule 56(a)(1) requires "a concise statement of each material fact as to which the moving party contends there is no genuine issue to be tried."  D. Conn. L. Civ. R. 56(a)(1).  Defendant's Statement, rather than being a collection of material facts, instead largely quotes from D'Angelo's deposition.  See, e.g., L.R. 56(a)(1) Stmt. at ¶¶ 21-23. 28-29 (Doc. No. 38).  Further, the Statement is replete with nonfactual characterizations, completely inappropriate in this context.  See, e.g., id. at ¶ 8, 46, 81 (describing D'Angelo's statements as concessions).  At a number of points in the Statement, defendant lists a fact then draws an inference, a task that is to be left to the jury.  See, e.g., id. at ¶ 16.  Finally, the last twenty-two "facts" are nothing more than legal arguments, which plaintiff cannot be expected to admit or deny, and quite reasonably does not.  See id. at ¶¶ 101-22.  As required by the federal and local rules, the court will not credit factual statements that are unsupported by the record, and will not deem legal arguments as admitted.
  Plaintiff, in several places in her Local Rule 56(a)(2) Statement (Doc. No. 42), fails to cite to the factual record as required by the Local Rules.  E.g., L.R. 56(a)(2) Stmt at ¶ 2; see D. Conn. L. Civ. R. 56(a)(2).  To the extent defendant's statements in these instances are supported by the record, the court will deem them admitted by the plaintiff.  See D. Conn. L. Civ. R. 56(a)(3).

during her off hours and late at night, and called her when he was drunk. See D'Angelo Dep. at 101. Romer also touched D'Angelo on her waist and her hair, and he allegedly caressed her face and put his arm around her on numerous occasions. See id. At one point, shortly before she resigned, Romer hugged and tried to kiss her. Id. at 103.

### A. Management's Knowledge and Failure to Respond

While D'Angelo never reported this behavior in writing, she describes instances where she believes no less than six WWE employees that she describes as members of management became aware of Romer's behavior. According to D'Angelo, Satin, her former supervisor, was in the same room as Romer and D'Angelo when Romer grabbed D'Angelo and pulled her close to him. See id. at 104, 203. D'Angelo told Romer not to touch her. Id. Satin was standing near them, and D'Angelo believes he saw what was happening. Id. Later that night, Satin, D'Angelo, and Romer were at dinner together. Id. at 204. D'Angelo was very upset and did not speak, causing Satin to ask her what was wrong. Id. D'Angelo did not respond but excused herself to go to the bathroom, where she broke down in tears. Id. On another occasion, D'Angelo confided in Satin at the office that she was having trouble working for Romer, because he was constantly discussing personal matters with her. Id. at 206-07. Satin encouraged D'Angelo to threaten to report Romer to Human Resources to try to get him to stop misbehaving. Id.

A second employee, Curt Schneider ("Schneider"), Vice President of Marketing, witnessed Romer's behavior toward D'Angelo on a trip in November 2004 or 2005. Id. at 195-96. Specifically, Schneider witnessed Romer getting physically close to D'Angelo throughout the trip. Id. at 196. On at least one occasion, Schneider

3

expressed that Romer was "out of his mind" and encouraged D'Angelo to leave the company.  Id. at 195.

Toward the end of D'Angelo's employment, Satin and Schneider witnessed yet another incident with Romer.  On a European trip in April 2006, Romer and D'Angelo were with several other WWE employees at a bar.  See Id. at 184-93.  In addition to Satin and Schneider, Jonathan Sully ("Sully"), another employee D'Angelo describes as a member of management, was also present.  Id. at 185-86,  Throughout the night, Romer was plying D'Angelo with drinks.  Id. at 187.  When she began to leave the bar to return to her room, Romer grabbed D'Angelo's arm in an attempt to get her to stay.  See id. at 184, 186-88.  D'Angelo refused Romer's demand and got into an elevator with Satin and Schneider, who both expressed concern about what happened at the bar.  Id. at 191.

After leaving Satin on his floor, Schneider and D'Angelo got off on Schneider's floor and continued their conversation, and D'Angelo expressed continued dismay at her treatment by Romer.  Id. at 192-93.  Schneider asked her, "[W]hat's Alex doing touching you like that?"  Id. at 192.  She replied, "This is what I have been going through."  Id.  When he asked what she was planning to do about it, she told him she was looking for a new job.  Id. at 193.  Sully also appears to have been within earshot of this conversation.  Id. at 200.

An additional employee, Michael Archer ("Archer"), Senior Director of Quality Assurance, seems to have been aware of Romer's behavior.  Archer was Senior Director of Quality Assurance and supervised Bernadette Hawks ("Hawks"), a coworker of D'Angelo.  See L.R. 56(a)(1) Stmt. at ¶ 49.  Hawks witnessed Romer touch D'Angelo

4

on her lower waist and reported this incident to Archer.  See id.  Archer approached D'Angelo, and she confirmed that what Hawks said was true.  See D'Angelo Dep. at 210.  However, when Archer asked D'Angelo whether she would like him to speak with Romer, she asked him not to.  See id. at 213.

Yet another employee who was aware of Romer's behavior toward D'Angelo was Lisa Richards ("Richards"), Director of Marketing.  D'Angelo spoke with Richards on multiple occasions during her employment.  See id. at 163-66.  In these conversations, D'Angelo informed Richards that Romer would constantly call her, sometimes drunk, and D'Angelo shared some of the inappropriate comments Romer would make to her over instant messaging.  Id. at 164-65.  Two of the comments D'Angelo remembers sharing were Romer's statement that she "look[ed] sexy in a karate suit" and that she "had nice legs."  Id. at 165.  She also remembers sharing with Richards the inappropriate names that Romer would call her (such as "'Tinks" and "Precious").  Id.  Richards acknowledged that this situation was "not very healthy" and encouraged D'Angelo to look for a position in Richards' department.  Id.

A final employee who was aware of Romer's behavior was Cheryl Yamuder ("Yamuder"), a Vice President in the WWE's legal offices.  According to D'Angelo, Yamuder was aware of Romer's obsessive behavior and once stated, "It's clear that he is totally in love with you."  Id. at 217.  Yamuder was with D'Angelo when Romer, drunk, dialed D'Angelo after work one night, "Just to say hi."  Id. at 219.  At the time D'Angelo informed Yamuder that this was a common occurrence.  Id.  Yamuder  also witnessed Romer "flipping out" when he suspected that D'Angelo was interviewing to leave the WWE.  Id.  D'Angelo would hide out in Yamuder's office to get away from Romer, and

Romer would often call Yamuder when he was trying to track D'Angelo down. Id. at 220.

  B. D'Angelo's Resignation

On May 5, 2006, D'Angelo gave the WWE ten days notice of her resignation. L.R. 56(a)(1) Stmt. at ¶ 88. After learning of D'Angelo's resignation letter, Yamuder appears to have informed Donna Goldsmith, Executive Vice President of Consumer Products, of the problems D'Angelo was experiencing. See id. at ¶¶ 90-92. Within a few days of this conversation, the WWE conducted "a complete and thorough investigation of D'Angelo's allegations." Id. at ¶ 95. At the conclusion of this investigation, and before D'Angelo's last day, the WWE terminated Romer's employment. Id. at ¶ 96. D'Angelo was then offered an opportunity to rescind her resignation in exchange for a promotion and a raise. Id. at ¶ 96. D'Angelo declined this offer and began to work instead at Sherwin Williams, obtaining a higher salary than she had received at the WWE. Id. at ¶ 97.

## III. STANDARD OF REVIEW

A motion for summary judgment "may properly be granted . . . only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant judgment for the moving party as a matter of law." In re Dana Corp., 574 F.3d 129, 151 (2d Cir. 2009). Thus, the role of a district court in considering such a motion "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." Id. In making this determination, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. See Fed R. Civ. P. 56(c); Loeffler v.

Staten Island Univ. Hosp., 582 F.3d 268, 274 (2d Cir. 2009).

"[T]he moving party bears the burden of showing that he or she is entitled to summary judgment." United Transp. Union v. Nat'l R.R. Passenger Corp., 588 F.3d 805, 809 (2d Cir. 2009). Once the moving party has satisfied that burden, in order to defeat the motion, "the party opposing summary judgment . . . must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'" Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir.2008) (quoting Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)); see also Havey v. Homebound Mortg., Inc., 547 F.3d 158, 163 (2d Cir. 2008) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)) (stating that a non-moving party must point to more than a mere "scintilla" of evidence in order to defeat a motion for summary judgment).

**IV.     DISCUSSION**

Title VII prohibits employment discrimination on the basis of sex. See 42 U.S.C. § 2000e-2(a)(1). D'Angelo asserts two distinct claims that are recognized by federal law. First, D'Angelo claims that she experienced a hostile work environment due to Romer's sexual harassment. Next, D'Angelo claims that, although she resigned from her position at the WWE, her decision to leave should be treated as a constructive discharge, due again to Romer's sexual harassment.

In its Motion for Summary Judgment, the WWE argues that there is insufficient evidence to create a material issue of fact with respect to either of D'Angelo's claims.

7

In the alternative, the WWE argues that it cannot be held liable for Romer's actions under the Faragher/Ellerth doctrine. The court will consider each of these arguments in turn.

    A.    Sufficiency of Evidence

        1.    Hostile Work Environment

"When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment . . . Title VII is violated." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993). In order to determine whether a work environment is "hostile" or "abusive," the court must look to "all of the circumstances" including (1) the frequency of the conduct, (2) the severity of the conduct, (3) whether the conduct is physically threatening or humiliating, and (4) whether the conduct unreasonably interferes with the employee's performance. Id. at 23; Kaytor v. Electric Boat Corp., 609 F.3d 537, 547 (2d Cir. 2010). There is both a subjective and an objective component to this claim: the environment must be objectively hostile or abusive, and the victim must subjectively perceive it as such. Harris, 510 U.S. at 21-22; Kaytor, 609 F.3d at 547.

"There is no fixed number of incidents that a plaintiff must endure in order to establish a hostile work environment," Alfano v. Costello, 294 F.3d 365, 379 (2d Cir. 2002), and a court must "evaluate the relevant conduct as a whole," Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 605 (2d Cir. 2006). However, "offhand comments or isolated incidents of offensive conduct (unless extremely serious) will not support a claim of discriminatory harassment." Byrne v. Telesector Res. Grp., Inc., 339 F. App'x

13, 18 (2d Cir. 2009). In the instant case, D'Angelo has presented sufficient evidence for a reasonable jury to find an objectively abusive environment.

D'Angelo describes Romer's harassing behavior as "constant." L.R. 56(a)(1) Stmt. at ¶ 9; L.R. 56(a)(1) Stmt. at ¶ 9; see Torres v. Pisano, 116 F.3d 625, 631 (2d Cir. 1997) (finding that a reasonable jury could credit "general allegations of constant abuse"). As she recalls, Romer called her "sexy," said she had nice legs, and called her "precious." D'Angelo Dep. at 165. Romer also suggested to D'Angelo on multiple occasions that he would be willing to have sex with her. Id. at 143-44. The WWE makes much of the fact that Romer's offensive communication with D'Angelo was by email and phone, as opposed to in person. See Mem. at 22 (Doc. No. 37). However, the WWE does not cite a case, and the court has not located one, where a court disregarded sexual harassment because of the media used to convey it. Rather, courts look to the circumstances surrounding such communication, including its frequency, its severity, whether it is physically threatening or humiliating, and whether it interferes with the employee's work. See, e.g., Fitzgerald v. Ford Marrin Esposito Witmeyer & Gleser, LLP, 29 F. App'x 740, 741-42 (2d Cir. 2002) (finding that an email proposition for sex could contribute to a finding of sexual harassment); Lueck v. Progressive Ins., Inc., No. 09-CV-6174, 2009 WL 3429794, at *2-4 (W.D.N.Y. Oct. 19, 2009) (finding that one offensive email, alone, did not suffice to support a claim of sexual harassment). Emails and telephone communications can certainly result in sexual harassment, and, in the instant case, given that these communications were coming from D'Angelo's (only) superior and given D'Angelo's testimony that Romer would physically molest her when they were together on business trips, the court finds that D'Angelo has presented an

9

issue of material fact such that a reasonable jury could find that Romer's behavior created an objectively hostile work environment.

The WWE asks the court to find that D'Angelo welcomed these interactions and therefore cannot establish the subjective requirement of a hostile work environment claim. See Mem. at 24. In support of this, the WWE offers several emails from D'Angelo to Romer containing jokes with sexual overtones. Id. While the court might consider these emails if they constituted "conduct of the same general variety" as Romer's conduct, SACCO v. Legg Mason Inv. Counsel & Trust Co., 660 F. Supp. 2d 302, 315 (D. Conn. 2009), the simple fact is that they do not. Nowhere in these emails does D'Angelo use pejorative or sexual terms to refer to Romer. Nowhere does she invite him to have sex with her or comment on his body parts. And, most importantly, nowhere does she invite him to grope her, grab her, or physically touch her in any way. Quite to the contrary, D'Angelo consistently testified that she did not want Romer to engage in this behavior, and she cites to at least one occasion where she explicitly told him not to touch her. D'Angelo Dep. at 203. To find to the contrary would require this court to examine the veracity of D'Angelo's statements regarding her subjective view of Romer's behavior, an examination that must be left to the finder of fact at trial.

In light of the record before it, the court finds that D'Angelo has presented evidence sufficient for a reasonable jury to find that Romer created an objectively hostile work environment and that D'Angelo subjectively experienced it as such.

2. Constructive Discharge

In order to establish a constructive discharge claim, plaintiff "must show working conditions so intolerable that a reasonable person would have felt compelled to resign."

10

Pa. State Police v. Suders, 542 U.S. 86, 147 (2004). Such a claim "can be regarded as an aggravated case of . . . sexual harassment or hostile work environment." Id. at 146. Based on the record, the court concludes that a reasonable jury could find that Romer created such an environment for D'Angelo.

D'Angelo has described what she views as a constant stream of sexual comments, as well as physical molestations, by her direct supervisor. At the time she left, she describes this behavior as having escalated to a breaking point. See D'Angelo Dep. at 103. The month before she left the company, on what appears to be her last business trip with Romer, D'Angelo says that Romer's sexual advances were so overt—he tried to kiss her at one point, grabbed her, and tried to go with her to her hotel room—that she felt unsafe in the same hotel as him and spent half of the night in the airport instead. See id. A jury could find on these facts that a reasonable person would have felt compelled to leave the company or risk serious harm.

The Second Circuit case law appears to have required an additional element: a showing of intent (or "deliberateness") on the part of the employer. See Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 74 (2d Cir. 2000). However, in a recent case, the Circuit Court recognized that the 2004 Supreme Court case, Pennsylvania State Police v. Suders, 542 U.S. 86, 146-47 (2004), might have removed the intent element from a constructive discharge claim. See Nugent v. St. Lukes-Roosevelt Hosp. Ctr., 303 F. App'x 943, 945 (2d Cir. 2008) (acknowledging the argument that Suders removed this intent requirement, but deciding on other grounds); but see Petrosino v. Bell Atl., 385 F.3d 210, 229-30 (2d Cir. 2004) (treating the Suders standard as the second inquiry, after a showing of intent). The Court in Suders describes a constructive

11

discharge claim as an "aggravated . . . hostile work environment" claim and does not engage in any inquiry into intent. Suders, 542 U.S. at 146-47; see also id. at 154 (Thomas, J., dissenting) ("[A]s it is currently conceived, a 'constructive' discharge does not . . . require that the act be undertaken with the same purpose as an actual discharge.").[2]

Even assuming the intent element remains a part of the Second Circuit's constructive discharge test, the court finds that there is sufficient evidence on which a reasonable jury could base a finding that Romer behaved "deliberately." The Second Circuit has never required that the employer have the specific intent to discharge the employee, see Petrosino, 385 F.3d at 229, and, given the circumstances of the instant case, requiring a finding of specific intent would make little sense.[3] Instead courts look

---

[2] A plain reading of Suders suggests that the objective test is the test for proof of a constructive discharge claim, rather than one part of the test. See Hoydic v. Genesco, Inc., No. AAN-CV-07-5003291-S, 2008 WL 1914338, at *4 (Conn. Super. Apr. 10, 2008) ("The word 'deliberate' or 'deliberately' nowhere appears in either the federal or state statute. Rather, the analysis to determine employer vicarious liability for constructive discharge due to a hostile work environment brought about by sexual harassment under Title VII . . . was enunciated in [Ellerth and Faragher] and subsequently clarified in [Suders]."). Perhaps indicating a shift in the direction of the single element / objective standard, the two most recent Second Circuit cases failed to include the intent element in their description of the standard. See Holowecki v. Fed. Express Corp., No. 09-3477-cv, 2010 WL 2573864, at *2 (2d Cir. June 24, 2010) ("To establish constructive discharge, a plaintiff must show that the abusive working environment became so intolerable that her resignation qualified as a fitting response." (internal quotation marks omitted)); Fincher v. Depository Trust & Clearing Corp., 604 F.3d 712, 725 (2d Cir. 2010) ("[A] plaintiff must show working conditions so intolerable that a reasonable person would have felt compelled to resign." (internal quotation marks omitted)). This shift would be consistent with the approach of a number of other circuits. See, e.g., Poland v. Chertoff, 494 F.3d 1174, 1184 (9th Cir. 2007); EEOC v. PVNF, LLC, 487 F.3d 790, 806 n.10 (10th Cir. 2007); Vallecillo v. HUD, 155 F. App'x 764, 768 (5th Cir. 2005); Makowski v. PSEG Servs. Corp., No. Civ. A. 01-4574, 2005 WL 3216526, at *6 (D.N.J. Nov. 29, 2005). It would also be consistent with the purpose of Title VII—"that the workplace be an environment free of discrimination." Ricci v. DeStefano, 129 S. Ct. 2658, 2674 (2009).

[3] Here, it would be impossible for D'Angelo to show that Romer intended for her to quit. According to D'Angelo, Romer wanted her to remain at the WWE, so that he could continue to harass her. Unlike cases where an employer holds an animus that inspires a desire for distance from a member of a protected class, harassment cases like D'Angelo's involve the opposite desire—a wish for the member of the class to stay, subject of course to the sexual harassment.

to whether the employer "deliberately and discriminatorily created work conditions so intolerable that a reasonable person . . . would have felt compelled to resign." Ferraro v. Kellwood, 440 F.3d 96, 101 (2d Cir. 2006) (internal quotation marks omitted). A reasonable jury could find in this case that Romer did not act merely negligently, but deliberately and persistently acted to sexually harass D'Angelo to a point where the conditions were such that a reasonable person would resign.

In light of the record before it, the court finds that D'Angelo has presented sufficient evidence upon which a reasonable jury could find that she was constructively discharged from the WWE as a result of Romer's sexual harassment.

B.     Faragher/Ellerth Defense

The WWE argues that, even if D'Angelo's claims survive summary judgment, it cannot be held liable for Romer's activity. While an employer is generally found to be vicariously liable for the actions of its supervisory employees, the Supreme Court has recognized a defense to such liability. See Faragher v. City of Boca Raton, 524 U.S. 775, 807-08 (1998); Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998). As a preliminary matter, in order to invoke the Faragher/Ellerth defense, the WWE cannot have taken any tangible employment action against D'Angelo or, if it did, any tangible employment action must not have been a part of the supervisor's discriminatory harassment. See Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 103 n.3 (2d Cir. 2010) (citing Faragher, 524 U.S. at 808; Ellerth, 524 U.S. at 765). The court finds, as stated below, that D'Angelo has presented sufficient evidence to raise an issue of material fact as to whether the WWE has satisfied the requirements of the Faragher/Ellerth defense. Therefore, the court does not need to determine whether

13

D'Angelo has presented sufficient evidence to raise a material issue of fact as to whether she has experienced a tangible employment action.[4]

The Faragher/Ellerth defense has two components: (1) the WWE must have exercised reasonable care to prevent or correct promptly the harassing behavior and (2) D'Angelo must have unreasonably failed to take advantage of any preventative or corrective opportunities made available to her by the WWE. See Gorzynski, 596 F.3d at 103 (citing Faragher, 524 U.S. at 807; Ellerth, 524 U.S. at 765). For the reasons below, the court finds that D'Angelo has presented sufficient evidence to create an issue of material fact as to whether the WWE took reasonable care and whether D'Angelo reasonably availed herself of the preventative and corrective opportunities presented to her. Therefore, D'Angelo's claims withstand summary judgment.

        1.      Reasonable Care to Prevent or Correct Promptly

Generally, the provision of "a reasonable avenue of complaint" is sufficient to satisfy the reasonable care requirement of the Faragher/Ellerth defense. In this case, the WWE presented evidence of an anti-harassment policy contained in its employee handbook. See World Wrestling Entertainment, Inc., Employee Handbook & Code of Business Conduct 12-14 ("WWE Employee Handbook"), Ex. C to L.R. 56(a)(1) Stmt. D'Angelo admitted at deposition to having received and signed this policy. D'Angelo Dep. at 70-71. However, an employer can still be held liable if the employee can show

---

[4] D'Angelo argues that she has experienced a tangible employment action by never being promoted. D'Angelo, however, only makes a general claim that she sought and never received a promotion. See D'Angelo Dep. at 39-41. Nowhere does she indicate that she officially applied for such a promotion, was qualified for it, or that she was actually denied it. See Lomotey v. State of Conn.—Dep't of Transp., 355 F. App'x 478, 480 (2d Cir. 2009) (setting forth the requirements of a prima facie case for failure to promote).

that it "knew, or should have known about the harassment yet failed to take remedial action." Duch v. Jakubek, 588 F.3d 757, 763 (2d Cir. 2009). Plaintiff must show that (1) an employee of the company has actual or constructive knowledge of the harassment, (2) this knowledge can be imputed to the employer, and (3) the employer's response was unreasonable. Id.

In this case, D'Angelo has provided sufficient evidence to create a material issue of fact as to whether other employees at the WWE were aware of Romer's harassing behavior. Satin, Schneider, and Sully all appear to have witnessed Romer touching D'Angelo inappropriately, and Satin and Schneider both verbally acknowledged what they saw. Archer's subordinate informed him of a similar event, at which point he approached D'Angelo who confirmed that what he was told was true. D'Angelo confided in both Richards and Yamuder, and Yamuder seems to have witnessed at least some of Romer's inappropriate communications.

An employee's knowledge will be imputed to the employer only when (1) the employee is of a sufficiently high level to qualify as a proxy for the company, (2) the official is charged with a duty to act on the information and stop the harassment, or (3) the employee is charged with a duty to inform the company of the harassment. Id. Based on the record, the court finds that there is sufficient evidence for a reasonable jury to find that at least one of the employees described above was charged with a duty to either act on or inform the WWE of Romer's harassment.

According to the WWE's anti-harassment policy, when any member of management receives a report of harassment, he or she is obligated to report the incident to Human Resources and an investigation is supposed to commence. See

15

WWE Employee Handbook 13. Of the employees described by D'Angelo as having been aware of Romer's behavior, two were vice presidents, two were directors, and one was a senior director. See discussion supra at 3-5. Another employee, Sully, was described in D'Angelo's deposition as a management-level employee, and the WWE has presented no evidence to rebut the same. See D'Angelo Dep. at 185-86. The court finds that there is sufficient evidence such that a reasonable jury could find that these employees were "members of management" under the WWE's policy, and that, therefore, their knowledge was imputable to the WWE.

Based on the evidence before the court, a reasonable jury could also find that the WWE acted unreasonably by failing to respond to this knowledge in any way. While the WWE did eventually fire Romer and offer D'Angelo a raise and a promotion, this was after two years of harassment and after D'Angelo had already made plans to move into a different job with a different company. A jury could reasonably find this after-the-fact remedy both unreasonable and inadequate.

        2.        Unreasonable Failure to Take Advantage of Preventative of Corrective Opportunities

A reasonable jury could similarly find that the WWE fails the second prong of the Faragher/Ellerth test. Rather than looking at the reasonableness of the WWE's response, this second step requires an examination of the reasonableness of D'Angelo's decisions.

D'Angelo conceded at her deposition that she received and signed the anti-harassment policy. The policy requires an employee to report any instances of harassment to Human Resources "or any other member of management." WWE

16

Employee Handbook 13.  The WWE argues that D'Angelo never officially reported Romer's behavior to any management-level employee.  However, a reasonable jury could find that D'Angelo directly reported Romer's behavior to at least two such employees, Richards, Director of Marketing, and Yamuder, Vice President in the Legal Department.  See discussion supra at 3-5.  She also had conversations with Satin, Schneider, and Archer, where they each acknowledged that they were aware of what was transpiring.  Many of these conversations appear to have been informal, and D'Angelo asked at least one of the managers—Archer—not to confront Romer about his behavior.  However, given that D'Angelo believed that no less than six management-level employees were aware of Romer's harassment, a jury could find that D'Angelo had reasonably taken advantage of the WWE's anti-harassment policy.  Cf. Gorzynski, 596 F.3d at 103, 105 (finding that plaintiff reporting only to her harassing supervisor was reasonable under a policy that required a victim to "bring [the alleged] conduct to the immediate attention of his or her supervisor, the People Department or any member of management").

A jury could also find that D'Angelo's decision to reject the raise and promotion that was offered to her just days before she was leaving the company was reasonable.  D'Angelo had already secured a job at another company, and she claims to have been so "humiliated" and "embarrassed" when everything came to light that she felt it would be better for her to start afresh at a new company.  D'Angelo Dep. at 84.  After two years of harassment that went unaddressed by the WWE and culminated in D'Angelo feeling threatened and abused, a jury could find that the rejection of a post-hoc remedy was a reasonable decision on her part.

## V. CONCLUSION

For the foregoing reasons, the court denies Defendant's Motion for Summary Judgment (Doc. No. 36).

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 15th day of October, 2010.

                                          /s/ Janet C. Hall  
                                          Janet C. Hall  
                                          United States District Judge